# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

Docket No. 25-1380

---

JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,

Plaintiffs/Appellants,

v.

TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police, MICHAEL d'ENTREMONT, in his official capacity as Chief of Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,

Defendants/Appellees.

---

## STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTIVE RELIEF PENDING APPEAL

## INTRODUCTION

Plaintiffs filed a civil action in the District Court seeking to enjoin

enforcement of the modest expansion of a buffer-zone order issued by a

1

Massachusetts Superior Court judge for the *Commonwealth v. Karen Read* murder trial.[1] Their two-count complaint under 42 U.S.C. § 1983, alleged that the buffer-zone order violated their First Amendment free speech rights and their Fourteenth Amendment due process rights. The state-court trial judge, Beverly J. Cannone, issued the buffer-zone order on March 25, 2025, following a hearing on the issue in open court. The order modestly expands a previous buffer-zone order that was issued by Judge Cannone before the first trial, which took place in 2024 and ended in a mistrial. The first buffer-zone order was upheld by the Massachusetts Supreme Judicial Court (SJC) against a First Amendment challenge in *Spicuzza v. Commonwealth*, 494 Mass. 1005, 232 N.E.3d 145 (2024) (per curiam).

On April 11, 2025, the District Court (Joun, J.) denied Plaintiffs' motion for a temporary restraining order or preliminary injunction to bar enforcement of the second buffer-zone order, prompting this appeal. Now, on the eve of trial,[2] Plaintiffs seek to have this Court belatedly enjoin the second buffer-zone order under Fed. R. App. P. 8(a)(2). For the reasons set forth below, their request should

---

[1] This Opposition if filed on behalf of the State Defendants: The Trial Court of the Commonwealth of Massachusetts and the following state officials sued in their official capacities -- the Hon. Beverly J. Cannone, The Colonel of the Massachusetts State Police Geoffrey Noble, and Norfolk County District Attorney Michael W. Morrissey.

[2] Opening Statements in Ms. Read's trial are scheduled to begin on Tuesday, April 22, 2025. https://www.usatoday.com/story/news/nation/2025/04/16/karen-read-murder-trial-what-is-next/83113955007/ (last accessed on April 20, 2025).

be denied.  In particular, Plaintiffs have failed to make the requisite "strong showing,"[3] needed to demonstrate a likelihood of success on the merits of their claims, given that the second buffer-zone order is content-neutral and does not restrict speech based on its message, it is narrowly tailored to restrict noise from infringing on Ms. Read's Sixth Amendment right to a fair trial, and it leaves open adequate speech alternatives.  Plaintiffs have also failed to make the requisite showing with respect to their Due Process claim, given that Judge Cannone permissibly exercised her inherent authority to protect Ms. Read's Sixth Amendment right to a fair trial, that she held a hearing in open court before entering her order, that she considered materials submitted by non-parties in which they conveyed their views about a buffer zone, and Plaintiffs had available to them other state-court remedies for challenging the buffer-zone order, e.g., filing a petition for judicial review under Mass. G.L. c. 211, § 3.  Finally, as to both claims, Plaintiffs have failed to show a threat of irreparable harm.

## BACKGROUND

### I.    STATE COURT PROCEEDINGS[4]

In March 2024, during the first state-court trial in *Commonwealth v. Karen Read*, the Commonwealth moved for an order barring demonstrations within a

---

[3] *Together Emps. v. Mass Gen. Brigham, Inc.*, 19 F.4th 1, 7 (1st Cir. 2021).
[4] References to entries on the District Court's docket shall be made as Dkt. No. __ at __.  References to Plaintiffs' motion for an injunction pending appeal, filed in this Court, will be made as Pl. Mot. at __.

3

buffer zone of 500 feet around the Dedham courthouse complex and prohibiting certain items from being worn or displayed inside the courthouse.[5]  A group of individuals moved to intervene in the case to oppose the Commonwealth's request.[6]  And the American Civil Liberties Union of Massachusetts, Inc. ("ACLUM") sought leave to file an amicus curiae memorandum, essentially opposing the request.[7]  Ms. Read took no position on the matter.[8]

Following a hearing, the Superior Court denied the motion to intervene, granted the ACLUM leave to submit its memorandum (which the court noted it had read), and granted the request for a buffer zone but only in part, instead ordering a smaller buffer zone, such that:

> No individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court.  This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting . . . [and] . . . no individuals will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial.  Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.[9]

---

[5] Commonwealth's Motion for Buffer Zone and Order Prohibiting Signs or Clothing in Favor of Either Party or Law Enforcement, at 2 (Dkt. 1-3).
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.* at 2 (quoting the first buffer-zone order).

4

The individuals who had been denied permission to intervene then filed a petition for extraordinary relief pursuant to Mass. Gen. Laws c. 211, § 3, challenging the trial court's denial of their motion to intervene as well as the buffer zone itself.[10]  In addition, an association of individuals who wanted to demonstrate within the buffer zone filed a petition for relief under the same statute.[11]  The Commonwealth opposed both petitions, while Ms. Read again took no position.[12]

On April 12, 2024, a single justice of the SJC denied both petitions.[13]  Characterizing the Superior Court's decision on the motion to intervene as "an ordinary procedural ruling," he concluded that it did not warrant the exercise of the SJC's extraordinary power of superintendence and denied relief as to that aspect of the first petition.[14]  Moving to the merits and noting "that the petitioners ha[d] standing to challenge the buffer zone order pursuant to G. L. c. 211, § 3, where they allege[d] that the buffer zone order infringes their First Amendment rights," the single justice determined that the buffer zone was a content-neutral and

---

[10] *Id*.  Chapter 211, section 3 of the Massachusetts General Laws confers upon the Supreme Judicial Court "a general superintendence power that permits, among other things, review of interlocutory matters in criminal cases only when substantial claims of irremediable error are presented and only in exceptional circumstances, where it becomes necessary to protect substantive rights." *Read v. Norfolk Cnty. Superior Ct.*, No. 25-1257, -- F.4th --, 2025 WL 926289, at *1 (1st Cir. Mar. 27, 2025) (quotations and ellipses omitted).

