No. 25-1380

# United States Court of Appeals

for the First Circuit

JASON GRANT, ALLISON TAGGART, LISA PETERSON, & SAMANTHA LYONS,

*Plaintiffs-Appellants*,

v.

TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J.
CANNONE IN HER OFFICIAL CAPACITY AS JUSTICE OF THE SUPERIOR COURT,
GEOFFREY NOBLE, AS COLONEL OF THE MASSACHUSETTS STATE POLICE, MICHAEL
D'ENTREMONT, IN HIS OFFICIAL CAPACITY AS CHIEF OF THE POLICE DEPARTMENT
OF THE TOWN OF DEDHAM, & MICHAEL W. MORRISSEY, IN HIS OFFICIAL
CAPACITY AS THE NORFOLK COUNTY DISTRICT ATTORNEY,

*Defendants-Appellees*.

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS DENYING A PRELIMINARY INJUNCTION

**BRIEF OF THE TRIAL COURT OF MASSACHUSETTS, BEVERLY J.
CANNONE, GEOFFREY NOBLE, AND MICHAEL W. MORRISSEY**

ANDREA JOY CAMPBELL
*Massachusetts Attorney General*

John R. Hitt, 1st Cir. No. 59001
Thomas E. Bocian, 1st Cir. No. 121912
Gabriel Thornton, 1st Cir. No. 1189527
Emily Rothkin, 1st Cir. No. 1202163
Emily Swanson, 1st Cir. No. 1216673
*Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................2

TABLE OF AUTHORITIES .........................................................4

STATEMENT OF JURISDICTION...............................................9

QUESTION PRESENTED .............................................................9

STATEMENT OF THE CASE.......................................................10

    A.    The Proceedings in The State Courts of Massachusetts..............10

        1.    The First State-Court Trial and Buffer-Zone Order...................10

        2.    The Second State-Court Trial and Buffer-Zone Order. ..............15

    B.    Plaintiffs' Civil Action and the Procedural History in Federal Court. ...................................................................................16

SUMMARY OF ARGUMENT .......................................................18

ARGUMENT ................................................................................22

    I.    Standard of Review…………………………………………22

    II.    Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits....................................................................................24

        A.    Plaintiffs are Unlikely to Succeed on Their First Amendment Claim....................................................................................24

            1.    The Buffer-Zone Order is Content-Neutral. ...............................24

            2.    The Buffer-Zone Order Serves a Compelling Governmental Interest. ..................................................................................27

            3.    The Buffer-Zone Order is Narrowly Tailored. ...........................29

            4.    Plaintiffs Have Adequate Speech Alternatives ...........................36

        B.    Plaintiffs are Unlikely to Succeed on Their Due Process Claim.............................................................37

    1.   Massachusetts Trial Courts Have the Inherent Power to Take Action Necessary to Ensure Fair Criminal Trials…………………………………………………..………....37

    2.   Plaintiffs Did Not Seek the Opportunity to be Heard, Even When the Opportunity Was Available to Them. ...................................40

    3.   Plaintiffs Fail to Show the Order is Unconstitutionally Vague……………………………………………..………..42

III.    Plaintiffs Cannot Satisfy Any of the Remaining Preliminary Injunction Factors. .................................................................44

    A.    Plaintiffs Cannot Demonstrate Irreparable Harm.......................44

    B.    The Balance of Equities Does Not Tip in Plaintiffs' Favor. .......45

    C.    An Injunction Would Harm the Public Interest...........................46

IV.    Principles of Comity Weigh Against the Relief Sought by Plaintiffs. .......................................................................47

CONCLUSION ....................................................................48

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................50

CERTIFICATE OF SERVICE ................................................................50

STATUTORY ADDENDUM .................................................................51

# TABLE OF AUTHORITIES

## Cases

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015) .................................................................23

*Ashcroft v. Am. Civ. Liberties Union*,
542 U.S. 656 (2004) .................................................................. 29, 33

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) .................................................................42

*Bl(a)ck Tea Soc'y v. City of Boston*,
378 F.3d 8 (1st Cir. 2004) .................................................................35

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) .................................................................45

*Chief Admin. Just. of the Trial Court v. Labor Relations Comm'n*,
404 Mass. 53, 533 N.E.2d 1313 (1989) .................................................38

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) .................................................................44

*Citizens for Peace in Space v. City of Colorado Springs*,
477 F.3d 1212 (10th Cir. 2007) .......................................................37

*Coalition to Protest Democratic Nat'l Convention v. City of Boston*,
327 F. Supp. 2d 61 (D. Mass. 2004) .......................................... 24, 36

*Commonwealth v. Underwood*,
358 Mass. 506, 265 N.E.2d 577 (1978) .................................................46

*Cox v. Louisiana*,
379 U.S 559 (1965) .................................................................. 28, 39

*Crocker v. Justs. of Superior Ct.*,
208 Mass. 162, 94 N.E. 369 (1911) .......................................... 38, 39

*Doe v. Anrig*,
    728 F.2d 30 (1st Cir. 1984) ...............................................................40

*First Just. of Bristol Div. of Juvenile Court Dep't v. Clerk-Magistrate of Bristol
    Div. of Juvenile Court Dep't*,
    438 Mass. 387, 780 N.E.2d 908 (2003) .............................................38

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991) .........................................................................28

*Gottfried v. Med. Plan. Servs., Inc.*,
    142 F.3d 326 (6th Cir. 1998) .............................................................48

*Greer v. Spock*,
    424 U.S. 828 (1976) ...........................................................................36

*Hill v. Colorado*,
    530 U.S. 703 (2000) ...........................................................................43

*Hodge v. Talkin*,
    799 F.3d 1145 (D.C. Cir. 2015) .........................................................28

*Hoover v. Wagner*,
    47 F.3d 845 (7th Cir. 1995) ...............................................................48

*In re Morrissey*,
    168 F.3d 134 (4th Cir. 1999) .............................................................28

*Lanier Pro. Servs., Inc. v. Ricci*,
    192 F.3d 1 (1st Cir. 1999) ..................................................................24

*March v. Mills*,
    867 F.3d 46 (1st Cir. 2017) ................................................................25

*Matter of an Impounded Case*,
    491 Mass. 109, 199 N.E.3d 435 (2022) .............................................38

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................... 23, 24

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ............................................................... 29, 33, 36

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................22

*Muniz v. Rovira*,
    373 F.3d 1 (1st Cir. 2004) ................................................................40

*New England Reg'l Council of Carpenters v. Kinton*,
    284 F.3d 9 (1st Cir. 2002) ...................................................... 24, 26, 35

*Nieves-Marquez v. Puerto Rico*,
    353 F.3d 108 (1st Cir. 2003) .................................................. 23, 46

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................23

*O'Coin's, Inc. v. Treas. of Worcester Cnty.*,
    362 Mass. 507, 287 N.E.2d 608 (1972) ............................................38

*O'Neil v. Canton Police Dep't*, No. 23-cv-12685-DJC, 2023 WL 7462523
    (D. Mass. 2023) ................................................................................28

*O'Neil v. Town of Nantucket.*,
    711 F.2d (1st Cir. 1983). ...................................................................42

*Picard v. Magliano*,
    42 F.4th 89 (2d Cir. 2022) ........................................................ 31, 39

*Read v. Commonwealth*,
    495 Mass. 312, 250 N.E.3d 551 (2025) .......................... 10, 13, 14, 15

*Read v. Norfolk Cnty. Superior Ct.*,
    133 F.4th 128 (1st Cir. 2025) ............................................................12

*Reed v. City of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ................................................................ 19, 25, 26

*Republican Co. v. Appeals Court*,
 442 Mass. 218, 812 N.E.2d 887 (2004) ..............................................................41

*Ridley v. Massachusetts Bay Transp. Auth.*,
 390 F.3d 65 (1st Cir. 2004).................................................................................42

*Riley v. National Federation of Blind N.C., Inc.*,
 487 U.S. 781 (1988)............................................................................................30