[11] Dkt. No. 1-3, at 2-3.

[12] *Id*. at 3.

[13] *Id*. at 3; Dkt No. 22 at 17-24.

[14] *Id*. at 21.

reasonable time-place-and-manner restriction that was narrowly tailored to a significant government interest and that left open ample alternative avenues for communication.[15]

The petitioners then appealed the single justice's rulings to the full SJC.[16] Again, the Commonwealth opposed relief, and Ms. Read took no position.[17]  On April 26, 2024, the SJC issued an order affirming the single justice's judgment, and it issued an explanatory opinion on May 2, 2024.[18]  494 Mass. 1005, 232 N.E.3d 145 (2024) (per curiam).  The SJC held that the single justice did not commit an error of law or abuse his discretion in deciding that the intervention request did not warrant the exercise of the court's extraordinary superintendence power.[19]  And as to the petitioners' constitutional arguments, the SJC concluded that the buffer zone was content-neutral, not a prior restraint, narrowly tailored to serve a significant government interest, and permitted adequate alternative means of communication.[20]

The SJC having upheld the buffer zone, Ms. Read's trial continued, "spanning eight weeks of evidence, [and] involving seventy-four witnesses and

---

[15] *Id*. at 21-24 & n. 7.
[16] Dkt. No. 1-3, at 3.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

657 exhibits."[21]  The 200-foot buffer zone adequately prevented any

demonstrations on the southern, eastern, and northern sides of the courthouse

complex from interfering with the proceedings inside the courthouse.[22]  The

western side of the courthouse, however, was different.  On that side, there are

larger open spaces that extend beyond 200 feet from the courthouse.[23]  Groups of

demonstrators gathered in those areas and engaged in coordinated shouting and

chanting, which shouts and chants could be heard inside the courthouse.[24]  In

addition, despite the 200-foot buffer zone, individuals were able to position

themselves close enough to nearby streets such that they were able to encourage

passenger and commercial vehicles to honk their horns as a form of

demonstration.[25]  The honking, especially from the airhorns of commercial

vehicles, could easily be heard inside the courthouse.[26]  The Massachusetts State

Police issued more than two dozen citations for horn violations and other motor-

vehicle offenses in connection with the trial.[27]

---

[21] *Read v. Commonwealth*, 495 Mass. 312, 313, 250 N.E.3d 551 (2025) (affirming trial court's denial of defendant's motion to dismiss after court declared a mistrial).
[22] Dkt. No. 1-3, at 5.
[23] *Id.*
[24] *Id.* at 6.
[25] *Id.*
[26] *Id.*
[27] *Id.*

At the conclusion of the evidence, the jury deliberated for five days.[28]  They could hear the protesters yelling and screaming during deliberations.[29]  They sent progressively insistent notes to the judge about their inability to reach a unanimous verdict.[30]  In their third and final note, "the jury stated that 'some members firmly believed that the evidence surpasses the burden of proof establishing the elements of the charges,' while others did not."[31]  "They described their views as rooted in 'sincere adherence to their individual principles and moral convictions,' and stated that further deliberation would be 'futile' and would 'force them to compromise these deeply held beliefs.'"[32]  After receiving the final note, the judge declared a mistrial.[33]  The Commonwealth then elected to re-try Ms. Read on the charges.

In advance of Ms. Read's retrial, on March 17, 2025, the Commonwealth filed a motion asking the court to impose a buffer zone and prohibit individuals from wearing or exhibiting in the courthouse any buttons, photographs, clothing, or insignia relating to the case or to any trial participant.[34]  The Commonwealth proposed that the buffer zone include the same 200-foot area around the courthouse

---

[28] *Read*, 495 Mass. at 313, 250 N.E.3d at 554.
[29] Dkt. No. 1-3, at 6.
[30] *Read*, 495 Mass. at 313, 250 N.E.3d at 554.
[31] *Id*. (brackets and ellipsis omitted).
[32] *Id*. (brackets omitted).
[33] *Id.*
[34] Dkt. No. 1-3, at 1.

complex that was in place during the first trial, as well as an area encompassed within four streets on the western side of the courthouse.[35]

On March 25, 2025, after a hearing, the court granted the Commonwealth's motion.[36]  The court found that a buffer zone was appropriate because, among other reasons, when proceedings in the case are taking place, "individuals line the sidewalks outside the courthouse, loudly chanting and voicing their opinions about witnesses, attorneys, and the strength of the Commonwealth's case."[37]  These individuals, the court found, also "display matters which may be in evidence during the trial or share their viewpoints as to the guilt or innocence of [Ms. Read] on their clothing or signage."[38]  If prospective or sitting jurors were exposed to such protesters or messages, the court concluded that Ms. Read's "right to a fair trial will be jeopardized."[39]  Further, the court determined that a modest expansion of the buffer zone was necessary.  It noted that during the first trial, demonstrators outside the 200-foot buffer on the western side of the courthouse "could be clearly heard inside the courthouse."[40]  The court also acknowledged the Commonwealth's concern about the honking from passing vehicles that could "be heard frequently

---

[35] *Id.*
[36] Dkt. No. 1-4, at 4; https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 (last accessed on Apr. 19, 2025).
[37] Dkt. No. 1-4. at 3.
[38] *Id.*
[39] *Id.*
[40] *Id.*

during the first trial."[41]  Additionally, the court cited the facts that a deliberating

juror reported being able to hear protesters "screaming and yelling" during

deliberations, and that a "group of local business owners and organizations" had

sent to the court a "list of concerns" that arose from "issues" they had experienced

during the first trial.[42]  The retrial began with jury selection in the Superior Court

on April 1, 2025.