*Sheppard v. Maxwell*,
 384 U.S. 333 (1966)................................................................................... 28, 39

*Smith v. Phillips*,
 455 U.S. 209 (1982)................................................................................... 40, 46

*Spicuzza v. Commonwealth*,
 494 Mass. 1005, 232 N.E.3d 145 (2024). .................................................. *passim*

*State v. LaFrance*,
 124 N.H. 171, 471 A.2d 340 (1983) ..................................................................38

*Sullivan v. City of Augusta*,
 511 F.3d 16 (1st Cir. 2007)................................................................................36

*Thomas v. Chicago Park Dist.*,
 534 U.S. 316 (2002)............................................................................................24

*United States v. Grace*,
 461 U.S. 171 (1983)............................................................................................35

*United States v. Wood*,
 299 U.S. 123 (1936)............................................................................................46

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
 121 F.4th 339 (1st Cir. 2024).............................................................................23

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
 645 F.3d 26 (1st Cir. 2011)................................................................................45

*Wainwright v. Lockhart,*
  80 F.3d 1226 (8th Cir. 1996) ...............................................................39

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)...................................................... 24, 25, 27, 43

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)e .................................................................................22

*Younger v. Harris,*
  401 U.S. 37 (1971)...............................................................................48

## **Statutes**

28 U.S.C. § 1292(a)(1)...........................................................................9

28 U.S.C. § 1331 ....................................................................................9

42 U.S.C. § 1983 ....................................................................................9

Mass. Gen. Laws ch. 90, § 24(2)(a½)(2) ............................................10

Mass. Gen. Laws ch. 211, § 3 ................................................. 11, 12, 41

Mass. Gen. Laws ch. 265, § 1 ..............................................................10

Mass. Gen. Laws ch. 265, § 13½ .........................................................10

## **Other Authorities**

U.S. Const. amdt. I........................................................................ *passim*

U.S. Const. amdt. VI ................................................................. 9, 19, 20

U.S. Const. amdt. XIV .................................................................. *passim*

*United States v. Tsarnaev*, Case No. 1:13-cr-10200-GAO (D. Mass.)............. 33, 34

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331, which provides the district courts with jurisdiction over civil actions arising under federal law. It denied Plaintiffs' request for a preliminary injunction on April 11, 2025. AA216[1] Plaintiffs filed a notice of appeal on April 17, 2025. ADD12. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1).

## QUESTION PRESENTED

A superior court judge in Massachusetts entered a buffer-zone order that barred demonstrations within a certain proximity to the courthouse during a criminal trial. Plaintiffs here—would-be protesters at the trial—filed a civil action in the district court under 42 U.S.C. § 1983, seeking to bar enforcement of the buffer-zone order on First Amendment free speech and Fourteenth Amendment due process grounds. The question presented is whether the district court acted within its discretion when it denied Plaintiffs' motion for preliminary injunctive relief, where Plaintiffs failed to show a likelihood of success on the merits of their claims because the buffer-zone order was content-neutral and narrowly tailored to achieve a significant governmental interest, *i.e.*, ensuring a criminal defendant's

---

[1] For consistency, the State Defendants use the same citation abbreviations as Plaintiffs. Plaintiffs' appendix is cited as AA[page] and their addendum is ADD[page]. Appellants' Opening Brief is cited as Br. [page].

Sixth Amendment right to fair trial by an impartial jury; the buffer-zone order provided adequate alternatives for Plaintiffs' speech; and there were available state-court procedures for challenging the order that Plaintiffs had not invoked at the time they sought preliminary injunctive relief.

## STATEMENT OF THE CASE

### A. The Proceedings in The State Courts of Massachusetts.

#### 1. The First State-Court Trial and Buffer-Zone Order.

In 2022, a grand jury in Norfolk County, Massachusetts, returned three indictments charging Ms. Karen Read with murder in the second degree, Mass. Gen. Laws ch. 265, § 1; manslaughter while operating a motor vehicle under the influence of alcohol, Mass. Gen. Laws ch. 265, § 13½; and leaving the scene of personal injury resulting in death, Mass. Gen. Laws ch. 90, § 24(2)(a½)(2). The charges arose from the death of John O'Keefe, a Boston police officer. AA3-4; *see also Read v. Commonwealth*, 495 Mass. 312, 314, 250 N.E.3d 551, 555 (2025).

In March 2024, as Ms. Read's criminal trial was due to start, the Commonwealth moved for an order barring demonstrations within a buffer zone of 500 feet around the courthouse complex in Dedham, and prohibiting certain items from being worn or displayed inside the courthouse. AA98. A group of individuals moved to intervene in the case to oppose the Commonwealth's request. AA98. And the American Civil Liberties Union of Massachusetts, Inc.

10

("ACLUM") sought leave to file an amicus curiae "memorandum," opposing the request. AA98. Ms. Read took no position on the matter. AA98.

Following a hearing, the superior court (Cannone, J.) denied the motion to intervene, granted the ACLUM leave to submit its memorandum (which the court noted it had read), and granted the request for a buffer zone in part. The court ordered a smaller buffer zone than the Commonwealth had requested, indicating that:

> No individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting . . . [and] . . . no individuals will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.

AA107-09.

The individuals who had been denied leave to intervene then filed a petition for extraordinary relief pursuant to Mass. Gen. Laws ch. 211, § 3, asking a single justice of the Massachusetts Supreme Judicial Court ("SJC") to review the superior court's denial of their motion to intervene as well as the validity of the buffer-zone

order itself.  AA98.[2]  In addition, an association of individuals who wanted to demonstrate within the buffer zone filed a petition for relief under the same statute. AA98-99.  The Commonwealth opposed both petitions, while Ms. Read again took no position.  AA99.

On April 12, 2024, a single justice of the SJC (Georges, J.) denied both petitions.  AA111-18.  Characterizing the superior court's decision on the motion to intervene as "an ordinary procedural ruling," he concluded that it did not warrant the exercise of the SJC's extraordinary power of superintendence and denied relief as to that issue.  AA114.  The single justice further recognized that "the petitioners ha[d] standing to challenge the buffer zone order pursuant to Mass. Gen. Laws ch. 211, § 3, where they allege[d] that the buffer zone order infringes their First Amendment rights."  AA114, n.7.  On the merits, the single justice determined that the buffer zone was a content-neutral and reasonable time-place-and-manner restriction, that it was narrowly tailored to a significant government interest, and that it left open ample alternative avenues for communication. AA114-18.

_____

[2]  Chapter 211, section 3 of the Massachusetts General Laws confers upon the SJC "a general superintendence power that permits, among other things, review of interlocutory matters in criminal cases only when substantial claims of irremediable error are presented and only in exceptional circumstances, where it becomes necessary to protect substantive rights."  *Read v. Norfolk Cnty. Superior Ct.*, 133 F.4th 128, 131 n.1 (1st Cir. 2025), *cert. denied* (Apr. 28, 2025).

The petitioners then appealed the single justice's rulings to the full SJC. AA99. Again, the Commonwealth opposed, and Ms. Read took no position. AA99. On April 26, 2024, the SJC issued an order affirming the single justice's judgment, and it issued an explanatory opinion on May 2, 2024. AA99. *See Spicuzza v. Commonwealth*, 494 Mass. 1005, 232 N.E.3d 145 (2024) (per curiam). The SJC held that the single justice did not commit an error of law or abuse his discretion in deciding that the intervention request did not warrant the exercise of the court's extraordinary superintendence power. *Id.* at 1007, 148. As to the petitioners' constitutional arguments, the SJC concluded that the buffer zone was not a prior restraint. It was instead a content-neutral regulation that was narrowly tailored to serve a significant government interest, and the buffer zone permitted adequate alternative means of communication. *Id.* at 1007-09, 148-49.