## II.    FEDERAL COURT PROCEDURAL HISTORY

Plaintiffs filed the instant civil action on April 1, 2025.[43]  The complaint

named as defendants: the Trial Court of Massachusetts; Superior Court Justice

Beverly Cannone, who entered the buffer-zone order; Geoffrey Noble, the Colonel

of the Massachusetts State Police; Michael d'Entremont, the chief of police in

Dedham, Massachusetts; and Michael Morrissey, the District Attorney in Norfolk

County.[44]  The complaint contained two counts seeking declaratory and injunctive

relief:  the first was that the buffer-zone order restrained Plaintiffs' free speech

rights in violation of the First Amendment; the second was that the buffer-zone

order violated Plaintiffs' due process rights insofar as the court (1) had no legal

---

[41] *Id.*

[42] *Id.*

[43] Dkt. Nos. 1, 2, 3.

[44] Dkt. No. 1.

authority to enter it and (2) failed to afford Plaintiffs notice and an opportunity to be heard before entering it.[45]

Along with their complaint, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction.[46]  The next day, the District Court set a hearing on the motion for April 4, 2025.[47]  In advance of the hearing, the State Defendants (meaning all but Chief d'Entremont) filed a written opposition to Plaintiffs' motion and an affidavit, attached to which were certain relevant portions of the state-court record.[48]  At the hearing, the District Court heard from both sides and called for supplemental briefing, which was due the following week.[49]  On April 11, 2025, the day after the parties submitted their supplemental briefing, the District Court entered a memorandum and order, denying Plaintiffs' motion for a temporary restraining order.[50]  The Court concluded that Plaintiffs had failed to show a likelihood of success on either of their two claims.[51]  In an electronic order issued shortly thereafter, the District Court clarified that, to the extent Plaintiffs' motion sought a preliminary injunction, such relief was denied as well.[52]

---

[45] Dkt. No. 1 at 7-10.
[46] Dkt. Nos. 2, 3.
[47] Dkt. No. 8.
[48] Dkt. No. 21.
[49] Dkt. No. 28.
[50] Dkt. No. 38.
[51] Dkt. No. 38 at 3-11.
[52] Dkt. No. 40.

Nearly one week later, Plaintiffs filed a notice of appeal and moved for an injunction (barring enforcement of the buffer-zone order), pending the outcome of their appeal in this Court.[53]  The District Court denied the motion for injunctive relief, and the appeal was docketed in this Court on April 17, 2025.[54]  Late the following day, Plaintiffs moved in this Court for an injunction barring enforcement of the buffer-zone order pending appeal.  The State Defendants here submit their response to that request.

## ARGUMENT

Pursuant to Fed. R. App. P. 8(a)(2), Plaintiffs seek an emergency injunction pending appeal.  "To be entitled to an injunction pending appeal, [Plaintiffs] must make a strong showing that they are likely to succeed on the merits, that they will be irreparably injured absent emergency relief, that the balance of the equities favors them, and that an injunction is in the public interest."  *Together Emps.*, 19 4.th at 7 (citing *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).  "The first two factors are the most important."  *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  "If the appellants cannot demonstrate irreparable harm, [the court] need not discuss the other factors."  *Id.*

---

[53] Dkt. Nos. 43, 44, 45.
[54] Dkt. No. 46.

## I.   PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs have failed to make a strong showing that they are likely to succeed on the merits.  For that reason alone, their motion should be denied.

### A. **Plaintiffs' First Amendment Claim Fails Because the Buffer Zone is a Content-Neutral Time, Place, and Manner Regulation That Survives the Applicable Level of Scrutiny.**

In a public forum, the regulation of the time, place, and manner of speech is permissible if it is (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leaves open adequate alternatives for communication. *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 27 (1st Cir. 2002) (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 n.3 (2002)).  For the reasons that follow, Plaintiffs fail to meet their burden to show that any of these elements are not satisfied.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1.  The Order Is Content Neutral.

The District Court correctly concluded that the second buffer-zone order is content-neutral.  Dkt. No. 38 at 6.  Plaintiffs cannot show that the state Superior Court adopted "a regulation of speech because of disagreement with the message it conveys." *See Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).  The buffer-zone order restricts any individual from "demonstrat[ing] in any manner, including carrying signs or placards within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court."  Dkt. 1-4 (Pl.

13

Exhibit C), at 3.  This restriction is not based on any particular message the speech conveys.  *See Coalition to Protest Democratic Nat'l Convention v. City of Boston*, 327 F. Supp. 2d 61, 70 (D. Mass. 2004) (holding restriction against parades in specific zone, which "applie[d] to all parades, regardless of content, let alone viewpoint" was content-neutral).  Regardless of whether a demonstrator wants to convey a message supporting Ms. Read, supporting the Commonwealth, or supporting a cause unrelated to Ms. Read's trial, their speech is equally restricted.  This is the very definition of content-neutral.  *See Ward*, 491 U.S. at 791 (regulation is content-neutral if it is "justified without reference to the content of the regulated speech"); *see also March v. Mills*, 867 F.3d 46, 49-50, 55-56 (1st Cir. 2017) (concluding noise provision that prohibited a person from making noise heard within abortion clinic when noise is made with the intention to either jeopardize health of individuals receiving health services within the building or to interfere with safe and effective delivery of health service was content-neutral).

A determination that the second buffer-zone order is content-neutral would be consistent with the SJC's decision upholding the first buffer-zone order entered before Ms. Read's first trial.  Specifically, the SJC held that because any protesters in support of Ms. Read or in support of the Commonwealth would be equally subject to restrictions of the buffer zone, the order was "'justified without reference to the content of the regulated speech.'"  *Spicuzza*, 494 Mass. at 1007, 232 N.E.3d

14

at 148 (quoting *Ward*, 491 U.S. at 791).  Moreover, in response to the argument

that the buffer zone was not content-neutral because commercial speech was still

allowed, the SJC noted that it is permissible for a regulation to have an incidental

effect on some speakers and not others.  *See Spicuzza*, 494 Mass. at 1007, 232

N.E.3d at 148 (quoting *Ward*, 491 U.S. at 791).  On these grounds, the SJC

concluded that the first buffer-zone order was content-neutral, just as this Court

should conclude with respect to the second buffer-zone order.