The SJC having upheld the buffer zone, Ms. Read's trial continued, "spanning eight weeks of evidence, [and] involving seventy-four witnesses and 657 exhibits." *Read*, 495 Mass. at 313, 250 N.E.3d at 554 (affirming denial of Ms. Read's motion to dismiss on double jeopardy grounds after trial court declared a mistrial). The 200-foot buffer zone adequately prevented any demonstrations on the southern, eastern, and northern sides of the courthouse complex from interfering with the proceedings inside the courthouse. AA101, 119. The western side of the courthouse, however, was different. On that side, there are larger open

spaces that extend beyond 200 feet from the courthouse. AA120. Demonstrator groups gathered in those areas and engaged in coordinated shouting and chanting, which could be heard inside the courthouse. AA121. In addition, despite the 200-foot buffer zone, individuals were able to position themselves close enough to nearby streets that they were able to encourage passenger and commercial vehicles to honk their horns as a form of demonstration. AA121. The honking, especially from the airhorns of commercial vehicles, could easily be heard inside the courthouse. AA121. The Massachusetts state police issued more than two dozen citations for horn violations and other motor-vehicle offenses in connection with the trial. AA121.

At the conclusion of the evidence, the jury deliberated for five days. *Read*, 495 Mass. at 313, 250 N.E.3d at 554. Jurors could hear the protesters yelling and screaming during deliberations. AA125. They sent progressively insistent notes to the judge about their inability to reach a unanimous verdict. *Read*, 495 Mass. at 313, 250 N.E.3d at 554. In their third and final note, "the jury stated that 'some members firmly believed that the evidence surpasses the burden of proof establishing the elements of the charges,' while others did not." *Id*. (brackets and ellipsis omitted). "They described their views as rooted in 'sincere adherence to their individual principles and moral convictions,' and stated that further deliberation would be 'futile' and would 'force them to compromise these deeply

held beliefs.'" *Id.* (brackets omitted). After receiving the final note, the judge declared a mistrial. *Id.* The Commonwealth then elected to re-try Ms. Read on the charges.

### 2. The Second State-Court Trial and Buffer-Zone Order.

In advance of Ms. Read's retrial before the same judge who presided over the first trial, on March 17, 2025, the Commonwealth filed a motion asking the court again to impose a buffer zone and prohibit individuals from wearing or exhibiting in the courthouse any buttons, photographs, clothing, or insignia relating to the case or to any trial participant. AA104. The Commonwealth proposed that the buffer zone include the same 200-foot area around the courthouse complex that was in place during the first trial, as well as an area encompassed within four streets on the western side of the courthouse. *Id.*

On March 25, 2025, after a hearing, the court granted the Commonwealth's motion. AA32-34.[3] The court found that a buffer zone was appropriate because, among other reasons, when proceedings in the case are taking place, "individuals line the sidewalks outside the courthouse, loudly chanting and voicing their opinions about witnesses, attorneys, and the strength of the Commonwealth's case." AA33. These individuals, the court found, also "display matters which may

_____

[3] Court TV, LIVE: MA v Karen Read Murder Retrial, Motions Hearing Day 2, https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 (last accessed on May 1, 2025).

be in evidence during the trial or share their viewpoints as to the guilt or innocence of [Ms. Read] on their clothing or signage." *Id.* If prospective or sitting jurors were exposed to such protesters or messages, the court concluded that Ms. Read's "right to a fair trial will be jeopardized." *Id.* Further, the court determined that a modest expansion of the buffer zone was necessary. It noted that during the first trial, demonstrators outside the 200-foot buffer zone on the western side of the courthouse "could be clearly heard inside the courthouse." *Id.* The court also acknowledged the Commonwealth's concern about the honking from passing vehicles that could "be heard frequently during the first trial." *Id.* Additionally, the court cited the facts that a deliberating juror reported being able to hear protesters "screaming and yelling" during deliberations, and that a "group of local business owners and organizations" had sent to the court a "list of concerns" that arose from "issues" they had experienced during the first trial. *Id.*; *see* AA152-53 (document containing list from local business owners and organizations). The retrial began with jury selection on April 1, 2025.

**B.      Plaintiffs' Civil Action and the Procedural History in Federal Court.**

Plaintiffs filed the instant civil action on April 1, 2025. AA1-11. The complaint named as defendants: the Trial Court of Massachusetts; the Superior Court of Massachusetts; Justice Beverly Cannone, who entered the buffer-zone order; Geoffrey Noble, the Colonel of the Massachusetts State Police; Michael

d'Entremont, the Chief of Police in Dedham, Massachusetts; and Michael W. Morrissey, the District Attorney in Norfolk County. AA2-3. The complaint contained two counts seeking declaratory and injunctive relief: *first*, that the buffer-zone order restrained Plaintiffs' free speech rights in violation of the First Amendment; and *second*, that the buffer-zone order violated Plaintiffs' due process rights, insofar as the court had no legal authority to enter it and failed to afford Plaintiffs notice and an opportunity to be heard before entering it. AA7-10.

Along with their complaint, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction. AA35-57. The next day, the district court (Joun, D.J.) set a hearing on the motion for April 4, 2025. AA59. In advance of the hearing, the State Defendants (meaning all but Chief d'Entremont) filed a written opposition to Plaintiffs' motion and an affidavit, attached to which were relevant portions of the state-court record. AA76-154. At the hearing, the district court heard from both sides and called for supplemental briefing, which was due the following week. AA175. On April 11, 2025, the day after the parties submitted their supplemental briefing, the district court entered a memorandum and order, denying Plaintiffs' motion for a temporary restraining order. ADD1-11. The court concluded that Plaintiffs had failed to show a likelihood of success on either of their two claims. ADD3. In an electronic order issued shortly thereafter,

the district court clarified that, to the extent Plaintiffs' motion sought a preliminary injunction, such relief was denied as well. AA216.

Nearly one week later, Plaintiffs filed a notice of appeal and moved in the district court for an injunction (barring enforcement of the buffer-zone order), pending the outcome of their appeal in this Court. ADD12-13; AA217-27. The district court denied the motion for injunctive relief, and the appeal was docketed in this Court on April 17, 2025. AA228. Late the following day, Plaintiffs moved in this Court for an injunction barring enforcement of the buffer-zone order pending appeal. The State Defendants opposed that request a few days later, and this Court denied Plaintiffs' motion on April 23, 2025.

## SUMMARY OF ARGUMENT

Plaintiffs have failed to meet their considerable burden of showing that the district court abused its discretion when it denied Plaintiffs' motion for preliminary relief.

<u>Likelihood of success on the merits – First Amendment challenge</u>: Plaintiffs have failed to show that they are likely to succeed on the merits of their First Amendment free-speech challenge to the buffer-zone order. In a traditional public forum, the regulation of the time, place, and manner of speech is permissible if it is (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leaves open adequate alternatives for communication.

*First*, the district court correctly concluded that the buffer-zone order was content-neutral primarily because it applies to all manner of demonstration regardless of the message conveyed. The district court's determination is consistent with a decision of the SJC that upheld as content-neutral an earlier version of the buffer-zone order with the same language. Additionally, the buffer-zone order meets the Supreme Court's test set forth in *Reed v. City of Gilbert, Arizona*, 576 U.S. 155, 163 (2015), because the buffer-zone order here bars *all* demonstrations within 200 feet of the courthouse, regardless of the demonstrator's message.

*Second*, the district court correctly concluded that the buffer-zone order— including its modest expansion on the west side of the Dedham courthouse—is narrowly tailored because it is based on the judge's real-world experience with the impact of noise and activity outside the courthouse during the defendant's first trial. The buffer-zone order is also limited in scope and time, and is tailored to ensure the criminal defendant's right to a fair trial under both the Sixth Amendment and the Massachusetts constitution is protected. The order thus serves not just a significant governmental interest, but also a compelling one: Ensuring a criminal defendant's right to a fair trial by an impartial jury.

*Third*, the district court correctly concluded that Plaintiffs did not have a likelihood of showing that the buffer zone left Plaintiffs with no adequate speech

alternatives.  Demonstrators are not prevented from gathering near the courthouse; rather, they are prevented only in the narrow range where demonstrations could affect the trial.  As the SJC previously concluded, the limited nature of the zone leaves open ample alternative channels for communicating information.