In addition, the Supreme Court has said that a law is content-based if it

"applies to particular speech because of the topic discussed or the idea or message

expressed," which "requires a court to consider whether a regulation of speech 'on

its face' draws distinctions based on the message a speaker conveys."  *Reed v. City

of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  "Some facial distinctions based on a

message are obvious, defining regulated speech by particular subject matter, and

others are more subtle, defining regulated speech by its function or purpose."  *Id.*

The buffer-zone order does not violate any of these principles.  As noted, it bars all

demonstrations within 200 feet of the courthouse regardless of whether the

demonstrator conveys a message supporting Ms. Read, against her, or on any topic

unrelated to the trial.  The order makes no distinction based on the "topic discussed

or the idea or message expressed."  *Id.*  Anyone demonstrating not only regarding

the Read trial, but also on any other topic—*i.e.*, without regard to the topic or

15

message—may not do so within the buffer zone.  And it does not regulate speech with respect to its "function or purpose."  Regardless of the speech's function or purpose, any form of protesting around the courthouse is subject to the buffer zone. *Contrast id.* at 164 (municipal ordinance was content-based where it subjected different kinds of signs—those "directing the public to church or some other 'qualifying event'"; signs "designed to influence the outcome of an election"; and "ideological signs" that "communicate [certain] message[s] or ideas"—to different form of regulations depending on which category it fell into).[55]

### 2. The Order Furthers A Compelling Government Interest And Is Narrowly Tailored.

The Superior Court established the buffer zone "to ensure [Ms. Read's] right to a fair trial."  Dkt. 1-4, at 2.  The right to a fair trial has long been recognized as a compelling state interest.  "Courts have agreed that protecting the right to a fair criminal trial by an impartial jury whose considerations are based solely on record evidence is a compelling state interest." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999) (citing, among other cases, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991), and *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966)). *Contrast*

---

[55] Even if this Court were to disagree and conclude that the second buffer-zone order creates content-based restrictions, Plaintiffs still have failed to make a strong showing of a likelihood of success because, as explained *infra*, the order "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171.

*McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 189 (D. Mass. 2015) (ordinance did not survive strict scrutiny because "promotion of tourism and business has never been found to be a compelling government interest for the purposes of the First Amendment"). Indeed, "[t]he Supreme Court has recognized the government's interest in 'protecting its judicial system from the pressures which picketing near a courthouse might create.'" *O'Neil v. Canton Police Dep't*, No. 23-cv-12685-DJC, 2023 WL 7462523, at *4 (D. Mass. 2023) (quoting *Cox v. Louisiana*, 379 U.S 559, 562 (1965)). [56]

---

[56] In *Cox*, 379 U.S. at 562, the Court observed:

> There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy. *See Wood v. Georgia*, 370 U.S. 375, 383 (1962). The constitutional safeguards relating to the integrity of the criminal process attend every stage of a criminal proceeding, starting with arrest and culminating with a trial 'in a courtroom presided over by a judge.' *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963). There can be no doubt that they embrace the fundamental conception of a fair trial, and that they exclude influence or domination by either a hostile or friendly mob. There is no room at any stage of judicial proceedings for such intervention; mob law is the very antithesis of due process. *See Frank v. Mangum*, 237 U.S. 309, 347 (1915) (Holmes, J., dissenting). A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence. A narrowly drawn statute such as the

Here, the Superior Court's order, as set forth in the memorandum of
decision, Dkt. 1-4, at 2-3, is carefully and narrowly tailored to modestly expand the
buffer zone on the west side of the courthouse based on the real-world experience
of noise and activity outside the courtroom impacting the sanctity of the
deliberations and proceedings inside the courthouse during the first trial.  The
judge expressly concluded that "[t]o ensure a fair trial with an impartial jury,
extending the buffer zone is necessary to prevent jurors from outside influence and
to prevent interruptions and distractions during trial." Dkt. 1-4, at 2-3.  And the
Superior Court narrowly tailored its modest extension of the buffer-zone order to
prevent noise that might, based on its experience in the first trial in the same
courtroom, interfere with a jury maintaining their impartiality.  Shouting heard
inside the courtroom and in the jury room, as well as honking from passing
vehicles, reportedly disrupted the jury's deliberations in the first trial.  *See* Dkt. No.
38 at 7-8 (District Court's order, noting the Superior Court's findings concerning
noise problems during the first trial and explaining why second buffer-zone order
was narrowly tailored).  *See generally Picard v. Magliano*, 42 F.4th 89, 104 (2d
Cir. 2022) ("The State would clearly have a compelling interest, for example, in

---

one under review is obviously a safeguard both necessary and
appropriate to vindicate the State's interest in assuring justice under
law.

prohibiting protests outside a courthouse featuring amplified calls for the jurors to reach a particular verdict in an ongoing trial in that courthouse that are audible inside the courtroom.").

Faced with the unique circumstances presented by the *Read* case and the experience of what occurred during the first trial, it is hard to envision how the judge could have more narrowly tailored the order to be "the least restrictive means among available, effective alternatives." *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 666 (2004).  In fact, the judge tried other available alternatives, rejected a broader 500-foot buffer zone that the Commonwealth had requested, and based on the real-world experience of the first trial, determined, in essence, that there were no "effective alternatives" to a modest expansion of the buffer zone to ensure the sanctity of the trial.  *Id*.  There is, thus, a "close fit between the ends [i.e., protecting Mr. Read's right to a fair trial] and the means" [i.e., the modestly expanded buffer-zone order] that ensures that Plaintiffs' First Amendment rights have not been "too readily 'scarific[ed] [] for efficiency.'" *McCullen v. Coakley*, 537 U.S. 464, 486 (2014) (quoting *Riley v. National Federation of Blind N.C., Inc.*, 487 U.S. 781, 795 (1988)).