      <u>Likelihood of success on the merits – Due Process challenge</u>:  Plaintiffs have failed to show they are likely to succeed on the merits of their Fourteenth Amendment due process claim.  *First*, Massachusetts courts have well-established state-law authority, particularly under the Massachusetts Declaration of Rights, that reaches beyond traditional adjudicatory powers to ensure the integrity of their proceedings.  The state courts' authority is at its zenith when, in a case like this, a criminal defendant's right to a fair trial by an impartial jury is threatened.  The SJC has long held that Massachusetts trial courts possess broad authority to ensure fair trials by impartial juries.  Such authority is consistent with decisions of the Supreme Court, and other courts of appeal under the Sixth Amendment and other sources of law.  Thus, there is no merit to Plaintiffs' argument that the superior court was somehow without power to ensure and protect a state-court criminal defendant's right to a fair trial by an impartial jury.

      *Second*, Plaintiffs are unlikely to succeed on the merits of their due process claim because they failed to avail themselves of available state-court remedies to challenge the buffer-zone order.  Before the buffer-zone order was issued, the

superior court held a hearing that was open to the public. That hearing was preceded by a publicly filed and publicly available motion by the Commonwealth requesting that the buffer zone be created around the courthouse. Other nonparties expressed their views in writing concerning the requested buffer zone, which the superior court judge read and noted in her decision. Moreover, during the first criminal trial, a different group of plaintiff-protesters, as well as the ACLUM, challenged the buffer zone in the superior court and by way of a petition filed with a single justice of the SJC. Still, Plaintiffs did not avail themselves of those procedures. Having done nothing in state court, Plaintiffs will not succeed on their claim that their due-process rights were violated by the issuance of the buffer-zone order, including because they lack standing.

*Third*, Plaintiffs' due process challenge to the buffer-zone order as void-for-vagueness is unlikely to succeed. The order is sufficiently clear, and the fact that it requires some interpretation does not mean that it is unconstitutionally vague.

<u>Other Preliminary Relief Factors</u>: Although not reached by the district court, Plaintiffs fail to show that they can satisfy any of the remaining factors necessary to obtain preliminary relief. For example, Plaintiffs cannot show they will suffer irreparable harm absent a preliminary injunction. Indeed, Plaintiffs did not seek relief in state court when the buffer zone was being considered and then waited until the start of the state-court trial to seek emergency relief in the district

court. Their failure to promptly act undermines their claim that they are entitled to emergency relief. Moreover, Plaintiffs cannot show that the balance of the equities tips in their favor. The Commonwealth's compelling interest in ensuring a fair trial for the state-court criminal defendant tips decidedly against Plaintiffs' free-speech interest where there are still open, adequate alternatives for Plaintiffs to communicate their messages. And a preliminary injunction would harm the public interest. There is a strong public interest in ensuring a fair trial by an impartial jury, which includes "physically clearing the path for jurors, witnesses, and other individuals to come and go from the court house complex without obstruction or interference by protestors or demonstrators and any concomitant intimidation or harassment." *Spicuzza*, 494 Mass. at 1008, 232 N.E.3d at 149.

Finally, the district court correctly noted that principles of comity caution against a federal court ruling on matters concerning an ongoing state-court criminal case. For all of these reasons, this Court should affirm the denial of Plaintiff's motion for preliminary relief.

## **ARGUMENT**

### I. **Standard of Review.**

A preliminary injunction is "a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a

preliminary injunction, Plaintiffs must show: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The first factor—likelihood of success on the merits—is the "sine qua non of a preliminary injunction. If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (Souter, J.) (citations omitted). "[T]he movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

This Court's "review of [the] district court's decision to . . . deny a preliminary injunction is for abuse of discretion." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024). This Court "examine[s] answers to abstract legal questions de novo, findings of fact for clear error, and judgment calls with significant deference to the trial court." *Id.* Plaintiffs "bear[ ] the considerable burden of demonstrating that the District Court

flouted the four-part test for preliminary injunctive relief." *Lanier Pro. Servs., Inc. v. Ricci*, 192 F.3d 1, 3 (1st Cir. 1999).

## II. Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits.

Plaintiffs have failed to demonstrate that they are likely to succeed on the merits. For that reason alone, the district court's decision should be affirmed.

### A. Plaintiffs are Unlikely to Succeed on Their First Amendment Claim.

In a public forum, the regulation of the time, place, and manner of speech is permissible if it is (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leaves open adequate alternatives for communication. *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 27 (1st Cir. 2002) (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 n.3 (2002)). The buffer-zone order satisfies each of these factors. *See Mazurek*, 520 U.S. at 972.

#### 1. The Buffer-Zone Order is Content-Neutral.

The buffer-zone order restricts any individual from "demonstrat[ing] in any manner, including carrying signs or placards within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court." AA34. This restriction is not based on any particular message the speech conveys. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Coalition to Protest Democratic Nat'l Convention v. City of Boston*, 327 F. Supp. 2d 61, 70 (D. Mass. 2004) (holding restriction against parades in specific zone, which "applie[d] to all

parades, regardless of content, let alone viewpoint" was content-neutral).

Regardless of whether a demonstrator wants to convey a message supporting Ms.

Read, supporting the Commonwealth, or supporting a cause unrelated to Ms.

Read's trial, their speech is equally restricted. This is the very definition of content

neutrality. *See Ward*, 491 U.S. at 791 (regulation is content-neutral if it is

"justified without reference to the content of the regulated speech"); *see also*

*March v. Mills*, 867 F.3d 46, 49-50, 55-56 (1st Cir. 2017) (concluding that

provision prohibiting a person from making noise heard within abortion clinic was

content-neutral).

The district court's determination that the second buffer-zone order is

content-neutral is also consistent with Supreme Court precedent, which provides

that a law is content-based only if it "applies to particular speech because of the

topic discussed or the idea or message expressed." *Reed v. City of Gilbert, Ariz.*,

576 U.S. 155, 163 (2015). This "requires a court to consider whether a regulation

of speech 'on its face' draws distinctions based on the message a speaker

conveys." *Id.* (recognizing that "[s]ome facial distinctions based on a message are

obvious, defining regulated speech by particular subject matter, and others are

more subtle, defining regulated speech by its function or purpose").

Here, the buffer-zone order bars *all* demonstrations within 200 feet of the

courthouse regardless of whether the demonstrator conveys a message supporting

Ms. Read, against her, or on any topic unrelated to the trial. The order makes no distinction based on the "topic discussed or the idea or message expressed." *See id.* Moreover, the buffer-zone order does not regulate speech with respect to its "function or purpose." *See id.* Any form of protest around the courthouse is subject to the buffer zone. *Contrast id.* at 164 (municipal ordinance was content-based where it subjected different kinds of signs—those "directing the public to church or some other 'qualifying event'"; signs "designed to influence the outcome of an election"; and "ideological signs" that "communicate [certain] message[s] or ideas"—to different form of regulations depending on which category they fell into).[4]

The district court's determination that the second buffer-zone order is content-neutral is consistent with the SJC's decision upholding the first buffer-zone order entered before Ms. Read's first trial. Specifically, the SJC held that because any protesters supporting Ms. Read or supporting the Commonwealth

---

[4] Even if this Court were to disagree and conclude that the second buffer-zone order creates content-based restrictions (it does not), Plaintiffs still failed to demonstrate a likelihood of success because, as explained *infra*, the order satisfies even more exacting scrutiny since it "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171. And because it satisfies that heightened standard, it necessarily satisfies the less stringent standard applicable to content-neutral regulations on speech as well. *New England Reg'l Council of Carpenters*, 284 F.3d at 27. In any event, Plaintiffs' argument that the district court's conclusion on content-neutrality was reversable error, Br. at 15, is without merit.

would be equally subject to restrictions of the first buffer zone, the order was "'justified without reference to the content of the regulated speech.'" *Spicuzza*, 494 Mass. at 1007, 232 N.E.3d at 148 (quoting *Ward*, 491 U.S. at 791). Moreover, in response to the argument that the buffer zone was not content-neutral because commercial speech was still allowed, the SJC noted that it is permissible for a regulation to have an incidental effect on some speakers and not others. *See Spicuzza*, 494 Mass. at 1007, 232 N.E.3d at 148 (quoting *Ward*, 491 U.S. at 791). On these grounds, the SJC concluded that the first buffer-zone order was content-neutral, just as the district court correctly concluded with respect to the second buffer-zone order at issue here.