Furthermore, in addition to the reasoning set forth by the judge in the March 25, 2025, memorandum of decision and order as discussed above, the judge also incorporated the reasons that compelled her to enter the buffer-zone order in Ms.

Read's first trial. Dkt. 1-4, at 1 (stating that "[f]or the reasons that compelled the Court to establish a buffer zone for the first trial, it is necessary to establish a buffer zone for the second trial to ensure the defendant's right to a fair trial"). Those reasons included, among other things: (1) "Individuals . . . displaying materials which may or may not be introduced into evidence during trial"; (2) "[D]isplaying materials . . . airing their opinions as to the guilt or innocence of the defendant on their clothing or signage"; and (3) "Witness intimidation." Dkt. 1-2, at 2. Again, in light of these additional reasons, it is hard to envision how the judge could have crafted a more narrowly-tailored order.

Before the District Court, Plaintiffs' counsel waived Plaintiffs' challenge to the portions of the buffer-zone order relating to noise. Dkt. 31, at 26 ("[W]e are waiving any argument that noise is something that we're seeking you to allow us to engage in"). Thus, before the District Court, their challenge was limited to only that portion of the order that would impact their ability to "stand on public sidewalks [] holding signs." *Id.*, at 25. Plaintiffs fail to mention this concession in their motion. But they do appear to suggest that a "quiet rule" and jury instructions would be a more narrowly tailored means ensuring a fair trial. Pl. Mot. at 10-11. Plaintiffs overlook the problem of noise being created in response to Plaintiffs' signs or their physical gestures while they quietly protest. The Superior Court expressly concluded that the modest expansion of the first buffer zone was

necessitated by the problem posed by "[v]ehicles honking their horns *in response to signs and gestures from [] demonstrators* [that] could [] be heard frequently during the first trial." Dkt. 1-4, at 3 (emphasis added).[57]  Because jurors would be aware that this unusual and incessant honking is a result of strong outside opinions about the murder trial on which they are sitting, it could affect their ability to be impartial or cause unnecessary disruptions to, or interference with, the ongoing proceedings.  *See* Dkt. 22, at 29 (affidavit of anonymous juror from first trial); Dkt. 22, at 31 ("I am frightened for my personal safety as a result of learning that someone associated with this case has been criminally charged with intimidation."); Dkt. 22, at 32 ("If someone is going to attack a sitting judge, I see no reason why they would not demean and attack, verbally and physically, a juror who sat on this jury."), Dkt. 22, at 33-34 (describing actions of journalist who "harass[ed] witnesses to the case, including by organizing crowds of people to harass them outside their homes" and made public statements "to the effect of, murderers, *and those who cover for them*, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe" (emphasis in

---

[57] In its initial buffer-zone order for the first trial, Dkt. 1-2, at 3, and then again in its buffer-zone order for the retrial, Dkt. 1-4, at 3, the Superior Court was also appropriately mindful that even signs held by protesters could affect Ms. Read's right to a fair trial if they were viewed by jurors or witnesses entering or approaching the courthouse, or by such individuals from within the courthouse. Such signs could introduce extraneous influences just like noise.  Any argument by Plaintiffs minimizing that risk is without merit.

affidavit)). Plaintiffs do not even suggest an effective alternative to the modest expansion of the buffer zone to address the problem posed by horn-honking caused by quiet demonstration that interrupted and disturbed the first trial and would likely do so again during the current trial absent the court's modest expansion of the buffer zone. *Ashcroft*, 542 U.S. at 666. The Superior Court chose the narrowest path to protect Ms. Read's right to a fair trial. *McCullen*, 537 U.S. at 486.

Finally, cases cited by Plaintiffs such as *United States v. Grace*, 461 U.S. 171 (1983), are distinguishable. Pl. Mot. at 11. *Grace* dealt with restrictions on speech on public sidewalks bounding the United States Supreme Court plaza. In concluding that the statutory provision at issue there violated the First Amendment, the Court expressly noted that there had been "no suggestion . . . [that the expressive] activities [at issue] in any way obstructed the sidewalks or access to the Building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds." *Grace*, 461 U.S. at 182. Here, by sharp contrast, there is evidence in the record that demonstrations *did* interfere with the orderly function of the first Superior Court trial, and in particular, the basic functioning of Ms. Read's first trial.

In sum, for at least the reasons set forth above, the buffer-zone order is narrowly tailored.

22

### 3.    Plaintiffs Have Adequate Speech Alternatives.

Where plaintiffs have access to numerous speech alternatives, they are unlikely to succeed on the merits. *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007) (noting court has upheld "alternative means of communication despite diminution in the quantity of speech, a ban on a preferred method of communication, and a reduction in the potential audience"). Here, demonstrators are not prevented from gathering near the courthouse but simply from gathering in the narrow range where the sound of demonstrations could affect the proceedings inside the courthouse. *See Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1225 (10th Cir. 2007) (plaintiffs "were sufficiently able to communicate their message even though they had no close, physical interaction with their intended audience"). As the SJC noted in its decision on the earlier buffer-zone order, the limited nature of the buffer zone leaves open "ample alternative channels for communication of the information." *Spicuzza*, 494 Mass. at 1008, 232 N.E.3d at 149 (quotation marks omitted).

In conclusion, the buffer-zone order is content-neutral because it does not restrict speech based on the demonstrators' message. But even if this Court disagrees, the buffer-zone order furthers the compelling interest of protecting Ms. Read's right to, and the public's interest in, a fair trial and impartial jury, and it is narrowly tailored to achieve that end. Lastly, the order leaves open alternatives,

such as the ability of demonstrators to convey their message in any area other than the limited area proscribed by the order.  Given these circumstances, Plaintiffs cannot demonstrate that they are likely to succeed on the merits of their First Amendment claim.