There is no merit to Plaintiffs' contention that specific speech is prohibited. Br. 15. Despite their assertion, Plaintiffs make no actual argument explaining how specific speech is prohibited, nor do they point to any actual examples of such prohibited speech. Their only supporting citation is to a self-serving, conclusory allegation in their verified complaint. Br. 16 (citing AA5 at ¶ 23). The district court, however, was not required to credit that assertion.

### 2. The Buffer-Zone Order Serves a Compelling Governmental Interest.

The superior court established the buffer zone "to ensure [Ms. Read's] right to a fair trial." AA 32. The right to a fair trial has long been recognized as a compelling state interest. "Courts have agreed that protecting the right to a fair

criminal trial by an impartial jury whose considerations are based solely on record evidence is a compelling state interest." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999) (citing, among other cases, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991), and *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966)). Indeed, "[t]he Supreme Court has recognized the government's interest in 'protecting its judicial system from the pressures which picketing near a courthouse might create.'" *O'Neil v. Canton Police Dep't*, No. 23-cv-12685-DJC, 2023 WL 7462523, at *4 (D. Mass. 2023) (quoting *Cox v. Louisiana*, 379 U.S 559, 562 (1965));[5] *see also Hodge v. Talkin*, 799 F.3d 1145, 1159 (D.C. Cir. 2015) (contrasting areas surrounding courthouses as distinct from areas surrounding other democratic institutions, *e.g.*, the United States Capitol, where exposure to popular opinion is fundamental to legislating).

---

[5] In *Cox*, the Court observed:

"There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. . . . There can be no doubt that [the constitutional safeguards] embrace the fundamental conception of a fair trial, and that they exclude influence or domination by either a hostile or friendly mob. There is no room at any stage of judicial proceedings for such intervention; mob law is the very antithesis of due process. A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." 379 U.S. at 562 (internal citations and quotation marks omitted).

### 3.   The Buffer-Zone Order is Narrowly Tailored.

The buffer-zone order is carefully and narrowly tailored.  AA32-24.  It modestly expands the buffer zone from the first trial on the west side of the courthouse based on the real-world experience of noise and activity outside the courthouse.

Faced with the first-hand experience of what occurred during the first trial, as well as the national attention the criminal trial has garnered, the superior court narrowly tailored the buffer-zone order to be "the least restrictive means among available, *effective* alternatives."  *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 666 (2004) (emphasis added).  In fact, during the first trial, the judge:  (1) tried the other available alternative, *i.e.*, specifically allowing the protesters to be closer to the west side of the courthouse; and (2) rejected a broader 500-foot buffer zone the Commonwealth requested.  Again, based on the real-world experience of the first trial, the judge determined, in essence, that there were no "effective alternatives" to a modest expansion of the buffer zone to ensure the sanctity of the trial.  *Id.*  There is, thus, a "close fit between the ends [*i.e.*, protecting Mr. Read's right to a fair trial] and the means [*i.e.*, the modestly expanded buffer-zone order]" that ensures that Plaintiffs' First Amendment rights have not been "too readily 'sacrific[ed] [] for efficiency.'"  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)

(quoting *Riley v. National Federation of Blind N.C., Inc.*, 487 U.S. 781, 795 (1988)).[6]

Plaintiffs offer a myriad of complaints as to why they believe the buffer-zone order is not narrowly tailored, but none is persuasive. *First*, Plaintiffs complain that the superior court considered no alternatives and engaged in no analysis. Br. 18. To the contrary, the superior court necessarily considered the less restrictive alternative to the buffer-zone order from the first trial and found it to be insufficient to protect the jury from unwarranted interference and, by extension, the defendant's right to a fair trial. AA32-34. The superior court expressly concluded that, "[t]o ensure a fair trial with an impartial jury, extending the buffer zone is necessary to prevent jurors from outside influence and to prevent interruptions and distractions during trial." AA33-34. And the superior court narrowly tailored its modest extension of the buffer zone to prevent noise that

---

[6] Moreover, in addition to the reasoning set forth in the superior court's March 25, 2025, memorandum of decision and order, the court also incorporated the reasons that compelled the court to enter the buffer-zone order in Ms. Read's first trial. AA32 (stating that "[f]or the reasons that compelled the Court to establish a buffer zone for the first trial, it is necessary to establish a buffer zone for the second trial to ensure the defendant's right to a fair trial"). Those reasons included, among other things: (1) "Individuals . . . displaying materials which may or may not be introduced into evidence during trial"; (2) "[D]isplaying materials . . . airing their opinions as to the guilt or innocence of the defendant on their clothing or signage"; and (3) "Witness intimidation." AA19. These additional reasons further demonstrate that the order is narrowly tailored.

might, based on its experience in the first trial in the same courtroom, interfere with a jury maintaining its impartiality. Shouting heard inside the courtroom and in the jury room, as well as honking from passing vehicles, reportedly disrupted the jury's deliberation in the first trial. *See* ADD7-8 (district court's order, noting the superior court's findings concerning noise problems during the first trial and explaining why second buffer-zone order was narrowly tailored). *See generally Picard v. Magliano*, 42 F.4th 89, 104 (2d Cir. 2022) ("The State would clearly have a compelling interest, for example, in prohibiting protests outside a courthouse featuring amplified calls for the jurors to reach a particular verdict in an ongoing trial in that courthouse that are audible inside the courtroom.").

*Second*, Plaintiffs argue that the superior court could have more narrowly handled the noise issues and protestors by providing specific jury instructions, closing the courtroom windows, and instructing law-enforcement to enforce existing laws. Br. 18-19. But these suggestions assume, without evidentiary support, that such steps had *not* been taken by the superior court. Moreover, Plaintiffs' argument wrongly assumes that noise was the only issue, when it was not. *See* AA33 (superior court's memorandum of decision and order, noting that "individuals line the sidewalks outside the courthouse" "[w]hen the matter is in court" and they "display matters which may be in evidence during the trial or share their viewpoints as to the guilt or innocence of the defendant on their clothing or

signage," which "created a substantial risk that the defendant's right to a fair trial will be jeopardized"); *see also* AA19 (discussing similar concerns that prompted buffer-zone order during first trial).[7]  To justify emergency relief, Plaintiffs had the burden to come forward with actual evidence supporting their emergency motion. Self-serving allegations and arguments based on factual assumptions not supported by the preliminary-injunction record are not enough.

Putting aside the significant enforcement challenges that would be presented by a "quiet rule," Br. 22, Plaintiffs ignore the problem of noise being created in response to Plaintiffs' signs or their physical gestures while they protest.  The superior court expressly concluded that the modest expansion of the first buffer zone was necessitated by the problem posed by "[v]ehicles honking their horns *in response to signs and gestures from [] demonstrators* [that] could [] be heard frequently during the first trial."  AA33 (emphasis added).  Jurors would undoubtedly be aware that the unusual and incessant honking was a result of strong

---

[7] Before the district court, Plaintiffs' counsel waived any challenge to the portions of the buffer-zone order relating to noise.  Dkt. 31, at 26 ("[W]e are waiving any argument that noise is something that we're seeking you to allow us to engage in").  Thus, before the district court, their challenge was limited to only that portion of the order that would impact their ability to "stand on public sidewalks [] holding signs."  *Id.*, at 25.

outside opinions about the murder trial on which they are sitting.[8] These types of distractions could affect their ability to be impartial or cause unnecessary disruptions to, or interference with, the ongoing proceedings. Plaintiffs do not even suggest an effective alternative to the modest expansion of the buffer zone to address the problem posed by horn-honking caused by quiet demonstration that interrupted and disturbed the first trial and would likely do so again during the current trial absent the court's modest expansion of the buffer zone. *See Ashcroft*, 542 U.S. at 666. The superior court chose the narrowest path available to protect Ms. Read's right to a fair trial. *See McCullen*, 573 U.S. at 486.