**B.**     **Plaintiffs' Due Process Claim Fails.**

There is no merit to Plaintiffs' Fourteenth Amendment Due Process Clause claim.  That claim appears to be bipartite, with one argument being that the Superior Court had no authority to enter the order and the other being that Plaintiffs were not afforded an opportunity to be heard on or challenge the buffer-zone order in the state courts.  Both are wrong.

As to the first, the SJC has recognized for over a century that the state courts have the power—and indeed, obligation—to take steps to ensure that a criminal defendant has a fair trial.  *Crocker v. Justices of Superior Ct.*, 208 Mass. 162, 178–79, 94 N.E. 369, 376–77 (1911).  In *Crocker*, the SJC observed:

> It is inconceivable that the people who had inherited the deeply cherished and hardly won principles of English liberty and who depleted their resources in a long and bloody war to maintain their rights of freemen, should have intended to deprive their courts of the power to secure to every citizen an impartial trial before an unprejudiced tribunal. . . .  There can be no justice in a trial by jurors inflamed by passion, warped by prejudice, awed by violence, menaced by the virulence of public opinion or manifestly biased by any influences operating either openly or insidiously to such an extent as to poison the judgment and prevent the freedom of fair action.  Justice cannot be assured in a trial where other considerations enter the minds of those who are to decide than the single desire to ascertain and

24

> declare the truth according to the law and the evidence. A court of general jurisdiction ought not to be left powerless under the law to do within reason all that the conditions of society and human nature permit to provide an unprejudiced panel for a jury trial. Without such a power it might become impossible to do justice either to the general public or to the individual defendant.

*Id.* The SJC has reaffirmed its adherence to these principles time and again, including recently. *See*, *e.g.*, *Matter of an Impounded Case*, 491 Mass. 109, 119-20, 199 N.E.3d 435, 445 (2022) ("We recognize that extraordinary fact patterns may require courts to exercise their inherent authority to ensure fair trials, promulgate rules, and administer the courts. Courts have the inherent power to do whatever may be done under the general principles of jurisprudence to insure to the citizen a fair trial, whenever his or her life, liberty, property or character is at stake." (quotations and brackets omitted)). The SJC's view in this regard is not novel. Courts around the nation have recognized similar principles. *See*, *e.g.*, *Picard*, 42 F.4th at 103 ("'[I]t is the utmost importance that the administration of justice be absolutely fair and orderly. . . . A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence.'" (quoting *Cox*, 379 U.S. at 562)); *see also Shephard v. Maxwell*, 384 U.S. 333, 358 (1966) ("[T]he courtroom and the courthouse premises are subject to control of the court."); *Wainwright v. Lockhart*, 80 F.3d 1226, 132 (8th Cir. 1996) ("State judges have broad discretion to take security

measures in state courthouses.").[58]  And in the context of a case involving a claim of an extraneous influence in a criminal trial, the Supreme Court itself noted, "Due process means a jury capable and willing to decide the case solely on the evidence before it, and *a trial judge ever watchful to prevent prejudicial occurrences* and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982) (emphasis added).

    As for the second prong of Plaintiffs' due process claim, it is based on the flawed factual premise that they had no opportunity to be heard by the Superior Court.  In fact, the Superior Court held a public hearing on the Commonwealth's buffer-zone motion.  https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 (last accessed on Apr. 19, 2025).  Other members of the public submitted concerns to the Superior Court which were considered by the Court.  *Id.  See also* Dkt. No.

----

[58] Plaintiffs' suggestion that the State Defendants failed to engage with their due process claim, Pl. Mot. at 13, is inconsistent with the record, Dkt. No. 21 at 14-15 ("There is also no merit to Plaintiffs' Fourteenth Amendment Due Process Clause claim.").  Plaintiffs' position below and before this Court appears to be that the Superior Court had no authority to issue the second buffer-zone order because they were not given notice and an opportunity to be heard.  Pl. Mot. at 14-15.  The State Defendants explained why the premise of that argument was flawed.  In any event, Plaintiffs' waiver argument overlooks the well-established principle that this Court is "free to affirm a district court's decision on any ground supported by the record even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below."  *Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir. 1984).  *Muniz v. Rovira*, cited by Plaintiffs (Pl. Mot. at 13), does not compel a contrary conclusion; it simply instantiates the equally well-established principle that the waiver doctrine will apply when *an appellant* raises new arguments on appeal to seek *reversal* of a lower court's decision.  373 F.3d 1, 4 (1st Cir. 2004).

22 at 58-59.  Plaintiffs point to no evidence that they tried to raise their concerns with the Superior Court and were denied a hearing, as the District Court ably noted.  Dkt. No. 38 at 9-10.  Instead, they point to the fact that the Superior Court did not permit certain protesters to intervene in the first criminal trial for purposes of challenging the buffer-zone order that had been entered at that time.  Pl. Mot. at 16.  While it is true that the Superior Court did not permit the protesters to intervene, that is because, under Massachusetts state law, intervention is a "concept foreign to criminal procedure." *Republican Co. v. Appeals Court*, 442 Mass. 218, 227 n.14, 812 N.E.2d 887, 895 (2004).  The Superior Court judge at the first trial did, however, "acknowledge[ ] the individual petitioners' motion to intervene," "not[ed] that she had read the motion papers and was not going to hear from counsel in connection with that motion," and "allowed the American Civil Liberties Union of Massachusetts to submit an amicus brief and indicated that she had read the amicus brief and did not need to hear from counsel." *Spicuzza*, 494 Mass. at 1006, 232 N.E.3d at 147.  These are not the actions of a judge who was disinterested in the points of view of those who took the initiative to share them.  And Plaintiffs had an available appellate-level remedy, too.  After all, the Single Justice who ruled on the challenge to the buffer zone in Ms. Read's first trial unambiguously stated that "the petitioners [there] ha[d] standing to challenge the buffer zone order pursuant to G. L. c. 211, § 3, where they allege[d] that the buffer

27

zone order infringe[d] their First Amendment rights."  Dkt. 22, at 20, n.7.  On

appeal from the Single Justice's order, the full SJC did not signal that the Single

Justice's ruling in that regard was wrong.  *Spicuzza*, 494 Mass. at 1007, 232 N.E.3d

at 148.  Opportunities to be heard were available; Plaintiffs simply opted not to

avail themselves of them.  Accordingly, they have no likelihood of success on the

merits of their due process claim.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY WILL SUFFER IRREPARBLE HARM.