*Third*, Plaintiffs rely on *United States v. Tsarnaev*, Case No. 1:13-cr-10200-GAO (D. Mass.). Br. 20. There, the District Court, in a lobby conference, stated that it preferred to wait and see what types of issues might arise involving demonstrators outside the courthouse. The judge said, "We'll watch it. If it seems

---

[8] Indeed, the record shows that the jurors already were acutely aware of strong public sentiment due to other events as well. *See* AA124 (affidavit of anonymous juror from first trial); AA125 ("I am frightened for my personal safety as a result of learning that someone associated with this case has been criminally charged with intimidation."); AA126 ("If someone is going to attack a sitting judge, I see no reason why they would not demean and attack, verbally and physically, a juror who sat on this jury."); AA127-28 (describing actions of journalist who "harass[ed] witnesses to the case, including by organizing crowds of people to harass them outside their homes" and made public statements "to the effect of, murderers, *and those who cover for them*, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe" (emphasis in affidavit)).

to be a problem, we'll see what we can do to adapt[.]" Transcript, *United States v.*

*Tsarnaev*, No. 13-10200-GAO (D. Mass. Dec. 30, 2014), at 81. Plaintiffs overlook

the tentative nature of the judge's decision and the fact that the judge there, unlike

the judge here, did not have the benefit of an earlier trial to understand the

problems that would be present. There is no evidence in the cited portion of the

*Tsarnaev* lobby conference that protesters' actions could be heard inside the

courtroom or jury deliberation room or otherwise actually interfered with the

defendant's right to a fair trial. As such, any comparison to the case is inapt.

Furthermore, the *Tsarnaev* case, which involved a protest zone near the front

entrance of the Federal courthouse in Boston, is factually distinguishable and of no

help on the narrowly tailored prong. *See* Br. 20, 23. The John Joseph Moakley

courthouse opened in 1998.[9] It is a vastly different and more soundproof building

than the Dedham courthouse that was constructed almost two centuries ago in

1827.[10] Protests held by the front doors of the Moakley courthouse are unlikely to

generate noise that can be heard in any of the courtrooms inside the building. Any

argument by Plaintiffs to suggest that a case involving the Moakley courthouse

---

[9] History & Architecture: Boston John J. Moakley Courthouse, https://www.mad.uscourts.gov/history/history-boston.htm (last accessed on May 1, 2025).

[10] Other Historic Resources in Dedham, https://www.dedham-ma.gov/your-government/historic-districts-commission-historical-commission/other-historic-resources (last accessed on May 1, 2025).

should somehow govern the Dedham courthouse at issue in this case fails for that simple reason. *Cf. Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 14 (1st Cir. 2004) (recognizing that the determination of whether a provision restricting speech is narrowly tailored is a highly fact-based analysis).

*Fourth*, the other cases cited by Plaintiffs are likewise distinguishable from the circumstances presented here. *See, e.g.*, Br. 22. For example, *United States v. Grace*, 461 U.S. 171 (1983), dealt with restrictions on speech on public sidewalks bounding the United States Supreme Court plaza. In concluding that the statutory provision at issue there violated the First Amendment, the Court expressly noted that there had been "no suggestion . . . [that the expressive] activities [at issue] in any way obstructed the sidewalks or access to the Building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds." *Id*. at 182. Here, by sharp contrast, there is record evidence that demonstrations *did* interfere with the orderly function of the first trial. Further, several courts have noted that restrictions on speech in public areas, such as sidewalks, may be permissible as long as they are narrowly tailored and otherwise satisfy the requirements of the applicable constitutional standard. *See, e.g.*, *New England Reg'l Council of Carpenters*, 284 F.3d at 27 ("The right to leaflet on public sidewalks, like any core speech activity, 'may be regulated in the interest of all; it is not absolute, but relative, and must be exercised

in subordination to the general comfort and convenience.'" (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976))); *Coalition to Protest Democratic Nat. Convention*, 327 F. Supp. 2d at 71 ("I find that the complete ban on parades on the Causeway Street sidewalk from Monday through Thursday is narrowly tailored to significant interests in public safety.").

Cases that involve buffer zones around health-care facilities like *McCullen v. Coakley*, 573 U.S. at 464, are also easily distinguishable. *See* Br. 18-19. *McCullen* involved a law that applied to *all* clinics *all* the time. By contrast, the buffer-zone order here is much more limited in time and scope. AA34 ("no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex *during trial of this case*, unless otherwise ordered by this Court.") (emphasis added). Thus, unlike the buffer zone in *McCullen*, the order here does not apply to *all* criminal trials in the Dedham courthouse *all* the time. The order here is analogous to the case-specific injunctions that the Supreme Court suggested would have been a narrower fit in *McCullen*, 573 U.S. at 492-96.

### 4. Plaintiffs Have Adequate Speech Alternatives.

Where plaintiffs have access to numerous speech alternatives, they are unlikely to succeed on the merits. *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007) (noting court has upheld "alternative means of communication despite diminution in the quantity of speech, a ban on a preferred method of

communication, and a reduction in the potential audience"). Here, demonstrators are not prevented from gathering near the courthouse but simply from gathering in the narrow range where demonstration could affect the trial. *See Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1225 (10th Cir. 2007) (plaintiffs "were sufficiently able to communicate their message even though they had no close, physical interaction with their intended audience"). As the SJC noted in its decision on the earlier buffer-zone order, the limited nature of the buffer zone leaves open "ample alternative channels for communication of the information." *Spicuzza*, 494 Mass. at 1008, 232 N.E.3d at 149 (quotation marks omitted). Given these circumstances, Plaintiffs cannot demonstrate that they are likely to succeed on the merits of their First Amendment claim.

**B.    Plaintiffs are Unlikely to Succeed on Their Due Process Claim.**

Plaintiffs' Fourteenth Amendment Due Process Clause claim is based on two theories: (1) that the superior court had no authority to enter the order in the first place, and (2) that Plaintiffs were not afforded an opportunity to be heard on or to challenge the buffer-zone order in the state courts. Neither argument is likely to be successful on the merits.

**1.    Massachusetts Trial Courts Have the Inherent Power to Take Actions Necessary to Ensure Fair Criminal Trials.**

It is well established under state law that the scope of the trial court's authority under the Massachusetts Declaration of Rights "reaches beyond

traditional adjudicatory powers" and inherently encompasses any power that is "essential to the function of the judicial department, to the maintenance of its authority, and to its capacity to decide cases." *First Just. of Bristol Div. of Juvenile Court Dep't v. Clerk-Magistrate of Bristol Div. of Juvenile Court Dep't*, 438 Mass. 387, 397, 780 N.E.2d 908, 915-16 (2003) (cleaned up); *see also, e.g., Matter of an Impounded Case*, 491 Mass. 109, 119-20, 199 N.E.3d 435, 445 (2022); *O'Coin's, Inc. v. Treas. of Worcester Cnty.*, 362 Mass. 507, 510, 287 N.E.2d 608, 611 (1972). Among these inherent powers is the ability "to control [a court's] own proceedings . . . and the environment of the court." *Chief Admin. Just. of the Trial Court v. Labor Relations Comm'n*, 404 Mass. 53, 57, 533 N.E.2d 1313, 1317 (1989) (quoting *State v. LaFrance*, 124 N.H. 171, 179–80, 471 A.2d 340 (1983)).