Plaintiffs have likewise failed to make a strong showing that they will suffer

irreparable harm.  Plaintiffs' claims of irreparable harm requiring an immediate

injunction are undermined by their having waited, before filing their suit in the

District Court, for almost two weeks after the Commonwealth first moved for the

entry of the buffer zone and a week after the issuance of the state court's order on

March 25, 2025.  It is further undermined by their having waited a week after the

District Court denied their motion for a temporary restraining order and

preliminary injunction to ask this Court for a stay pending appeal.  *Cf. Citibank,*

*N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (vacating preliminary

injunction, where 10-week delay by plaintiff in seeking injunction after learning of

defendant's alleged wrongdoing undermined claim of irreparable harm).  As a

result, "the failure to act sooner undercuts the sense of urgency that ordinarily

accompanies a motion for preliminary relief and suggests that there is, in fact, no

irreparable injury." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 35 (1st Cir. 2011). Here, Plaintiffs fail to convincingly explain their delay in seeking relief. This delay undermines Plaintiffs' claim of irreparable harm. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (plaintiffs' "cries of urgency are sharply undercut by [their] own rather leisurely approach to the question of preliminary injunctive relief").

Further, Plaintiffs' additional delay in seeking an injunction pending appeal also undermines their claim for emergency relief from this Court. This Court "do[es] not lightly grant emergency relief, especially where the ''emergency'' is largely one of [plaintiff's] own making' and the relief sought would interfere with processes on which many others have reasonably relied." *Boston Parent Coal. for Acad. Excellence Corp. v. School Comm. of City of Boston*, 996 F.3d 37, 50 (1st Cir. 2021) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010). These principles, as applied in election cases, have force here, too. *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam) (explaining that the requirement that a party seeking injunctive relief "must generally show reasonable diligence" applies "in election law cases as elsewhere").

Entering injunctive relief on the literal eve of the opening statements in Ms. Read's criminal trial would likely disrupt the start of Ms. Read's trial and jeopardize her right to fair trial by an impartial jury. Plaintiffs' week-long delay in

29

seeking emergency injunctive relief means that entering injunctive relief at the last moment before the trial is scheduled to begin will cause delay and confusion in the state-court criminal trial. *See Boston Parents Coal. for Acad. Excellence Corp.*, 996 F.3d at 50–51 (declining to enter injunctive relief pending appeal, in part, because it would create "chaos" given Plaintiffs' delay in seeking relief).

## III.  THE BALANCE OF THE EQUITIES DO NOT TIP IN PLAINTIFFS' FAVOR.

Plaintiffs have also failed to a make the requisite strong showing that the balance of the equities tip in their favor.  Here, the balance of the equities favors maintaining the buffer-zone order.  First, Plaintiffs' delay in seeking relief cuts against them.  Although the Commonwealth moved for entry of the renewed buffer zone on March 17, 2025, and the Superior Court held a public hearing on the motion before it issued the buffer-zone order on March 25, 2025, Plaintiffs apparently made no attempt to raise their concerns about the buffer zone directly with the Superior Court.[59]  Rather, they waited until April 1, 2025, a week after the Superior Court entered the buffer-zone order and more than two weeks after the

---

[59] Had Plaintiffs raised their objections with the Superior Court they likely would have been considered by the Court.  During the hearing on the Commonwealth's motion concerning the buffer zone, the Superior Court noted that it had received emails from other interested persons concerning the scope of the buffer zone and that it would read and consider those emails before ruling on the Commonwealth's motion.  https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 through 1:14:39 (last accessed on Apr. 19, 2025).  In fact, the buffer-zone order acknowledged the concerns raised by nonparties.  Dkt. 1-4 (Pl. Exhibit C), at 2 n.2.

Commonwealth moved for the renewed entry of the buffer-zone order, to file their challenge in the District Court. This recurring delay continues even in the challenge before this Court, and it sits very uncomfortably next to the urgency Plaintiffs attempt to convey. Plaintiffs waited for nearly a week after the District Court denied their motion for a temporary restraining order and a preliminary injunction to seek a stay pending appeal from this Court. Moreover, jury selection in Ms. Read's case is complete and the trial is scheduled to be under way this week. Second, as outlined in the Commonwealth's motion papers and as set forth in the Superior Court's order of March 25, 2025, there are substantial fair-trial concerns that tip overwhelmingly in favor of the State Defendants. Among these equitable concerns are the real-world disruptive impact of noise on the jury emanating from individuals outside the buffer zone as well as vehicle horns and similar noises coming from vehicles on nearby roads whose drivers are expressing support for one side or the other by way of horn-honking and similar noises audible to the jurors inside the courthouse.

## IV.    AN INJUNCTION HERE WOULD HARM THE PUBLIC INTEREST.

Plaintiffs also fail to make the requisite strong showing that an emergency injunction would promote the public interest. In addition to failing to demonstrate a substantial likelihood of success on the merits, a significant risk of irreparable harm, or that the balance of the equities tips in their favor, Plaintiffs also have not

met their burden of a strong showing of "a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). Plaintiffs' failure to carry that burden may be because, contrary to Plaintiffs' argument, the buffer-zone order supports the public's interest in ensuring a fair trial by protecting the jury from extraneous influences. Plaintiffs' failure to carry that burden is yet another reason why this Court should deny Plaintiffs' request for an injunction pending appeal.