The courts' inherent authority is at its zenith when extraordinary fact patterns, like those present in Ms. Read's case, threaten a criminal defendant's right to a fair trial by an impartial jury. *See Matter of an Impounded Case*, 491 Mass. at 119-20, 199 N.E.3d at 445; *Crocker v. Justs. of Superior Ct.*, 208 Mass. 162, 178–79, 94 N.E. 369, 376–77 (1911). In *Crocker*, where publicity and local sentiment against a defendant threatened to influence the jury, the SJC explained that "[t]here can be no justice in a trial by jurors inflamed by passion, warped by prejudice, awed by violence, menaced by the virulence of public opinion or manifestly biased by any influences operating either openly or insidiously to such

an extent as to poison the judgment and prevent the freedom of fair action." 208

Mass. at 179, 94 N.E. at 376–77.  As such, it held that courts in Massachusetts

have not only the authority, but also the duty, "to do within reason *all that the*

*conditions of society and human nature permit* to provide an unprejudiced panel

for a jury trial."  *Id.* (emphasis added).

The SJC's view in this regard is not novel.  Courts around the nation have

recognized similar principles.  *See*, *e.g.*, *Picard*, 42 F.4th at 103 ("'[I]t is the

utmost importance that the administration of justice be absolutely fair and

orderly. . . .  A State may adopt safeguards necessary and appropriate to assure that

the administration of justice at all stages is free from outside control and

influence.'" (quoting *Cox*, 379 U.S. at 562)); *see also Sheppard*, 384 U.S. at 358

("[T]he courtroom and the courthouse premises are subject to control of the

court."); *Wainwright v. Lockhart*, 80 F.3d 1226, 1232 (8th Cir. 1996) ("State

judges have broad discretion to take security measures in state courthouses.").

And in the context of a case involving a claim of an extraneous influence in a

criminal trial, the Supreme Court itself noted:  "Due process means a jury capable

and willing to decide the case solely on the evidence before it, and *a trial judge*

*ever watchful to prevent prejudicial occurrences* and to determine the effect of

such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982) (emphasis added).[11]

### 2. Plaintiffs Did Not Seek the Opportunity to be Heard, Even When the Opportunity Was Available to Them.

Plaintiffs' second due process argument is based on the flawed factual premise that they had no opportunity to be heard by the superior court.

The superior court held a public hearing on the Commonwealth's buffer-zone motion.[12] Other members of the public submitted concerns to the superior court, which were considered by the court. AA32; *see also* AA33 n.2, 152-53. Plaintiffs point to no evidence that they tried to raise their concerns with the superior court and were denied a hearing, as the district court correctly noted. ADD9-10. Instead, they point to the fact that the superior court did not permit

---

[11] Plaintiffs' suggestion that the State Defendants failed to engage with Plaintiffs' due process claim, Br. 25-26, is wrong. AA89-90 (arguing that "[t]here is also no merit to Plaintiffs' Fourteenth Amendment Due Process Clause claim" and explaining why). In any event, this Court is "free to affirm a district court's decision on any ground supported by the record even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below." *Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir. 1984). *Muniz v. Rovira*, cited by Plaintiffs (Br. 25), does not compel a contrary conclusion; it simply provides an example of the well-established principle that the waiver doctrine will apply when *an appellant* raises new arguments on appeal to seek *reversal* of a lower court's decision. 373 F.3d 1, 4 (1st Cir. 2004).

[12] Court TV, LIVE: MA v Karen Read Murder Retrial, Motions Hearing Day 2, https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 (last accessed on May 1, 2025).

certain protesters to intervene in the first criminal trial for purposes of challenging the buffer-zone order that had been entered at that time. Br. 30. While the superior court did not permit a different group of protesters to *intervene*, that was because, under Massachusetts state law, intervention is a "concept foreign to criminal procedure." *Republican Co. v. Appeals Court*, 442 Mass. 218, 227 n.14, 812 N.E.2d 887, 895 (2004). The superior court judge at the first trial did, however, "acknowledge[ ] the individual petitioners' motion to intervene," "not[ed] that she had read the motion papers," and "allowed the [ACLUM] to submit an amicus brief," which the court indicated it had read. *Spicuzza*, 494 Mass. at 1006, 232 N.E.3d at 147. These are not the actions of a judge who was uninterested in the points of view of those who took the initiative to share them.

Further, Plaintiffs had an available remedy by means of petitioning a single justice of the SJC. After all, the single justice who ruled on the challenge to the buffer zone in Ms. Read's first trial unambiguously stated that "the petitioners [there] ha[d] standing to challenge the buffer zone order pursuant to Mass. Gen. Laws ch. 211, § 3, where they allege[d] that the buffer zone order infringe[d] their First Amendment rights." AA114, n.7. Thus, opportunities to be heard in state court were available; Plaintiffs simply opted not to avail themselves of them.

Accordingly, they have no likelihood of success on the merits of their due process claim.[13]

### 3. Plaintiffs Fail to Show the Order is Unconstitutionally Vague.

There is no merit to Plaintiffs' argument that the buffer-zone order is void for vagueness. *See* Br. 30-32. As this Court has noted "[t]he mere fact that a regulation requires interpretation does not make it vague." *Ridley v. Massachusetts*

---

[13] Even putting aside these opportunities to express their views or seek relief in the state courts, Plaintiffs have not established that they had an individual right to be heard in the first place. The Due Process Clause cannot be used to challenge rules of general applicability. *See*, *e.g.*, *O'Neil v. Town of Nantucket*, 711 F.2d 469, 472 (1st Cir. 1983) ("Procedural due process has not been held to require that the affected individuals or groups be granted a hearing before government acts in a legislative, or broadly rule-making or policy-forming, capacity.") (quoting Tribe, American Constitutional Law (1978), p. 514); *see also Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("The question, then, is whether all individuals have a constitutional right to be heard before a matter can be decided in which all are equally concerned . . . . The answer of this court [in prior cases] was that it was hard to believe that the proposition was seriously made. Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole.").

To be sure, any individual plaintiff would have a right to be heard before (or shortly after) they are subject to an individual sanction for violating the order. But that does not mean individuals have a due process right to participate in the development of a rule of general applicability like the buffer-zone order.

Finally, it is doubtful that Plaintiffs have standing to raise their due process claim. As discussed above, Plaintiffs have not suffered an injury-in-fact because the record is devoid of any evidence that they even attempted to avail themselves of *any* available state-court process to challenge the buffer zone. Indeed, although Plaintiffs have argued that they have standing to bring their First Amendment claim, Br. 14, their brief is silent concerning standing to bring their Fourteenth Amendment due process claim.

*Bay Transp. Auth.*, 390 F.3d 65, 93 (1st Cir. 2004); *see also Ward*, 491 U.S. at 794 (stating that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

Here, the district court correctly determined that the order was not vague because it "identifies the action prohibited with specific examples—'no individual may demonstrate in any manner, including carrying signs or placards'"; "clearly identifies the area where protesters are prohibited from demonstrating—'within 200 feet of the courthouse complex, including the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building'"; clearly identifies "the zone of the Extension—'the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street'"; and "specifies how long [the buffer zone] will be in effect—'during trial of this case.'" ADD10.

Rather than challenge or engage with the district court's specific points as described above, Plaintiffs advance a brief, conclusory, and speculative argument pointing to fact-patterns in other cases not currently before this Court to argue that they have no way of knowing what speech is prohibited. Br. 32. As the district court correctly concluded, "'speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a[n] [order] when it is surely valid in the vast majority of its intended applications.'" ADD10 (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

Plaintiffs' vagueness challenge should be rejected.

## III. Plaintiffs Cannot Satisfy Any of the Remaining Preliminary Injunction Factors.

Because Plaintiffs cannot show a likelihood of success on the merits, they are not entitled to preliminary relief. The State Defendants nevertheless address the remaining preliminary injunction factors for completeness and because each presents an independent basis for affirming the denial of preliminary relief.