Again, the judge entered the buffer-zone order "[t]o ensure the defendant's right to a fair trial." Dkt. 1-4 (Exhibit C), at 1-2. The Commonwealth, and by extension the public, also "has the right to, and an interest in the defendant receiving, a fair trial." *Commonwealth v. Underwood*, 358 Mass. 506, 511, 265 N.E.2d 577, 582 (1978). And part of ensuring a defendant's right to, and the public's interest in, a fair trial is preventing exposure of the jury to extraneous influence. *See Smith*, 455 U.S. at 217; *Wood*, 299 U.S. at 133. As described above, the buffer zone ordered during the first trial did not prevent the sound of demonstrations from the west side of the courthouse, and the honking of horns in response to those demonstrations, from being heard inside the courthouse. Dkt. No. 22 at 25-28. Additionally, an anonymous juror from the first trial attested that he "could hear protesters outside screaming and yelling" as the jury deliberated. Dkt. No. 22 at 30-36. Thus, denial of Plaintiffs' motion and the resulting

maintenance of the buffer-zone order would protect the public interest by preventing the sound of demonstrations from becoming an extraneous influence on the jury.

Such a conclusion regarding the public's interest in maintenance of the buffer-zone order would be consistent with the SJC's decision on the earlier buffer-zone order and how that order protected Ms. Read's and the Commonwealth's right to a fair trial. As held by the SJC with respect to the earlier buffer-zone order, the buffer zone "will help ensure a fair trial" "by physically clearing the path for jurors, witnesses, and other individuals to come and go from the court house complex without obstruction or interference by protestors or demonstrators and any concomitant intimidation or harassment." *Spicuzza*, 494 Mass. at 1008, 232 N.E.3d at 149. The order "helps protect the jurors . . . from extraneous influence that might result from, for example, viewing pictures of putative evidence directly in their path." *Id.*

Thus, for at least those reasons, the buffer-zone order is consonant with the public interest. At the very least, Plaintiffs failed to demonstrate, as they must, that the equitable relief that they seek would serve the public interest. That failure, along with Plaintiffs' other shortcomings described above, should result in this Court denying Plaintiffs' motion for an injunction pending appeal.

## V.  PRINCIPLES OF COMITY CAUTION AGAINST INJUNCTIVE RELIEF HERE.

Here, the preliminary-injunction record shows that the entry of the Superior Court's buffer-zone order occurred only after the judge carefully and cautiously considered the relevant facts.  The buffer zone has been modestly expanded on the west side of the courthouse based only on the real-life experience of the first trial and the shortcomings of the first buffer-zone order, all of which were in the factual record before the judge.  Additionally, the judge's order is informed by her own experience in the courtroom and courthouse where the trial is now unfolding.  The state-court judge is in the better position to assess the facts on the ground. Plaintiffs have available state-court avenues for seeking judicial review of the buffer-zone order.  And in fact, other plaintiffs seeking similar relief did so in challenging the first buffer-zone order, bringing a petition before a single justice of the SJC and then appealing to the full SJC panel.

The Supreme Court has cautioned that "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases.  Rather, they reflect a complex mix of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987).  Recognizing that "complex mix of considerations," courts have concluded that, even where the formal requirements of an abstention doctrine are not met, relief may be inappropriate when a plaintiff

34

bypasses available state-court remedies to challenge a state court's injunction or order in federal court. *See*, *e.g.*, *Gottfried v. Med. Plan. Servs., Inc.*, 142 F.3d 326, 332-333 (6th Cir. 1998) ("we hold that a federal court should abstain when a nonparty to a state court injunction brings a First Amendment challenge to the injunction in federal court before requesting relief from the state court"; "[e]ven when there are no jurisdictional bars to such extraordinary relief, a federal court should initially abstain and give due respect to the state court's ability to determine the scope of its injunctions within the constitutional framework."); *Hoover v. Wagner*, 47 F.3d 845, 851 (7th Cir. 1995) (Posner, C.J.) ("Taking as true the facts pleaded by the plaintiffs, we hold that it would be an abuse of discretion, in light of the principles of equity and comity that underlie *Younger,* [401 U.S. 37 (1971),] to grant the relief sought by the plaintiffs.  Should the plaintiffs ever be arrested or otherwise impeded or punished for the exercise of their right of free speech, they will have an abundance of state and federal remedies to which to appeal.").  These principles apply with equal force here and undercut Plaintiffs' ability to make a strong showing that they will succeed on the merits.

## <u>CONCLUSION</u>

For the reasons set forth above and as set forth in the State Defendants' preliminary-injunction oppositions in the District Court, this Court should deny Plaintiffs' Motion.

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ John R. Hitt

_____

John R. Hitt, No. 59001
Thomas Bocian, No. 121912
Emily Rothkin, No. 1202163
Emily Swanson, No. 1216673
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 727-2200
Dated:  April 21, 2025        thomas.bocian@mass.gov
john.hitt@mass.gov
emily.rothkin@mass.gov
emily.swanson@mass.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

This opposition does not comply with the type-volume limitation of Fed. R. App. P. 27(d)(2)(b), but the State Defendants have sought leave to file an opposition in excess of the page limit.

This opposition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this opposition has been prepared in a proportionately-spaced typeface using Microsoft Word Times New Roman 14-point font.

April 21, 2025

/s/ John R. Hitt
Massachusetts Assistant Attorney General

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 21, 2025, I electronically filed this opposition with the Clerk of the Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Participants in this case who are registered CM/ECF users will be served by the appellate CM/EFC system.

April 21, 2025

/s/ John R. Hitt
Massachusetts Assistant Attorney General