### A. Plaintiffs Cannot Demonstrate Irreparable Harm.

Plaintiffs' claims of irreparable harm requiring an immediate injunction are undermined by their constant delays in seeking judicial relief. For example, Plaintiffs waited almost two weeks after the Commonwealth first moved for the entry of the buffer zone—and one week after the superior court's March 25 order entering the buffer zone—before filing their suit in the district court. Plaintiffs then waited another week after the district court denied their motion for a temporary restraining order and preliminary injunction to ask this Court for a stay pending appeal. *Cf. Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (vacating preliminary injunction, where 10-week delay by plaintiff in seeking injunction after learning of defendant's alleged wrongdoing undermined claim of irreparable harm). As a result, "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests

that there is, in fact, no irreparable injury." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 35 (1st Cir. 2011).

And Plaintiffs fail to convincingly explain their delay in seeking relief. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (plaintiffs' "cries of urgency are sharply undercut by [their] own rather leisurely approach to the question of preliminary injunctive relief").

**B.     The Balance of Equities Does Not Tip in Plaintiffs' Favor.**

Plaintiffs have also failed to demonstrate that the balance of the equities tips in their favor. Rather, the balance of the equities favors maintaining the buffer-zone order. *First*, Plaintiffs' delay in seeking relief cuts against them. *See supra*, Argument Section III(A). Plaintiffs made no attempt to raise their concerns about the buffer zone directly with the superior court.[14] *Second*, there are substantial fair-trial concerns that tip overwhelmingly in favor of the State Defendants. Among these equitable concerns are the real-world disruptive impact of noise on the jury emanating from individuals outside the courthouse, as well as vehicle

_____

[14] Had Plaintiffs raised their objections with the superior court they likely would have been considered by the court. During the hearing on the Commonwealth's motion regarding the buffer zone, the superior court noted that it had received emails from other interested persons concerning the scope of the buffer zone and that it would read and consider those emails before ruling on the Commonwealth's motion. Court TV, LIVE: MA v Karen Read Murder Retrial, Motions Hearing Day 2, https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 through 1:14:39 (last accessed on May 1, 2025). In fact, the buffer-zone order acknowledged the concerns raised by nonparties. AA33 n.2.

horns and similar noises from vehicles on nearby roads whose drivers are expressing support for one side or the other by way of horn.

### C.    An Injunction Would Harm the Public Interest.

Plaintiffs have not met their burden of showing "a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez*, 353 F.3d at 120. Indeed, contrary to Plaintiffs' argument, the buffer-zone order supports the public's interest in ensuring a fair trial by protecting the jury from extraneous influences.

The superior court entered the buffer-zone order "[t]o ensure the defendant's right to a fair trial."  AA32.  The Commonwealth, and by extension the public, also "has the right to, and an interest in the defendant receiving, a fair trial." *Commonwealth v. Underwood*, 358 Mass. 506, 511, 265 N.E.2d 577, 582 (1978). Part of ensuring a defendant's right to a fair trial is preventing exposure of the jury to extraneous influences.  *See Smith*, 455 U.S. at 217; *United States v. Wood*, 299 U.S. 123, 133 (1936); *see also Spicuzza*, 494 Mass. at 1008, 232 N.E.3d at 149 (the buffer zone "will help ensure a fair trial" "by physically clearing the path for jurors, witnesses, and other individuals to come and go from the court house complex without obstruction or interference by protestors or demonstrators and any concomitant intimidation or harassment" and recognizing that the order "helps protect the jurors . . . from extraneous influence that might result from, for

example, viewing pictures of putative evidence directly in their path"). Here, the buffer zone ordered during the first trial did not prevent the sound of demonstrations from the west side of the courthouse, and the honking of horns in response to those demonstrations, from being heard inside the courthouse. AA33, 120-22. Additionally, during jury deliberations, jurors "could hear protesters outside screaming and yelling." AA125. The new buffer-zone order is intended to protect the public interest by preventing the sound of demonstrations from becoming an extraneous influence on the jury.

## IV. Principles of Comity Weigh Against the Relief Sought by Plaintiffs.

The superior court issued its buffer-zone order after carefully considering the relevant facts. For example, the court modestly expanded the buffer zone on the west side of the courthouse based on the judge's real-life experience of noise and disruptions during the first trial. The state-court judge, who presided over the first trial and is currently presiding over the second, is in the best position to assess the facts on the ground.

Plaintiffs have available state-court avenues for seeking judicial review of the buffer-zone order but have not availed themselves of those procedures. For example, other plaintiffs seeking similar relief challenged the first buffer-zone order by bringing a petition before a single justice of the SJC and then appealing to the full SJC. Where these plaintiffs have not taken advantage of available state

court remedies, the federal courts should be very cautious about stepping in. *See,*

*e.g.*, *Gottfried v. Med. Plan. Servs., Inc.*, 142 F.3d 326, 332-33 (6th Cir. 1998)

("we hold that a federal court should abstain when a nonparty to a state court

injunction brings a First Amendment challenge to the injunction in federal court

before requesting relief from the state court"; "[e]ven when there are no

jurisdictional bars to such extraordinary relief, a federal court should initially

abstain and give due respect to the state court's ability to determine the scope of its

injunctions within the constitutional framework"); *Hoover v. Wagner*, 47 F.3d 845,

851 (7th Cir. 1995) (Posner, C.J.) (holding "it would be an abuse of discretion, in

light of the principles of equity and comity that underlie *Younger* [*v. Harris*], [401

U.S. 37 (1971),] to grant the relief sought by the plaintiffs" and recognizing that

"[s]hould the plaintiffs ever be . . . impeded or punished for the exercise of their

right of free speech, they will have an abundance of state and federal remedies to

which to appeal").

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the district court's order

denying Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Andrea Joy Campbell
*Attorney General*

/s/ John R. Hitt
John R. Hitt, 1st Cir. No. 59001
Thomas E. Bocian, 1st Cir. No. 121912
Gabriel Thornton, 1st Cir. No. 1189527
Emily Rothkin, 1st Cir. No. 1202163
Emily Swanson, 1st Cir. No. 1216673
*Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
john.hitt@mass.gov
thomas.bocian@mass.gov
emily.rothkin@mass.gov
emily.swanson@mass.gov
gabriel.thornton@mass.gov

Date: May 2, 2025

## Certificate of Compliance With Rule 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,960 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the Microsoft Word word-processing system used to prepare the brief.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ John R. Hitt
Counsel for the State Defendants/Appellees

## Certificate Of Service

I hereby certify that this document, filed through the Electronic Case Filing system on May 2, 2025, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ John R. Hitt

## <u>STATUTORY ADDENDUM</u>

28 U.S.C. § 1292(a)(1) ..............................................................................52

28 U.S.C. § 1331 ......................................................................................52

Mass. Gen. Laws ch. 211, § 3 ..................................................................52

# THE UNITED STATES CODE

## TITLE 28   JUDICIARY AND JUDICIAL PROCEDURE

## SECTION 1292   INTERLOCUTORY DECISIONS

**(a)** Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

> **(1)** Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court . . . .

## SECTION 1331   FEDERAL QUESTION

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

# MASSACHUSETTS GENERAL LAWS

## CHAPTER 211   THE SUPREME JUDICIAL COURT

## SECTION 3      SUPERINTENDENCE OF INFERIOR COURTS; POWER TO ISSUE WRITS AND PROCESS

The supreme judicial court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided; and it may issue all writs and processes to such courts and to corporations and individuals which may be necessary to the furtherance of justice and to the regular execution of the laws.

In addition to the foregoing, the justices of the supreme judicial court shall also have general superintendence of the administration of all courts of inferior jurisdiction, including, without limitation, the prompt hearing and disposition of matters pending therein, and the functions set forth in section 3C; and it may issue such writs, summonses and other processes and such orders, directions and rules as

may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts, and the securing of their proper and efficient administration; provided, however, that general superintendence shall not include the authority to supersede any general or special law unless the supreme judicial court, acting under its original or appellate jurisdiction finds such law to be unconstitutional in any case or controversy. Nothing herein contained shall affect existing law governing the selection of officers of the courts, or limit the existing authority of the officers thereof to appoint administrative personnel.