No. 25-1380

*In the*

# UNITED STATES COURT OF APPEALS
*for the*
# FIRST CIRCUIT

JASON GRANT, ALLISON TAGGART,
LISA PETERSON, AND SAMANTHA LYONS,

*Plaintiffs-Appellants,*

v.

TRIAL COURT OF THE COMMONWEALTH OF
MASSACHUSETTS, BEVERLY J. CANNONE,
GEOFFREY NOBLE, MICHAEL D'ENTREMONT,
AND MICHAEL W. MORRISSEY,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-10770-MJJ
The Honorable Myong J. Joun*

## APPELLANTS' CORRECTED APPENDIX

MARC J. RANDAZZA
JAY M. WOLMAN
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: 888-887-1776
ecf@randazza.com
Attorneys for Plaintiffs-Appellants.

# TABLE OF CONTENTS

| Date Filed | Description | Page |
|---|---|---|
| 04/01/2025 | Plaintiff's Verified Complaint [Dkt. No. 1] | AA001 |
| 04/01/2025 | Civil Cover Sheet [Dkt. No. 1-1] | AA016 |
| 04/01/2025 | Exh. A – April 4, 2024, Buffer Zone Order [Dkt. No. 1-2] | AA017 |
| 04/01/2025 | Exh. B – March 17, 2025, Commonwealth Motion for Buffer Zone [Dkt. No. 1-3] | AA021 |
| 04/01/2025 | Exh. C – March 25, 2025, Second Prior Restraint Order [Dkt. No. 1-4] | AA031 |
| 04/01/2025 | Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction [Dkt. No. 2] | AA035 |
| 04/01/2025 | Memorandum of Law in Support of Motion for Temporary Restraining Order and for a Preliminary Injunction [Dkt. No. 3] | AA037 |
| 04/02/2025 | Plaintiffs' Category Sheet [Dkt. No. 7] | AA058 |
| 04/02/2025 | Electronic Notice Setting Hearing [Dkt. No. 8] | AA059 |
| 04/02/2025 | Notice of Filing Supplemental Exhibits [Dkt. No. 9] | AA060 |
| 04/02/2025 | Exh. A – Declaration of Michel Bryant [Dkt. No. 9-1] | AA061 |
| 04/02/2025 | Exh. B – Michel Bryant Video [Dkt. No. 9-2] | AA064 |
| 04/02/2025 | Notice of Conventional Filing [Dkt. No. 10] | AA065 |
| 04/02/2025 | Notice of Filing Supplemental Exhibits [Dkt. No. 11] | AA066 |
| 04/02/2025 | Exh. A – Buffer Zone Map [Dkt. No. 11-1] | AA068 |
| 04/02/2025 | Exh. B – Town of Dedham Police Community Notification [Dkt. No. 11-2] | AA074 |

| 04/04/2025 | State Defendants' Opposition to Motion for a Temporary Restraining Order [Dkt. No. 21] | AA076 |
|---|---|---|
| 04/04/2025 | Affidavit of Assistant District Attorney Caleb J. Schillinger [Dkt. No. 22] | AA095 |
| 04/04/2025 | Notice of Filing Supplemental Exhibit [Dkt. No. 27] | AA155 |
| 04/04/2025 | Exh. A – Tom Derosier Video [Dkt. No. 27-1] | AA158 |
| 04/04/2025 | Exh. B – *Derosier et al v. Noble et al.* Complaint [Dkt. No. 27-2] | AA159 |
| 04/04/2025 | Electronic Clerk's Notes for Proceedings Held [Dkt. No. 28] | AA175 |
| 04/07/2025 | Transcript Notice [Dkt. No. 31] | AA176 |
| 04/10/2025 | Plaintiffs' Supplemental Brief [Dkt. No. 35] | AA177 |
| 04/10/2025 | State Defendants' Supplemental Preliminary Injunction Opposition [Dkt. No. 36] | AA193 |
| 04/11/2025 | Notice of Supplemental Exhibit and Request for Judicial Notice [Dkt. No. 37] | AA202 |
| 04/11/2025 | Exh. A – Fayetteville Observer Article [Dkt. No. 37-1] | AA205 |
| 04/11/2025 | Plaintiffs' Emergency Motion for Clarification [Dkt. No. 39] | AA214 |
| 04/11/2025 | Order Granting Plaintiffs' Emergency Motion for Clarification [Dkt. No. 40] | AA216 |
| 04/17/2025 | Plaintiffs' Emergency Motion for Injunction Pending Appeal [Dkt. No. 43] | AA217 |
| 04/17/2025 | Memorandum in Support of Plaintiffs' Emergency Motion for Injunction Pending Appeal [Dkt. No. 44] | AA220 |
| 04/17/2025 | Order Denying Plaintiffs' Emergency Motion for Injunctive Relief Pending Appeal [Dkt. No. 46] | AA228 |
| 04/07/2025 | Transcript of April 4, 2025, Hearing [Dkt. No. 31] | AA229 |

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>               Plaintiffs,<br><br>     v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>               Defendants. | Civil Action No. _____ |

## <u>VERIFIED COMPLAINT</u>

The Karen Read trial has drawn significant public attention. Plaintiffs are members of the public wish to publicly express themselves near, *but not on*, the grounds of, the courthouse where the second Karen Read trial is taking place. Their primary concern is that they wish to criticize Judge Cannone. They have been doing so since November 2024, without incident. They have been doing so peacefully. They have been doing so while Judge Cannone presides over cases in the Dedham Courthouse, and neither the Sixth Amendment nor the First Amendment have felt the slightest chafe. However, Judge Cannone has found her pretext to shut down protests against her – an ignoble request from the Commonwealth that an ill-defined "buffer zone" be declared on the streets, public walkways, public library, and private properties surrounding the Dedham Courthouse. Judge Cannone joyfully entered the order, ex parte, enjoining Plaintiffs (and everyone else), who are not subject to her jurisdiction, from speaking on private property and on traditional

RANDAZZA | LEGAL GROUP

public fora. It is a lawless, *ultra vires* act, that violates the constitutional guarantees of free speech and due process. Cannone has issued this order primarily to quash criticism directed at her, as this the only protests that have been documented have been the Plaintiffs in this case, who have quietly held signs criticizing Cannone. To remedy this constitutional wrong, the Plaintiffs Jason Grant, Allison Taggart, Lisa Peterson, and Samatha Lyons bring this Civil Action against Defendants TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney. Plaintiffs bring a claim under 42 U.S.C. § 1983 for Defendants' violation of their First and Fourteenth Amendment rights, and allege as follows:

## **THE PARTIES**

1.      Plaintiff Jason Grant is a natural person who resides in the Commonwealth of Massachusetts.

2.      Plaintiff Allison Taggart is a natural person who resides in the Commonwealth of Massachusetts.

3.      Plaintiff Samatha Lyons is a natural person who resides in the Commonwealth of Massachusetts.

4.      Plaintiff Lisa Peterson is a natural person who resides in the Commonwealth of Massachusetts.

5.      Defendant Trial Court of the Commonwealth of Massachusetts is a judicial entity organized under Mass. Gen. Laws. ch. 211B, § 1.

6.      Defendant Beverly J. Cannone is a Justice of the Norfolk County Superior Court and, at all relevant times, worked in Dedham, Massachusetts.

7.      Defendant Michael W. Morrissey is the Norfolk County, Massachusetts, District Attorney and, at all relevant times, worked in Norfolk County, Massachusetts.

8.      Defendant Michael d'Entremont is the Chief of the Police Department of the Town of Dedham, Massachusetts, and, at all relevant times, worked in Dedham, Massachusetts.

9.      Defendant Geoffrey Nobel is the Superintendent of the Massachusetts State Police and, at all relevant times, worked in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this civil action per 28 U.S.C. § 1331 as this is a civil action arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution.

11.     This Court has personal jurisdiction over all defendants as they are all citizens or organs of the Commonwealth of Massachusetts, and the defendants committed the acts complained of within the said Commonwealth.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) as all defendants reside in this District and all events giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

13.     On or about January 29, 2022, John O'Keefe, a Boston Police Officer, died.

14.     On or about June 9, 2022, a true bill was returned in the Trial Court of the Commonwealth of Massachusetts, Superior Court Department, Norfolk County, indicting Karen Read and charging her with a) second degree murder of O'Keefe per G.L. c. 265, § 1; b) killing

O'Keefe with her motor vehicle while intoxicated per G.L. c. 265, § 13 ½; and c) a hit-and-run death of O'Keefe under. G.L. c. 90, § 24,(2)(a ½)(2).

15.    Defendant Cannone is the presiding judge in the Read prosecution, in the case styled *Commonwealth v. Read,* Case No. 2282CR00017, in the Trial Court of the Commonwealth of Massachusetts, Superior Court Department, Norfolk County (hereinafter "*Read* Case").

16.    The Norfolk County District Attorney's office, led by Michael W. Morrissey, is prosecuting the *Read* Case on behalf of the Commonwealth.

17.    A trial in the *Read* Case was held in 2024, which resulted in a mistrial after the jury failed to reach a unanimous decision (hereinafter "first trial").

18.    A second trial in the *Read* Case began on April 1, 2025 (hereinafter "second trial").

19.    Prior to the first trial, the Commonwealth filed a motion to *inter alia* create a "buffer zone" beyond the grounds of the Norfolk Superior Courthouse, to prohibit any individual from demonstrating in any manner about Read, law enforcement, the DA, potential witnesses, and evidence within 500 feet of the court complex during the trial.

20.    Massachusetts citizens Tracey Anne Spicuzza, Lorena Jenkinson, Dana Stewart Leonard, and Paul Cristoforo thereupon moved to intervene for the limited purpose of opposing the Commonwealth's buffer-zone motion.

21.    The motion to intervene was denied by Justice Cannone who declared that the citizens had no right to intervene, even though the order would directly affect them.

22.    Judge Cannone then issued an order granting the Commonwealth's motion, asserting that the Commonwealth's perceived inconveniences overcame everyone else's First Amendment rights, without regard for any differentiation between members of the public, and expressly ordered that "no individual may demonstrate in any manner, including carrying signs or

**AA004**

placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court.  This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building.  Individuals are also prohibited from using audio enhancing devices while protesting." *See* **Exhibit A**.

23.     Speech that does not qualify as a "demonstrate[on]" was not restricted.  Thus, a nearby café could advertise breakfast using a bullhorn and parade its menu on picket signs and placards; Celtics and Bruins fans could similarly honor their teams by hooting/hollering and carrying placards.  And in fact, commercial speech was permitted within the zone.

24.     In advance of the second trial, the Commonwealth again moved for a buffer zone, but with a larger area (again, encompassing private property and traditional public fora, including public sidewalks and other areas).  The Commonwealth also sought specific instructions to request police to use force to quash any dissent or protest.  *See* **Exhibit B**.

25.     Without an opportunity for affected persons to intervene or be heard, Judge Cannone issued an Order on March 25, 2025, granting the Commonwealth's motion, asserting that the basis for the first motion warranted a *larger* buffer zone for the second trial, and expressly ordered that "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court.  This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building.  The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street.  Individuals are also prohibited from using audio enhancing devices while protesting." *See* **Exhibit C** (hereinafter "Second Prior Restraint Order").

26.     For the past several months, Plaintiffs have been engaged in peaceful demonstrations, with no adverse incidents.

27.     Such demonstrations took place in the location that is within the buffer zone of the Second Prior Restraint Order.

28.     For example, Plaintiff Jason Grant peacefully demonstrated on the sidewalk next to the courthouse holding signs reading "Judge Bev is Conflicted" and "Bev's Court is a Clownshow" regarding and with images of D.A. Morrissey and Judge Cannone:



29.     Such demonstrations were specifically about Judge Cannone and occurred during trials presided over by Judge Cannone.

30.     There were no disturbances, incidents, nor interference with any of the trials taking place, but Judge Cannone was apparently embarrassed and annoyed by people protesting against her.  Nevertheless, nobody's rights were impeded upon, and not one complaint was received that the plaintiffs are aware of.

31.      Plaintiffs wish to continue to demonstrate, including criticizing Judge Cannone, off the grounds of the said courthouse complex but within the buffer zone during the second trial.

32.      Plaintiffs reasonably fear that Judge Cannone will attempt to hold them in contempt if they engage in such demonstration or will otherwise attempt another unconstitutional act to suppress those who would criticize her publicly.

33.      Plaintiffs reasonably fear that  the Norfolk County District Attorney's office, under the control and direction of Defendant Morrissey, will seek their prosecution for violation of the Order if they engage in such demonstration.

34.      As Dedham Police officers took action to enforce the buffer zone order during the first trial, Plaintiffs reasonably fear that the Dedham Police Department, under the control and direction of Defendant d'Entremont, will arrest them for violation of the Second Prior Restraint Order if they engage in such demonstration.

35.      As Massachusetts State Police officers took action to enforce the buffer zone order during the first trial, Plaintiffs reasonably fear that the Massachusetts State Police, under the control and direction of Defendant Noble, will arrest them for violation of the Second Prior Restraint Order if they engage in such demonstration.

## CAUSE OF ACTION
### *Count I*
**Violation of the First Amendment to the United States Constitution**
**Declaratory Judgment & Injunctive Relief**
**(42 U.S.C. 1983 – First Amendment)**

36.      Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

37.      The Second Prior Restraint Order is facially unconstitutional.  It is a content-based regulation of protected speech in a public forum that cannot withstand strict scrutiny.  While the Supreme Court has upheld a statute relating to picketing or parading near courthouses, it has not

RANDAZZA | LEGAL GROUP

**AA007**

approved of a 200 foot buffer with an additional larger, ill-defined area.  Contrast *Cox v. Louisiana*, 379 U.S. 559 (1965).  It is overinclusive—it includes speech in private businesses and homes and in traditional public fora.  And, it is underinclusive, as it does not regulate other forms of speech directed at potential jurors (the ostensible "fair trial" reason given).

38.     The Second Prior Restraint Order purports to address noise and to minimize prospective jurors' exposure to viewpoints about the Read case, but it is targeted solely to speech in the ambit of the Read case when Judge Cannone and the Superior Court routinely conduct jury trials without such restrictions.

39.     Judge Cannone could have taken measures to reduce jurors' exposure to noise and public speech without imposing content-based restrictions.

40.     The Second Prior Restraint Order is unconstitutionally vague.  Plaintiffs cannot ascertain where they may not demonstrate as the purported bounds are not bounds at all.  Plaintiffs cannot ascertain exactly what speech is prohibited—it is unclear if they can wave political signs that say "Vote Against DA Morrissey" or "Judge Cannone is Corrupt."

41.     The Second Prior Restraint Order is an unconstitutional prior restraint on speech.

42.     The Second Prior Restraint Order is unconstitutional as applied.  Defendants have been purposely targeting people, like Plaintiffs, who dislike Judge Cannone, and there is nothing that suggests they would threaten anyone siding with the prosecution or supporting Judge Cannone.

43.     Plaintiffs have been injured, or reasonably fear imminent injury, by these constitutional violations, and Plaintiffs are entitled to relief.

**AA008**

44.     Therefore, Plaintiffs are entitled to a declaration that the Second Prior Restraint Order is unconstitutional and they are entitled to an injunction against all Defendants prohibiting enforcement of the Second Prior Restraint Order.

### *Count II*
**Violation of the Fourteenth Amendment to the United States Constitution**
**(42 U.S.C. 1983 – Procedural Due Process)**

45.     Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

46.     Defendants' conduct of issuing and enforcing the Second Prior Restraint Order is unconstitutional and violates Plaintiffs' rights to due process of law under the Fourteenth Amendment.

47.     Prior to being deprived of their rights to speak freely and to assemble, Plaintiffs were entitled to due process.

48.     There was no hearing, no opportunity to be heard, nor was there any due process whatsoever.  There was merely an arbitrary and capricious action designed to harm Plaintiffs and others, issued by one person on account of anticipated First Amendment protected activity.

49.     Judge Cannone's Second Prior Restraint Order was issued in the absence of statutory authority or inherent authority over persons not brought within her jurisdiction through process.

50.     Judge Cannone's Second Prior Restraint Order was a usurpation of legislative and regulatory functions, not a judicial act.

51.     Judge Cannone has no authority over what non-parties to a proceeding may do off of courthouse property, let alone on private property or traditional public fora.

52.      The Massachusetts Constitution does not empower Superior Court Justices with explicit or inherent authority to regulate private property or traditional public fora in the way they might regulate courthouse property.

53.      No Massachusetts statute empowers Superior Court Justices with explicit or inherent authority to regulate private property or traditional public fora in the way they might regulate courthouse property.

54.      No ordinance of the Town of Dedham empowers Superior Court Justices with explicit or inherent authority to regulate private property or traditional public fora in they way they might regulate courthouse property.

55.      Plaintiffs have been injured, or reasonably fear imminent injury, by these constitutional violations, and Plaintiffs are entitled to relief.

56.      Therefore, Plaintiffs are entitled to a declaration that the Second Prior Restraint Order is unconstitutional and they are entitled to an injunction on the Second Prior Restraint Order's enforcement.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on each claim asserted or hereafter asserted in the Complaint, and on each defense asserted or hereafter asserted by the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A.      A declaration that the Second Prior Restraint Order is unconstitutional under the First and Fourteenth Amendments of the United States Constitution.

B.      A declaration that enforcing the Second Prior Restraint Order is unconstitutional under the First and Fourteenth Amendments of the United States Constitution.

C.      A preliminary and permanent injunction enjoining each Defendant from interfering with Plaintiff's right to lawfully engage in constitutionally protected expression and activity within Dedham, Massachusetts.

D.      To award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and any other applicable law; and

E.      To award such other relief as this Honorable Court may deem just and proper.

Dated: April 1, 2025.                    Respectfully Submitted,

                                         /s/ Marc J. Randazza
                                         Marc J. Randazza, BBO# 651477
                                         mjr@randazza.com, ecf@randazza.com
                                         Jay M. Wolman, BBO# 666053
                                         jmw@randazza.com
                                         RANDAZZA LEGAL GROUP, PLLC
                                         30 Western Avenue
                                         Gloucester, MA 01930
                                         Tel: (978) 801-1776

                                         Mark Trammell
                                         (*Pro Hac Vice* Forthcoming)
                                         Center for American Liberty
                                         P.O. Box 200942
                                         Pittsburgh, PA 15251
                                         Tel: (703) 687-6200
                                         MTrammell@libertyCenter.org

                                         *Attorneys for Plaintiffs.*

## VERIFICATION OF COMPLAINT

I, Jason Grant, am a Plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Dated: _4-1-2025_

By: _____
Jason Grant

**AA012**

## VERIFICATION OF COMPLAINT

I, Allison Taggart, am a Plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Dated: 4-1-25

By: _____
Allison Taggart

AA013

## VERIFICATION OF COMPLAINT

I, Samantha Lyons, am a Plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Dated: 4-1-25

By: *Samantha Lyons*
Samantha Lyons

**AA014**

## VERIFICATION OF COMPLAINT

I, Lisa Peterson, am a Plaintiff in the above-captioned matter. I have reviewed the foregoing

allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the

foregoing allegations are true and correct to the best of my knowledge and understanding.

Dated: **4-1-2025**                    By _Lisa Peterson_
                                            Lisa Peterson

RANDAZZA | LEGAL GROUP

**AA015**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Jason Grant, Allison Taggart, Lisa Peterson, and Samantha Lyons

**DEFENDANTS**

Trial Court of the Commonwealth of Massachusetts, et al.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Randazza Legal Group, PLLC
30 Western Ave., Gloucester MA, 01930 (888) 887-1776

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983 – First and Fourteenth Amendments

Brief description of cause:
Violation of the First and Fourteenth Amendments - Declaratory and Injunctive Relief

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**  *(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
April 1, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Marc J. Randazza

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AA016

# <u>Exhibit A</u>

April 4, 2024, Buffer Zone Order
*Commonwealth v. Read*

$\partial 74$

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CRIMINAL ACTION
22-00117

### COMMONWEALTH

#### vs.

### KAREN READ

## MEMORANDUM OF DECISION AND ORDER ON COMMONWEALTH'S MOTION FOR BUFFER ZONE SURROUNDING NORFOLK SUPERIOR COURT AND REQUEST FOR ORDER PROHIBITING SIGNS OR CLOTHING IN FAVOR OF EITHER PARTY OR LAW ENFORCEMENT

The Commonwealth seeks an Order from this Court (1) establishing a buffer zone around the Norfolk Superior Courthouse in Dedham during the trial of the defendant, in which demonstrations related to the case would be prohibited, and (2) prohibiting any individual from wearing any clothing or insignia related to the case in the courthouse during trial. While the Court recognizes and appreciates the constitutional right of the people to peacefully protest under the First Amendment to the United States Constitution,[1] the defendant has the right to a fair trial by an impartial jury under the Sixth Amendment to the United States Constitution. See U.S. Const. amend. VI ("the accused shall enjoy the right to a speedy and public trial, by an impartial jury"); *Skilling* v. *United States*, 561 U.S. 358, 377 (2010). "This right, ensuring the defendant 'a fair trial,' has also been characterized as 'a basic requirement of due process.'" *In re Tsarnaev*, 780 F.3d 14, 18 (1st Cir. 2015), quoting *Skilling*, 561 U.S. at 378.

To ensure the defendant's right to a fair trial, the Court may restrict protected speech so long as the restrictions do not "burden substantially more speech than is necessary to further the

---

[1] This court acknowledges the helpful *amicus curiae* memorandum submitted by the American Civil Liberties Union of Massachusetts, Inc.

**AA018**

government's legitimate interests." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 799 (1989). In this case, it is well documented that protestors have shouted at witnesses and confronted family members of the victim. Individuals have also taken to displaying materials which may or may not be introduced into evidence during trial, and airing their opinions as to the guilt or innocence of the defendant on their clothing or on signage. Witness intimidation has also been a prevalent issue in this case. Given these past actions, the Court concludes there is a substantial risk that the defendant's right to a fair trial will be jeopardized if prospective jurors are exposed to the protests and messages displayed on signs or otherwise, particularly before this Court has had an opportunity to instruct the jurors about their obligations with regard to remaining fair and unbiased. The risk extends during trial where jurors and witnesses would have no choice but to be exposed daily to the messages and viewpoints of the protestors when entering and leaving the courthouse or sitting in the courtroom.

The defendant here is entitled to a fair trial with an impartial jury, free from outside influence, focused solely on the evidence presented in the courtroom during trial and the applicable law. To protect this right, this Court must reduce the risk of exposing witnesses or jurors in this case to such outside influences.

## ORDER

It is, hereby, **ORDERED** that no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting.

2

**AA019**

It is further **ORDERED** that no individuals will be permitted to wear or exhibit any
buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or
relating to any trial participant, in the courthouse during the trial.  Law enforcement officers who
are testifying or are members of the audience are also prohibited from wearing their department
issued uniforms or any police emblems in the courthouse.


Date:    April 4, 2024

Beverly J. Cannone
Justice of the Superior Court


3

**AA020**

# <u>Exhibit B</u>

March 17, 2025, Commonwealth's
Motion for Buffer Zone
*Commonwealth v. Read*

**AA021**

611

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                        SUPERIOR COURT DEPARTMENT
                                                   DOCKET NO. 2282-CR-0117

COMMONWEALTH

v.

KAREN READ

## COMMONWEALTH'S MOTION FOR BUFFER ZONE AND ORDER PROHIBITING SIGNS OR CLOTHING IN FAVOR OF EITHER PARTY OR LAW ENFORCEMENT

During the defendant's first trial, the Court established a buffer zone in which demonstrations were prohibited within 200 feet of the courthouse complex. The Commonwealth requests that this buffer zone be re-established for the defendant's upcoming retrial, but with two important modifications. First, on the western side of the courthouse facing Court Street, the extent of the buffer zone was inadequate to prevent such demonstrations from jeopardizing the integrity and fairness of the proceedings; the demonstrations could be heard inside the courthouse, including by the jurors during their deliberations. To prevent this from reoccurring, the Commonwealth requests that the buffer zone be extended to include the area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street. Second, the Commonwealth requests that the Court's buffer zone order expressly include a mechanism for its enforcement. Where a person is believed to have violated the buffer zone provision, and has refused requests to comply, law enforcement personnel should be authorized to use reasonable physical force and to arrest that person to ensure compliance.

Additionally, the Commonwealth requests that the Court again order that individuals are not permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case or to any trial participant, in the courthouse during the retrial.

**AA022**

## **Background**

On March 26, 2024, the Commonwealth moved for an order barring demonstrations within a buffer zone of 500 feet around the courthouse complex, and prohibiting certain items from being worn or displayed inside the courthouse, during the defendant's first trial. (Dkt. 254). A group of individuals moved to intervene in the case to oppose the Commonwealth's request. (Dkt. 265). The American Civil Liberties Union of Massachusetts, Inc. ("ACLUM") sought leave to file an "*amicus curiae* memorandum," essentially in opposition to the request. (Dkts. 266, 267). The defendant took no position on the matter.

Following a hearing on April 4, 2024, the Court denied the motion to intervene, granted the ACLUM leave to submit its memorandum (which the Court noted it had read), and ordered that:

> "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting"

and

> "no individuals will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse."

(Dkt. 274) (the "buffer zone order," copy attached as Exhibit A).

The would-be intervenors filed a petition for extraordinary relief pursuant to G.L. c. 211, § 3, in the Supreme Judicial Court for Suffolk County, challenging both the denial of intervention and the buffer zone order (case no. SJ-2024-0122). Soon thereafter, a second petition under G.L. c. 211, § 3, was filed by an association of individuals who wished to demonstrate in the buffer

2

zone during the trial and two members of the association (case no. SJ-2024-0123). The
Commonwealth opposed the petitions, and the defendant again took no position.

On April 12, 2024, a single justice of the Supreme Judicial Court denied the petitions.
See memorandum of decision and judgment, copy attached as Exhibit B. The single justice held
that the denial of the motion to intervene was "an ordinary procedural ruling" not requiring the
Court's extraordinary intervention and therefore denied any relief from that ruling. The single
justice also determined, on the merits, that the buffer zone order passed constitutional muster and
did not violate the petitioners' First Amendment rights. Specifically, the establishment of the
buffer zone was a content-neutral and reasonable time-place-manner restriction on speech that
was narrowly tailored to serve a significant governmental interest and that left open ample
alternative channels for communication of information.

The petitioners appealed the single justice's judgment to the full Supreme Judicial Court
(case no. SJC-13589). The Commonwealth filed a response; the defendant further declined to
take a position. On April 26, 2024, the full Court issued an order affirming the judgment, and on
May 2, 2024, it issued an opinion stating the reasons for that order. See Spicuzza v.
Commonwealth, 494 Mass. 1005 (2024). The Court held that the single justice did not commit
an error of law or abuse his discretion in determining that the denial of the motion to intervene
was not a matter warranting the Court's exercise of its extraordinary power of general
superintendence. See id. at 1007. As to the petitioners' constitutional arguments, the full Court
similarly concluded that the restriction created by the buffer zone was content neutral and not a
prior restraint on speech, it was narrowly tailored to serve a significant governmental interest,
and it left open ample alternative means of communication. See id. at 1007-1008.

3

**AA024**

### Discussion

The factual circumstances and concerns that necessitated the creation of the buffer zone last time are no less present or compelling today. This case continues to garner significant public interest and media attention, locally and nationally, and is the subject of commentary on various social media platforms. The proceedings are still attended by groups of individuals demonstrating in front of the courthouse, displaying references to materials that may or may not be introduced in evidence at retrial, and airing their opinions as to the trial judge, prosecutors, witnesses, and the guilt or innocence of the defendant on their clothing or on signage. Shown below, for example, are photographs of demonstrators who appeared (despite the inclement weather) at the hearing on February 6, 2025:







4

**AA025**

In addition, and as the Court found when it issued the buffer zone order, protesters have shouted at witnesses and have confronted family members of the victim. Witness intimidation also remains a prevalent issue in this case, with additional criminal charges having been filed earlier this month. See Commonwealth v. Aidan Kearney, Stoughton Dist. Ct. No. 2555-CR-225. See also Affidavit of Juror Doe (Dkt. 380) (describing efforts by individuals to intimidate, harass, and "dox" jurors following declaration of mistrial). The re-establishment of a buffer zone is therefore necessary to help ensure that both parties receive a fair retrial, free from outside influences. See Spicuzza, 494 Mass. at 1009, citing Commonwealth v. Underwood, 358 Mass. 506, 511 (1970) (noting the Commonwealth too has the right to, and an interest in the defendant receiving, a fair trial, and the buffer zone order also supported that right).

During the first trial, the 200-foot extent of the buffer zone was adequate to prevent any demonstrations occurring on the southern, eastern, and northern sides of the courthouse complex from interfering with the proceedings inside the courthouse. See Affidavit of Massachusetts State Police Sergeant Michael W. Hardman ("Aff."), filed herewith, at ¶ 3. On the western side of the complex, however, it proved to be inadequate. On that side there are larger, open spaces that extend beyond 200 feet from the courthouse—in particular, the paved and grassy areas along High Street between Bullard Street and Ames and Court Streets. These areas are shown in the Google Maps screenshot below, along with a red line superimposed to indicate the extent of the 200-foot buffer zone on that side of the complex:

5

**AA026**



(Aff., ¶ 4). Groups of demonstrators gathered in these areas, presumably with the property owners' permission, and engaged in coordinated shouting and chanting aimed directly at the courthouse. (Aff., ¶ 5). Even when standing just outside the buffer zone, these demonstrators could be heard inside the courthouse, including during deliberations. See Aff., ¶ 5; Affidavit of Juror Doe at ¶ 10 ("During jury deliberations we could hear protesters outside screaming and yelling.").

As another consequence of the 200-foot extent of the buffer zone, individuals positioned in these areas were close enough to Court and Ames Streets to encourage passenger and commercial vehicles traveling on those streets to honk their horns as a form of demonstration. (Aff., ¶ 6). This happened repeatedly, and the honking—especially from the air horns of the

**AA027**

commercial vehicles—could easily be heard inside the courthouse. (Aff., ¶ 6).[1]  In connection
with the first trial, the Massachusetts State Police issued more than two dozen citations for horn
violations and other motor vehicle offenses. (Aff., ¶ 6).

    To maintain the integrity of the retrial proceedings, and to prevent witnesses and
prospective or seated jurors from being subjected to these demonstrations, the Commonwealth
requests that the buffer zone on the western side of the courthouse complex be extended to
include the area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street.
The extended buffer zone would range from approximately 300 feet between the northern ends
of the complex and Bullard Street to roughly 400 feet between the complex and Bullard Street
along High Street. (Aff., ¶ 7).  This would bring within the buffer zone those areas where
demonstrations undermined the buffer zone's very purposes, while at the same time ensuring that
demonstrators are not moved any farther away from the courthouse complex than is necessary to
prevent those same issues from recurring.  It is narrowly tailored to address the specific problems
that were encountered from experience at the first trial, and it will still leave open ample
alternative channels of communication and outlets for demonstrations.

    The Commonwealth also requests that the order re-establishing a buffer zone expressly
state that a violation of any of the provisions of the order may constitute contempt of court and
that law enforcement officers are authorized to enforce compliance with the order by using
reasonable physical force and arresting any person who officers reasonably believe to be in
violation of the order and who has refused to follow officers' prior verbal requests to comply.
Officers will continue to seek compliance in the first instance through verbal requests and the use

---

[1] This continues to be a demonstration tactic, as shown in the above photograph of the individual
at the February 6 hearing who is holding up a sign that says, "Honk for Justice."  Frequent
honking has occurred at nearly every hearing held in this case over the past several months and
has been clearly audible in the upstairs courtrooms.

AA028

of de-escalation techniques to the maximum extent possible. (Aff., ¶ 8). But where an

individual refuses to comply, officers need to be able to use reasonable physical force and to

make an arrest to ensure compliance with the order and to avoid jeopardizing their own safety

and that of the public. (Aff., ¶ 8). The order itself may provide that authorization. See

Commonwealth v. Williams, 439 Mass. 678, 686 (2003), citing Commonwealth v. Garner, 423

Mass. 735, 745-746 (1996) (courts may authorize law enforcement personnel to use reasonable

force to carry out lawful orders, and courts are not constitutionally required "to prescribe with

exactitude the particular degree of force to be used" in carrying out orders).

For these reasons, the Commonwealth respectfully requests that the Court allow this

motion and issue an order with the following (or substantially similar) terms:

- The Court hereby establishes a "buffer zone" around the courthouse complex during retrial of this case. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone extends 200 feet from the courthouse complex and further includes the area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street. No individual may demonstrate in any manner, including carrying signs or placards, within the buffer zone, unless otherwise ordered by this Court. Individuals are also prohibited from using audio enhancing devices while demonstrating.

- No individual will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the retrial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.

- A violation of any provision of this Order may constitute contempt of court. Court officers may eject or exclude entry to any person believed to have violated the provision against wearing or exhibiting certain clothing or items in the courthouse. Any person believed to have violated the buffer zone provision of this Order, and who has refused a prior verbal request by law enforcement personnel to comply with that provision, may be subject to arrest. Law enforcement personnel may use reasonable physical force where necessary to compel such person's compliance with that provision.

8

**AA029**

Respectfully submitted
for the Commonwealth,

/s/ Hank Brennan

Hank Brennan
Specially Appointed Assistant District Attorney

/s/ Adam C. Lally

Adam C. Lally
Assistant District Attorney

/s/ Laura A. McLaughlin

Laura A. McLaughlin
Assistant District Attorney

Dated:  March 17, 2025

## Certificate of Service

I hereby certify that a copy of the foregoing was served on counsel for the defendant via email on March 17, 2025.

/s/ Hank Brennan

Hank Brennan
Specially Appointed Assistant District Attorney

9

**AA030**

# **Exhibit C**

March 25, 2025, Second
Prior Restraint Order
*Commonwealth v. Read*

**AA031**



## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**                                         **SUPERIOR COURT**
                                                        **CRIMINAL ACTION**
                                                        **22-00117**

### COMMONWEALTH

#### vs.

### KAREN READ

### MEMORANDUM OF DECISION AND ORDER ON COMMONWEALTH'S MOTION FOR BUFFER ZONE AND ORDER PROHIBITING SIGNS OR CLOTHING IN FAVOR OF EITHER PARTY OR LAW ENFORCEMENT

Prior to the defendant's first trial, on April 4, 2024, this Court issued an order establishing a buffer zone around the Norfolk Superior Courthouse prohibiting any individual from demonstrating in any manner within 200 feet of the courthouse complex and from wearing any clothing or insignia related to the case in the courthouse during trial. The Commonwealth now moves for the Court to reestablish the buffer zone for the defendant's upcoming second trial and modify the previous order by extending it to include area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street.[1]

To ensure the defendant's right to a fair trial, the Court may restrict protected speech so long as the restrictions do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 799 (1989). For the same reasons that compelled the Court to establish a buffer zone for the first trial, it is necessary to establish a buffer zone for the second trial to ensure the defendant's right to a fair trial.

---

[1] During argument on the motion, the Commonwealth withdrew its request for a second modification to the April 4, 2024 Order.

**AA032**

The case continues to garner significant public interest. When the matter is in court, individuals line the sidewalks outside the courthouse, loudly chanting and voicing their opinions about witnesses, attorneys, and the strength of the Commonwealth's case. They display matters which may be in evidence during trial or share their viewpoints as to the guilt or innocence of the defendant on their clothing or on signage. If prospective jurors are exposed to the protestors and messages displayed on signs or otherwise, particularly before this Court has had an opportunity to instruct the jurors about their obligations with regard to remaining fair and unbiased, there is a substantial risk that the defendant's right to a fair trial will be jeopardized. The risk extends during trial where jurors and witnesses would have no choice but to be exposed daily to the messages and viewpoints of the protestors when entering and leaving the courthouse or sitting in the courtroom or jury room.

Additionally, the Court concludes that modification to the April 4, 2024 Order is necessary. Despite the 200-foot buffer zone around the courthouse complex during the first trial, on the western side of the courthouse complex where there is a large open space running along High Street between Bullard Street and Ames Street, the collective voices of groups of demonstrators gathering outside the buffer zone could be clearly heard inside the courthouse. See Affidavit of Massachusetts State Police Sergeant Michael W. Hardman at par. 5. Vehicles honking their horns in response to signs and gestures from these demonstrators could also be heard frequently during the first trial. See *id.* at par. 6. Indeed, after trial, a deliberating juror reported that during deliberations, the jurors could hear protestors outside screaming and yelling. See Affidavit of Juror Doe at par. 10.[2] To ensure a fair trial with an impartial jury, extending the

---

[2] The Court also recognizes the list of concerns sent to the Court by the "Karen Read Trial Prepare Together Group"—a group of local business owners and organizations that experienced issues with protestors during the first trial.

AA033

buffer zone is necessary to prevent jurors from outside influence and to prevent interruptions and distractions during trial.

It is, therefore, **ORDERED** that no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street. Individuals are also prohibited from using audio enhancing devices while protesting.

It is further **ORDERED** that no individuals will be permitted to wear any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.

Date:  March 25, 2025

Beverly J. Cannone
Justice of the Superior Court

3

**AA034**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS, <br><br> Plaintiffs, <br><br> v. <br><br> TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney, <br><br> Defendants. | Civil Action No. _____ <br><br> **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, AN INJUNCTION PENDING APPEAL** <br><br> **[ORAL ARGUMENT REQUESTED]** |

Judge Beverly Cannone committed a lawless act, issuing an *ex parte* order against non-parties outside her jurisdiction in an effort to restrain their First Amendment right to engage in peaceful speech.  Plaintiffs Jason Grant, Allison Taggard, Lisa Peterson, and Samantha Lyons hereby move this Honorable Court, pursuant to Fed. R. Civ. P. 65, for a temporary restraining order and for a preliminary injunction or, in the alternative, per Fed. R. Civ. P. 62(d), for an injunction pending appeal, enjoining the Order of March 25, 2025, issued by Judge Beverly J. Cannone, Justice of the Superior Court of Massachusetts, Norfolk County, in the matter of *Commonwealth v. Karen Read,* and enjoining Defendants Trial Court of the Commonwealth of Massachusetts, Beverly J. Cannone, in her official capacity as Justice of the Superior Court, Geoffrey Noble, as Superintendent of the Massachusetts State Police; Michael D'Entremont, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts,

and Michael W. Morrissey, in his official capacity as the Norfolk County District Attorney, from enforcing the said order. The order is an unconstitutional prior restraint and content-based infringement on Plaintiffs' First Amendment right to speak and it was issued against Plaintiffs in the absence of due process, without opportunity to be heard, without authority, and outside Judge Cannone's jurisdiction. In support hereof, Plaintiffs refer to the accompanying memorandum and exhibits, incorporated herein by reference.

Pursuant to Local Rule 7.1(a)(2), undersigned counsel hereby certify that they attempted in good faith to confer with Defendants to narrow the issues in this motion prior to filing, but were unable to do so.

WHEREFORE Plaintiffs respectfully request that this Honorable Court issue a temporary restraining order and, thereupon, a preliminary injunction, enjoining the order and the enforcement thereof or, in the alternative, enjoin such on appeal if this request is denied.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs believe that oral argument may assist the court. This matter involved significant Constitutional issues that oral argument will help to address.

Dated: April 1, 2025.                          Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark Trammell
(*Pro Hac Vice* Forthcoming)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

- 2 -
Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary
Injunction or, in the Alternative, an Injunction Pending Appeal

AA036

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS, <br><br> Plaintiffs, <br><br> v. <br><br> TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney, <br><br> Defendants. | Civil Action No. _____ <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, AN INJUNCTION PENDING APPEAL** <br><br> **[ORAL ARGUMENT REQUESTED]** |

Plaintiffs are four Massachusetts citizens who have been peacefully demonstrating against Judge Beverly J. Cannone for months.  Now, they risk jail if they continue to do so, in the same spot, at the same time. Judge Cannone issued an *ex parte* order, without due process and outside the scope of her authority, that acts as a content-based prior restraint.  Plaintiffs are not parties to any action before her and had no opportunity to be heard before she silenced them.  This Court must now act and enjoin her lawless order and the enforcement thereof.[1]  In the alternative, Plaintiffs seek an injunction pending appeal under Fed. R. Civ. P. 62(d).

---

[1] Plaintiffs are aware that Section 1983 explicitly provides that, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."  42 U.S.C. § 1983.  This motion is not, therefore, directed at Judge Cannone.

- 1 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA037

**1.0    Factual Background[2]**

On January 29, 2022, John O'Keefe, a Boston Police Officer, died.  On June 9, 2022, Karen Read was indicted in Norfolk County, Massachusetts for his murder.  The case has drawn significant attention, including sharp criticism aimed toward Judge Beverly Cannone.

Cannone is the presiding judge in the Read prosecution, in the case styled *Commonwealth v. Read,* Case No. 2282CR00017 (hereinafter "*Read* Case").  The Norfolk County District Attorney's office, led by Michael W. Morrissey, is prosecuting the *Read* Case on behalf of the Commonwealth. A trial in the *Read* Case was held in 2024, which resulted in a mistrial after the jury failed to reach a unanimous decision (hereinafter "first trial"). A second trial in the *Read* Case began on April 1, 2025 (hereinafter "second trial").

Prior to the first trial, the Commonwealth filed a motion to *inter alia* create a "buffer zone" beyond the grounds of the Norfolk Superior Courthouse, to prohibit any individual from demonstrating in any manner about Read, law enforcement, the DA, potential witnesses, and evidence within 500 feet of the court complex during the trial. Massachusetts citizens Tracey Anne Spicuzza, Lorena Jenkinson, Dana Stewart Leonard, and Paul Cristoforo thereupon moved to intervene for the limited purpose of opposing the Commonwealth's buffer-zone motion. The motion to intervene was denied by Justice Cannone who declared that the citizens had no right to intervene, even though the sought-after order would directly affect them.  Judge Cannone then issued an order granting the Commonwealth's motion, asserting that Read's right to a fair trial overcame everyone else's First Amendment rights, without regard for any differentiation between members of the public, and expressly ordered that:

---

[2] Unless otherwise stated, all facts are drawn from the Verified Complaint.

- 2 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

**AA038**

no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting.

*See* Complaint, Exhibit A. Under that order, speech that does not qualify as a "demonstrate[on]" was not restricted. Thus, a nearby café could advertise breakfast using a bullhorn and parade its menu on picket signs and placards; Celtics and Bruins fans could honor the teams by hollering and carrying placards. Commercial speech actually did occur throughout the trial.

In advance of the second trial, the Commonwealth again moved for a buffer zone, but with a larger area (encompassing private property and traditional public fora, including public sidewalks and other areas). Without an opportunity for affected persons to intervene or be heard, Judge Cannone issued an Order on March 25, 2025, granting the Commonwealth's motion, asserting that the basis for the first motion warranted a larger buffer zone for the second trial, and expressly ordered that:

no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street. Individuals are also prohibited from using audio enhancing devices while protesting.

*See* Complaint, Exhibit C (hereinafter "Second Prior Restraint Order").

Plaintiffs Jason Grant, Allison Taggart, Lisa Peterson, and Samantha Lyons are Massachusetts residents. Since November 2024, Plaintiffs have regularly peacefully protested near the courthouse, holding signs criticizing Judge Cannone. Their demonstrations took place within the buffer zone of the Second Prior Restraint Order. For example, Plaintiff Jason Grant peacefully demonstrated on the sidewalk next to the courthouse holding signs reading "Judge Bev

- 3 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA039

is Conflicted" and "Bev's Court is a Clownshow" regarding and with images of D.A. Morrissey and Judge Cannone:



Their demonstrations were about Judge Cannone and occurred during trials presided over by Judge Cannone.  There have been no adverse incidents and no trials have been disturbed.  The First and Sixth Amendments coexisted.

However, now things are about to change.  Karen Read's second trial is beginning and international media attention is focused on the Dedham Courthouse.  Despite any pretextual arguments to the contrary, it appears that the only true reason Cannone and the Commonwealth want protesters hidden away from view is they do not want the press to see them.

Plaintiffs wish to continue to demonstrate, including criticizing Judge Cannone, off the grounds of the courthouse complex but within the buffer zone.  Plaintiffs reasonably fear that Judge Cannone will attempt to hold them in contempt if they engage in such demonstration.  Plaintiffs reasonably fear that  the Norfolk County District Attorney's office, under the control and direction of Defendant Morrissey, will seek their prosecution for violation of the Order if they engage in

- 4 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA040

such demonstration. As Dedham Police officers took action to enforce the buffer zone order during the first trial, Plaintiffs reasonably fear that the Dedham Police Department, under the control and direction of Defendant d'Entremont, will arrest them for violation of the Second Prior Restraint Order if they engage in such demonstration.  Similarly, as Massachusetts State Police officers took action to enforce the buffer zone order during the first trial, Plaintiffs reasonably fear that the Massachusetts State Police, under the control and direction of Defendant Noble, will arrest them for violation of the Second Prior Restraint Order if they engage in such demonstration.  Thus, they come to this Court seeking injunctive relief against the order and enforcement thereof, as they have no recourse before Judge Cannone who not only would not permit intervention, but has a personal bias and hostility toward people who protest against her.

**2.0    Legal Standard**

Rule 65 of the Federal Rules of Civil Procedure provides for temporary restraining orders and preliminary injunctions in federal courts upon notice to the adverse party.[3]  *See* Fed. R. Civ. P. 65(a) and (b).  A temporary restraining order or preliminary injunction must (1) state the reasons why it issued; (2) state its specific terms; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d). Injunctive relief should be issued if: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm if the injunction did not issue; (3) the balance of equities tips in plaintiff's favor; and (4) the injunction is in the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

---

[3] If this Court declines to enter the injunction, Plaintiffs request that the Court err on the side of the Constitution and at grant an injunction pending appeal per Fed. R. Civ. P. 62(d).  Such is proper if the movant makes "a strong showing that they are likely to succeed on the merits, that they will be irreparably injured absent emergency relief, that the balance of the equities favors them, and that an injunction is in the public interest." *Together Emples v. Mass Gen. Brigham Inc*., 19 F.4th 1, 7 (1st Cir. 2021). The test is nearly identical to the standard test for a preliminary injunction. *See Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008).

Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

**AA041**

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (*per curiam*). At this stage, the "court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

## 3.0    This Court Should Enjoin the Order and its Enforcement

### 3.1    Plaintiffs Have Standing

In First Amendment cases, there is standing when the plaintiff intends to engage in a Constitutionally protected activity, which has been proscribed by the government, and there is a credible threat of prosecution. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56-57 (1st Cir. 2003) (standing when a plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences"). In the First Amendment context in particular, a plaintiff has standing to sue if a challenged statute or regulation operates to "chill" the plaintiff's exercise of their First Amendment rights. *Doe v. Bolton*, 410 U.S. 179, 188 (1973).

The harm is readily apparent. Judge Cannone issued her Second Prior Restraint Order that prohibits Plaintiffs' speech of a certain content in a place where Plaintiffs have been peacefully demonstrating for months. Verified Complaint at ¶¶ 25-35. Their speech is undoubtedly chilled— they face arrest and prosecution if they continue. Thus, Plaintiffs have standing to bring suit and seek this injunction.

### 3.2    Plaintiffs are Likely to Succeed

Judge Cannone violated Plaintiffs' First and Fourteenth Amendment rights to free speech (Count I) and due process (Count II) by issuing the Second Prior Restraint Order that threatens

- 6 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA042

them with arrest by the Dedham Police and criminal prosecution by the Norfolk County District Attorney if they engage in conduct protected under the First Amendment. Plaintiffs are prohibited from demonstrating and speaking certain content in a traditional public forum without any process, let alone the due process to which they are entitled under law. Thus, Plaintiffs are likely to succeed on the merits of their claims.

### 3.2.1    Plaintiffs' First Amendment Rights are Violated

Judge Cannone violated Plaintiffs' constitutional rights by issuing her Second Prior Restraint Order. Because the order infringes on Plaintiffs' First Amendment rights, Defendants must justify their actions. *Comcast of Maine/New Hampshire, Inc. v. Mills*, 435 F. Supp. 228, 233 (D. Me. 2019) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017)); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 509 (1969) ("In order for the State . . to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."). They cannot.

Plaintiffs' speech is protected under the First Amendment and the order is a content-based restriction. "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws abridging the freedom of speech." *Mass. Coal. For the Homeless v. City of Fall River*, 486 Mass. 437, 440 (2020) (*quoting Reed v. Gilbert*, 576 U.S. 155, 163 (2015)) (quotation marks omitted). Plaintiffs' speech does not within one of the few "historic and traditional categories of expression long familiar to the bar" for which content-based restrictions on speech are clearly permitted. *United States v. Alvarez*, 567 U.S. 709, 717-18 (2012) (cleaned up). "Singing . . . whistling, shouting, [and] yelling" are forms of speech protected by the First Amendment. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772 (1994). Demonstrating is

- 7 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA043

protected by the First Amendment. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (describing privilege of citizens to assemble, parade, and discuss public questions in streets and parks).

Content-based regulations are subject to strict scrutiny, which requires the government to demonstrate "a compelling interest and . . . narrow[] tailor[ing] to achieve that interest." *Reed,* 576 U.S. at 155 (*quoting Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). Narrow tailoring in the strict scrutiny context requires the restriction to be "the least restrictive means among available, effective alternatives." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004). Defendants' actions fail strict scrutiny.

There is no compelling interest in restricting a citizen from publicly and peacefully demonstrating against a judge. Plaintiffs have not done anything that would arise to "serious evil" that justifies the restrictions imposed by Defendants. *See United States v. Treasury Employees*, 513 U.S. 454, 475 (1995). Defendants have no reasonable justification their actions. While Judge Cannone purports to be protecting Ms. Read's right to a fair trial, Read did not seek the prior restraint—it was the Commonwealth that did so. If Plaintiffs' months of demonstrations did not compromise anyone else's right to a fair trial, they will not compromise Ms. Read's.

Defendants are expected to argue it is a content-neutral regulation because it changes the location of the content but does not prohibit the speech altogether. This is a fallacy. Even facially content-neutral regulations will be considered content-based if they cannot be "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, only specific speech is prohibited. In contrast, commercial speech advertising a nearby café is permitted. Celtics and Bruins fans may loudly demonstrate in favor of their teams in the buffer zone. The only thing prohibited is specific content.

- 8 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA044

In the attempted challenge to the buffer zone order for the first trial, made by different individuals, the Massachusetts Supreme Judicial Court determined that it was content neutral, because it had an "incidental effect on some speakers or messages but not others" citing *Ward*. *Spicuzza v. Commonwealth*, 494 Mass. 1005, 1008 (2024). The regulation in *Ward* was about volume and expressly had nothing to do with content. In contrast, one must directly look at the content of the speech barred under the first and, now second, Orders from Judge Cannone: an individual may hold up a sign within the Zone that says "Marry Me" or "Buy Gold," but if the sign says "Impeach Judge Cannone" it is barred. There is nothing "incidental" about it—it is expressly aimed at content. And *Ward* would be just fine if it were applied here – perhaps a limitation on the volume of demonstrations *could* be justified, but not a wholesale lockdown on dissent.

Assuming, *arguendo*, the "buffer zone" is content neutral, such restrictions are subject to intermediate scrutiny, meaning they must be "narrowly tailored to serve and significant government interest, and … leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The order is not narrowly tailored—Judge Cannone could simply instruct jurors to ignore the demonstrations. The order need not be directed at such a broad amount of speech. And, it does not leave open ample alternative channels—the news media cover the area closest to the courthouse, leaving Plaintiffs unheard. The *Spicuzza* Court asserted it was narrowly tailored because 200 feet is less than the original 500 feet the Commonwealth request, but that does not justify 200 feet. 494 Mass. at 1008. Thirty feet is enough to ensure passage for those who need access. And, as to the fear of extraneous

- 9 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA045

influence (*id.*), curative jury instructions are commonplace.[4]  While the *Spicuzza* Court asserted there were ample alternative channels, it made this pronouncement in the absence of record evidence and identified none.  494 Mass. at 1008.

Sidewalks and streets and parks outside a courthouse are given even greater First Amendment deference than the inside of the courtroom. "For the First Amendment does not speak equivocally. . . . It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges v. California*, 314 U.S. 252, 263 (1941).  Sidewalks, including sidewalks around courthouses, are traditional public forums. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 817 (1985); *United States v. Grace*, 461 U.S. 171, 177 (1983), quoting *Perry Education Assn. v. Perry Local Educator's Assn.*, 460 U.S. 37, 45 (1983). Public streets and sidewalks, "are presumptively traditional public forums, and the Supreme Court has repeatedly reaffirmed their status as places for expressive activity." *Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus*, 634 F.3d 3, 11 (1st Cir. 2011). The *Spicuzza* Court expressly avoided reaching this issue, asserting that it did not have a sufficient record.  494 Mass. at 1008.  In contrast, this Court has verified statements that the buffer zone does, in fact, include sidewalks and other areas that are traditional public fora, thus the *Spicuzza* decision is inapposite and should be disregarded.

The Second Prior Restraint Order substantially and directly violates the First Amendment. The Superior Court did not even *consider*, much less correctly analyze, its obligations to narrowly tailor the Zone, nor did it consider, much less implement, any less restrictive means.  The Superior Court simply napalmed the entire First Amendment in a vaguely-defined area.

---

[4] Courts, for example, routinely instruct jurors to ignore protestors who remind jurors of their power to acquit against the evidence (also known as "jury nullification"), which instructions are abided.  *See, e.g., United States v. Kleinman*, 880 F.3d 1020, 1031 (9th Cir. 2018).

Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

**AA046**

Judge Cannone did not define "demonstrate," yet it could encompass a broad swath of constitutionally protected conduct that would have no possible effect on the purported purpose for the Zone.  Given the ill-defined term, citizens are left to guess what they can and cannot do. Can they march in a single column?  Not if "demonstrate" prevents that.  Can they hold a candlelight vigil?  Probably not.  When they are left to define "demonstrate" on their own, and the penalty for guessing wrong is contempt, this does not even meet rational basis review, much less strict scrutiny.

Temporally, when does this restriction apply?  The Superior Court said it was "during trial."  Is that the six week period of trial, or is it the technical interpretation of "gavel to gavel?"  If the former, that would mean even at midnight on a Saturday, there can be no demonstrations.  If the latter, then what purpose does it serve, since the jury will not be outside, but will be in the courthouse?  The Superior Court's Order is so unbalanced that it does not stand even slightly-rational analysis.

If the Superior Court has the power to reach outside the courthouse (which seems suspect), and the ban were limited to jury selection only, this might be rational.  During trial, the jury can be brought in through the back entrance to the courthouse, and demonstrators could be banned from that entrance. Any infringement on First Amendment rights from these narrowly tailored and limited remedies would be de minimis enough that more zealous parties might complain, but these Plaintiffs would not challenge them.

Plaintiffs, had they been given an opportunity to be heard, would have suggested the following narrow tailoring devices:

    1.    Any restrictions on demonstrations should only be during jury selection, when prospective jurors will be entering through the main entrance and they cannot be

Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

**AA047**

instructed to enter through the alternate entrances.

2.      Any concerns about tainting the jury or witnesses should be limited to actual contact with jurors or witnesses.  Any concerns about demonstrators influencing them should be addressed by bringing jurors and witnesses in through alternate entrances, where there may be reasonable buffer zones enacted, however such buffer zones should be limited to 25 feet on either side of the rear entrance to the courthouse.

3.      If there is a specific finding that it is impossible for a juror or witness to enter the courthouse through the back entrance, perhaps then, law enforcement may be called to require that demonstrators face away from the courthouse for the few seconds it takes for that person to enter the courthouse, and then the demonstrators may continue un-restricted once that affected person has entered or exited the building.  However, to prevent abuse of this narrowly tailored restriction, there should be a specific factual finding as to why it would be impossible to use the back door, rather than the public facing door to the courthouse.

Since Judge Cannone did not endeavor to properly narrow her order, it should be enjoined.  Perhaps then she may take the opportunity to narrow it.  Until then, the content discriminatory order is unconstitutional and the Second Prior Restraint Order must be enjoined.

### 3.2.2   Judge Cannone's Order Constitutes a Prior Restraint

"The principal purpose of the First Amendment's guaranty is to prevent prior restraints." *In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986). The Norfolk County Superior Court created a "Prior Restraint Zone" prohibiting all demonstrations (without defining that term) in a vaguely-defined area, but clearly encompassing a broad swath of traditional public forums.  It did so without considering arguments that could have helped tailor the relief when it gave no

- 12 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA048

opportunity to hear to those who would be directly impacted by the Prior Restraint Zone.

When, as here, a prior restraint impinges upon the right of the public to speak, and forbids pure speech, not speech connected to any conduct, "the presumption of unconstitutionality is virtually insurmountable." *In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986). If a court wishes to take away the right to protest, it may not do so without at least entertaining protesters' arguments to the contrary.

"The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 271 (1948). "Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Id.* In this case, the media (aside from one outlet) has been largely absent from performing its Fourth Estate function, but demonstrators have taken up that slack. Judge Cannone's actions, especially the way its order was crafted, create at least the impression to the public that it was not done for the stated reasons, but rather to insulate itself from publicity and meaningful criticism.

When a trial court tries to take away First Amendment rights *in its very realm – the courthouse itself*, the Supreme Court requires that it make specific findings justifying closure. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 558 (1980). Here, Judge Cannone went beyond her realm of the courthouse, and issued an order that purports to restrict speech in a traditional public forum. Where the government seeks to shut down traditional public forums, in the absence of statutory authority upon which it could be based, the case law is not as rich with cases on point. This may be because it has been obvious that a judge lacks authority to issue an order regulating conduct of parties that are not before it, on land that the court itself does not control. This appears to be a case of first impression, where a court seeks to extend its tentacles outside of its realm (the

- 13 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA049

courthouse) and ensnare *all demonstrations* on property it does not control including traditional public forums and even private property.  There are cases discussing *legislative* authority over such areas, such as *Cox v. Louisiana,* 379 U.S. 536 (1965). But despite a good faith effort to find one, Plaintiffs' counsel is unable to find a single case where a Court purported to command contempt authority over demonstrators outside the courthouse grounds.

Our Constitution rarely, if ever, tolerates a prior restraint. "Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 530, 559 (1976). "The Supreme Court has roundly rejected prior restraint." *Kinney v. Barnes*, 443 S.W.3d 87, 91 n.7 (Tex. 2014) (citing Sobchak, W., *The Big Lebowski*, 1998). Prior restraints "bear a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986) (same).

The *Spicuzza* Court asserted that the first order was not a prior restraint because it viewed the restriction as merely a content neutral time/place/manner restriction.  494 Mass. at 1008.  As it is a content-based restriction, this Court should not compound the *Spicuzza* Court's error. Judge Cannone's order is a prior restraint. Plaintiffs have never threatened anyone or shown a scintilla of violent behavior, nor engaged in any conduct that would warrant a prior restraint. Absent any justification, the prior restraint must be enjoined.

### 3.2.3   Plaintiffs Deserved Due Process – It Was Denied

It is an affront to due process that a court can deprive hundreds of people of their First Amendment rights without an opportunity to be heard.  Judge Cannone had no authority to issue her Second Prior Restraint Order.  She cited to no violation by Plaintiffs (nor anyone else) of any

- 14 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA050

law or rule and she arbitrarily determined that Plaintiffs' statements (which she likely was not even aware of) warranted a prior restraint, measured against no regulation.

Judge Cannone's order was issued without jurisdiction over Plaintiffs, *ex parte,* and without authority.  Judge Cannone has no authority outside the courthouse complex.   In Massachusetts,  "Inherent powers of the courts are those 'whose exercise is essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases.'" *Brach v. Chief Justice of the Dist. Court Dep't*, 386 Mass. 528, 535 (1982), quoting *Sheriff of Middlesex County v. Commissioner of Correction*, 383 Mass. 631, 636 (1981).  "The inherent authority of the judiciary 'is not limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate.'" *Opinions of the Justices*, 372 Mass. 883, 892-93 (1977) quoting *O'Coin's, Inc. v. Treasurer of the County of Worcester*, 362 Mass. 507, 510 (1972).  Controlling traditional public fora (sidewalks) and private property is not essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases, else such orders would've been commonplace for centuries.  Nor is it part of the ancillary functions.  Judge Cannone undertook land-use regulation, the province of the legislature or town.  The *Spicuzza* Court failed to even address the lack of authority Judge Cannone commanded over non-parties on traditional public fora and private property.

Most importantly, no procedures are in place to have contested the order.  There was no meaningful opportunity to be heard— it was issued on an *ex parte* basis. *Ex parte* communications can "shadow the impartiality, or at least the appearance of impartiality," of a proceeding and "may, in some circumstances, constitute a deprivation of due process of law." *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir. 1976), cert. denied, 429 U.S. 858 (1976), *overruled on other grounds by*

- 15 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA051

*Maine v. Moulton*, 474 U.S. 159 (1985). Here, Judge Cannone only heard from the Commonwealth and gave no opportunity to any potentially affected person to be heard.  In fact, history shows she flatly denies intervention to be heard to those who would be affected.  And, as for the individuals who attempted to intervene and oppose the buffer zone order in the first trial, the Massachusetts Supreme Judicial Court even determined that denying intervention was not something they would consider. *Spicuzza,* 494 Mass. at 1007.  The *Spicuzza* Court was glaringly silent on the question of due process.  Thus, the *ex parte* motion by the Commonwealth denied Plaintiffs their due process.

It is fundamental that a court cannot bind non-parties who are not brought within the court's jurisdiction.  As the First Circuit observed:

> a federal court will not impose judgment on a party that is not offered the opportunity to defend itself. *Lambert*, 355 U.S. at 228. The idea that process is not only due but must be duly provided is so "universally prescribed in all systems of law established by civilized countries," *Twining v. New Jersey*, 211 U.S. 78, 111 (1908), that courts have only seldom to remind litigants that such is the case. *See, e.g., Brown v. American Nat. Bank*, 197 F.2d 911, 914 (10th Cir. 1952) ("It is a familiar rule of frequent enunciation that judgment may not be entered with binding effect against one not actually or constructively before the court."); *Bronco Wine Co. v. Frank A. Logoluso Farms*, 214 Cal. App. 3d 699, 717 (1989) ("Rendering a judgment for or against a nonparty to a lawsuit may constitute denial of due process under the United States and California Constitutions. . . . Notice and a chance to be heard are essential components to the trial court's jurisdiction and for due process. Without jurisdiction over the parties, an *in personam* judgment is invalid."); *Demoulas v. Demoulas*, 428 Mass. 555, 591 (1998) ("The judge did not have jurisdiction over nonparties, and we cannot make awards in favor of nonparties. .").

*Wilson v. Town of Mendon*, 2002 U.S. App. LEXIS 4352, *17-19 (1st Cir. Mar. 19, 2002).  Here, Plaintiffs were never brought within Judge Cannone's jurisdiction and her order cannot bind them.

The order's vagueness further evidences a deprivation of due process.  The order, like any regulation, must define the offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A great degree of

- 16 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA052

specificity and clarity of such notice and restriction is required when First Amendment rights are at stake. *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986). A regulation is vague if it either fails to place people on notice of exactly which conduct is prohibited, or if the possibility for arbitrary enforcement is present. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).  Here, there was not even a regulation allegedly violated.

The Second Prior Restraint Order is a vague, unconstitutional regulation.  Government regulations which rely on a viewer's subjective interpretation of facts are void for vagueness. *Morales*, 527 U.S. at 56-64 (holding a provision criminalizing loitering, which is defined as "to remain in any one place with no apparent purpose," void for vagueness because the provision was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene"); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554-55 (9th Cir. 2004) (holding a statute requiring physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others").

*Morales* provides a useful guidepost for when enforcement of a statute or regulation may be unconstitutionally vague:

> If the police are able to decide arbitrarily which members of the public they will order to disperse, then the Chicago ordinance becomes indistinguishable from the law we held invalid in *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965). Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disperse.

- 17 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA053

527 U.S. at 58-59.  Here, Plaintiffs have no precise ability to know whether their speech is prohibited.  Is a sign saying "Judge Cannone likes Pineapple on Pizza" prohibited?  The order is vague and subject to arbitrary and discriminatory enforcement.

The Order *seems* so transparently invalid that demonstrators of extraordinary firmness *might* simply ignore it, relying on *In re Providence Journal Co.*, 820 F.2d 1342, 1347 (1st Cir. 1986):

> "An order entered by a court clearly without jurisdiction over the contemnors or the subject matter is not protected by the collateral bar rule. Were this not the case, a court could wield power over parties or matters obviously not within its authority - - a concept inconsistent with the notion that the judiciary may the judiciary may exercise only those powers entrusted to it by law."

However, in that landmark case, the Providence Journal did not face being thrown into a jail cell for ignoring a patently unconstitutional order.  Plaintiffs certainly could. They should not be forced to violate the Order, get locked up, and *then* challenge the contempt. This Court should rein in Judge Cannone.  Thus, the issuance of the Second Prior Restraint Order violates Plaintiffs' 14th Amendment right to due process and warrants injunctive relief.

### 3.3    There is Irreparable Injury That Will Continue if Not Enjoined

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When a plaintiff seeks injunctive relief for "an alleged violation of First Amendment rights, a plaintiff's irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Assn'n of Club Owners and Fraternal Srvs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Thus, if the plaintiff demonstrates a likelihood of success on the merits of its First Amendment claim, they necessarily also establish irreparable harm. *Fortuño, 699 F.3d at 15.*

- 18 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA054

Judge Cannone deprived Plaintiffs of their First Amendment rights by banning them from speaking in a traditional public forum, and Plaintiffs fear enforcement by the Dedham police and Norfolk District Attorney.  Thus, Plaintiffs will be irreparably harmed absent injunctive relief.

### 3.4    The Balance of Equities Tips in Plaintiff's Favor

When the government restricts First Amendment rights, the balance of hardships weighs in a plaintiff's favor. *See Firecross Ministries v. Municipality of Ponce*, 204 F. supp. 2d 244, 251 (D.P.R. 2002) (holding that "insofar as hardship goes, the balance weighs heavily against Defendants, since they have effectively silenced Plaintiffs' constitutionally protected speech").

The balance of equities tips in Plaintiffs' favor.  Failing to grant the injunction will continue to deprive them of their constitutional rights pursuant to the First and Fourteenth Amendments. Defendants will suffer no harm if Plaintiffs are granted the requested injunctive relief.  Rather, an injunction will merely restore the rights guaranteed by the U.S. Constitution.  A temporary restraining order, to be converted into a preliminary injunction must issue.

### 3.5    Injunctive Relief is in the Public Interest

The public interest "favors protecting First Amendment rights." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624, (S.D. W.V. 2013); *see also Carey v. FEC*, 791 F. Supp. 2d 121, 135-36 (D. D.C. 2011); *Mullin v. Sussex Cnty., Del.*, 861 F. Supp. 2d 411, 428 (D. Del. 2012). The public interest is served by issuing an injunction where "failure to issue the injunction would harm the public's interest in protecting First Amendment rights in order to allow the free flow of ideas." *Magriz v. union do Tronquistas de Puerto Rico, Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (citation omitted).  Moreover, the unconstitutional actions here harms nonparties to the case because they limit or infringe upon their rights. *See Wolfe Fin. Inc. v. Rodgeres*, 2018 U.S. Dist. LEXIS 64335, at *49 (M.D. N.C. April 17, 2018) (*citing McCarthy v. Fuller*, 810 F.3d 456, 461

- 19 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA055

(7th Cir. 2015).  Nor is there any harm to the interests of justice and a fair trial; demonstrations are not uncommon without such restrictions and a jury can be properly instructed.  Thus, the public interest weighs in favor of enjoining the Second Prior Restraint Order.

### 3.6    At Most, a Minimal Bond Should Be Required

Rule 65 provides that a court cannot enter injunctive relief unless the moving party "gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  In other words, a bond should only be required if the enjoined party will suffer any harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

Defendants will suffer no damages if the Court issues the requested injunction, which will simply allow the free exercise of constitutional rights.  All that the injunction will do is repair the *status quo*.  For this reason, Plaintiffs request that the injunction issue with no bond required.  If a bond is required, Plaintiffs request that it be a token of $1.

### 4.0    Conclusion

Plaintiffs wish to be heard.  The Court should enter a preliminary injunction against the Defendants, enjoining the Second Prior Restraint Order and preventing them from taking action against Plaintiffs on account of such and from taking any action to try to apply that order.  Specifically, they should be enjoined from threatening or imposing criminal sanctions or civil sanctions, or contempt sanctions against speech that only violates the Second Prior Restraint Order.

Should the Court decline to enter such injunction, Plaintiffs request alternative relief in the form of an injunction pending appeal.  Fed. R. Civ. P. 62(d).

- 20 -
Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

AA056

Dated: April 1, 2025.                    Respectfully Submitted,

                                         /s/ Marc J. Randazza
                                         Marc J. Randazza, BBO# 651477
                                         mjr@randazza.com, ecf@randazza.com
                                         Jay M. Wolman, BBO# 666053
                                         jmw@randazza.com
                                         RANDAZZA LEGAL GROUP, PLLC
                                         30 Western Avenue
                                         Gloucester, MA 01930
                                         Tel: (978) 801-1776

                                         Mark. Trammell
                                         (*Pro Hac Vice* Forthcoming)
                                         Center for American Liberty
                                         P.O. Box 200942
                                         Pittsburgh, PA 15251
                                         Tel: (703) 687-6200
                                         MTrammell@libertyCenter.org

                                         *Attorneys for Plaintiffs.*

RANDAZZA | LEGAL GROUP

Memorandum of Law in Support of Plaintiff's Motion for a
Temporary Restraining Order and for a Preliminary Injunction

**AA057**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Grant, et al., v. Trial Court of the Commonwealth of Massachusetts, et al.

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

   ☐  **I.**  160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   ☑  **II.**  110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   ☐  **III.**  120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

   ***Also complete AO 120 or AO 121. for patent, trademark or copyright cases.**

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**
   YES ☐   NO ☑

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC §2403)**
   YES ☐   NO ☑

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**
   YES ☐   NO ☐

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**
   YES ☐   NO ☑

7. **Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**
   YES ☑   NO ☐

   **A.**  **If yes, in which division do all of the non-governmental parties reside?**
   Eastern Division ☑   Central Division ☐   Western Division ☐

   **B.**  **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**
   Eastern Division ☐   Central Division ☐   Western Division ☐

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**
   YES ☐   NO ☑

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Marc J. Randazza
**ADDRESS** 30 Western Ave., Gloucester, MA 01930
**TELEPHONE NO.** 888-887-1776

**(CategoryForm11-2020.wpd )**

**AA058**

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

## District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 4/2/2025 at 10:43 AM EDT and filed on 4/2/2025

**Case Name:** Grant et al v. Trial Court of the Commonwealth of Massachusetts et al
**Case Number:** 1:25-cv-10770-MJJ
**Filer:**
**Document Number:** 8(No document attached)

**Docket Text:**
**ELECTRONIC NOTICE Setting Hearing on [2] MOTION for Temporary Restraining Order *and for a Preliminary Injunction or, in the Alternative, an Injunction Pending Appeal* : Motion Hearing set for 4/4/2025 02:30 PM in Courtroom 20 (In person only) before Judge Myong J. Joun.**

**It is further ORDERED that Plaintiffs shall serve a copy of this Order on Defendants immediately upon receipt to ensure that Defendants' counsel will appear at the hearing.**

**(JL)**

**1:25-cv-10770-MJJ Notice has been electronically mailed to:**

**Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com**

**1:25-cv-10770-MJJ Notice will not be electronically mailed to:**

**AA059**

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>Plaintiffs,<br><br>v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

## <u>NOTICE OF FILING SUPPLEMENTAL EXHIBITS</u>

Plaintiffs hereby file supplemental exhibits in support of their Motion for a Temporary Restraining Order and for a Preliminary Injunction or, in the alternative, an Injunction Pending Appeal (ECF No. 2).

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark Trammell
(*Pro Hac Vice* Forthcoming)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

# **Exhibit A**

Declaration of Michel Bryant

**AA061**

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Jason Grant, Allison Taggart, and Samantha Lyons,<br><br>Plaintiffs,<br><br>v.<br><br>Norfolk County Superior Court, and Beverly J. Cannone, in her official capacity as Justice of the Norfolk County Superior Court.<br><br>Defendants. | Civil Action No. 1:25-cv-10770-MJJ<br><br>**<u>DECLARATION OF MICHEL BRYANT</u>** |

I, Michel Bryant, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.  I have knowledge of the facts set forth herein, and if called as a witness, could and would testify thereto.

2.      I am a Host and Executive Producer with Justice Served TV, LLC.

3.      I am an Executive Producer for I Survived a Crime, which was a production with Law and Crime Productions and The Legal Edge Network, LLC, airing on A&E Network and NETFLIX.

4.      I am an Executive Producer for CULT JUSTICE, airing on the Hulu Network

5.      I submit this Declaration to authenticate the video titled "Arrest Threats by Mass Staties in #KarenRead Case."

6.      I recorded this video on April 1, 2025.

7.      I recorded this video through my phone.

8.      On that day, I was walking on the sidewalk near the Dedham Courthouse, inside the "buffer zone," but I was not protesting, I was news gathering.

**AA062**

Doc ID: f7412dfa6aa1c7734c6289cda66ebe2b274dd3df

9.      On that day, two Massachusetts State Police approached me and told me that I could not remain in the area, despite the fact that I was only newsgathering.

10.     While we were walking, I saw the State Troopers approach Mr. John Delgado, ("Delgado").

11.     Delgado is wearing a blue sticker that says, "Real Justice for John O'Keefe FKR."

12.     The video shows a law enforcement officer tell Delgado, "That's gotta go" in reference to Delgado's sticker.

13.     The video then shows this law enforcement officer rip Delgado's sticker off his jacket.

14.     This video further shows the law enforcement officer telling Delgado "I don't want to see you walking by here again."

15.     This video streamed live from my phone to YouTube on or about 9:33 am EDT on April 1, 2025.

16.     I later uploaded this video to my YouTube Channel, JSTV – Justice Served TV, on April 2, 2025.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated: ___04 / 02 / 2025_____        By: _____*Michel Bryant*_____
                                             Michel Bryant

**AA063**

Doc ID: f7412dfa6aa1c7734c6289cda66ebe2b274dd3df

# <u>Exhibit B</u>

Michel Bryant Video
April 1, 2025

## To be filed conventionally with the Clerk's Office

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>Plaintiffs,<br><br>v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

## <u>NOTICE OF CONVENTIONAL FILING WITH THE CLERK'S OFFICE</u>

Notice is hereby given that the documents and exhibits or attachments listed below have been manually filed with the Court and are available in electronic form only:

- ECF No. 9-2; **<u>Exhibit B</u>** Video Exhibit – April 1, 2025 Michel Bryant video.

The video is maintained in the case file in the Clerk's Office.

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark Trammell
(*Pro Hac Vice* Forthcoming)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS, <br><br>           Plaintiffs, <br><br>    v. <br><br> TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney, <br><br>           Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

**<u>NOTICE OF FILING SUPPLEMENTAL EXHIBITS</u>**

      Plaintiffs hereby file the following supplemental exhibits in support of their Motion for a Temporary Restraining Order and for a Preliminary Injunction or, in the alternative, an Injunction Pending Appeal (ECF No. 2):

      1.      The Buffer Zone map and Free Speech Zone, a/k/a "Peaceful Demonstration Area," found on the website of the Police Department of the Town of Dedham at <https://www.dedham-ma.gov/home/showdocument?id=25245&t=638790193306379728> and attached hereto as **<u>Exhibit A</u>**.

      2.      Town of Dedham Police Community Notification – Commonwealth vs. Karen Read Trial on the letterhead of Defendant d'Entremont, found on the Dedham Police Department Facebook page at <https://www.facebook.com/photo.php?fbid=976386021341582&set=a.244639677849557&type=3&mibextid=wwXIfr&rdid=DqyL9yUNDgdAifdh&share_url=https%3A

Notice of Filing Supplemental Exhibits
Civil Action No. 1:25-cv-10770-MJJ

**AA066**

%2F%2Fwww.facebook.com%2Fshare%2F18gjUnt2si%2F%3Fmibextid%3DwwXIfr>    and

attached hereto as **Exhibit B**.


Dated: April 2, 2025.                        Respectfully Submitted,

                                             /s/ Marc J. Randazza
                                             Marc J. Randazza, BBO# 651477
                                             mjr@randazza.com, ecf@randazza.com
                                             Jay M. Wolman, BBO# 666053
                                             jmw@randazza.com
                                             RANDAZZA LEGAL GROUP, PLLC
                                             30 Western Avenue
                                             Gloucester, MA 01930
                                             Tel: (978) 801-1776

                                             Mark. Trammell
                                             (*Pro Hac Vice* Forthcoming)
                                             Center for American Liberty
                                             P.O. Box 200942
                                             Pittsburgh, PA 15251
                                             Tel: (703) 687-6200
                                             MTrammell@libertyCenter.org

                                             *Attorneys for Plaintiffs.*

AA067

# **Exhibit A**

Buffer Zone Map
and Free Speech Zone

**AA068**

COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**                                                    **SUPERIOR COURT
                                                                   CRIMINAL ACTION
                                                                   22-00117**

COMMONWEALTH

**vs.**

**KAREN READ**

<u>**MEMORANDUM OF DECISION AND ORDER ON
COMMONWEALTH'S MOTION FOR BUFFER ZONE AND ORDER PROHIBITING
SIGNS OR CLOTHING IN FAVOR OF EITHER PARTY OR LAW ENFORCEMENT**</u>

Prior to the defendant's first trial, on April 4, 2024, this Court issued an order

establishing a buffer zone around the Norfolk Superior Courthouse prohibiting any individual

from demonstrating in any manner within 200 feet of the courthouse complex and from wearing

any clothing or insignia related to the case in the courthouse during trial. The Commonwealth

now moves for the Court to reestablish the buffer zone for the defendant's upcoming second trial

and modify the previous order by extending it to include area encompassed within Bates Court,

Bullard Street, Ames Street, and Court Street.[1]

To ensure the defendant's right to a fair trial, the Court may restrict protected speech so

long as the restrictions do not "burden substantially more speech than is necessary to further the

government's legitimate interests." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 799 (1989).

For the same reasons that compelled the Court to establish a buffer zone for the first trial, it is

necessary to establish a buffer zone for the second trial to ensure the defendant's right to a fair

trial.

---

[1] During argument on the motion, the Commonwealth withdrew its request for a second modification to the April 4, 2024 Order.

**AA069**

The case continues to garner significant public interest. When the matter is in court, individuals line the sidewalks outside the courthouse, loudly chanting and voicing their opinions about witnesses, attorneys, and the strength of the Commonwealth's case. They display matters which may be in evidence during trial or share their viewpoints as to the guilt or innocence of the defendant on their clothing or on signage. If prospective jurors are exposed to the protestors and messages displayed on signs or otherwise, particularly before this Court has had an opportunity to instruct the jurors about their obligations with regard to remaining fair and unbiased, there is a substantial risk that the defendant's right to a fair trial will be jeopardized. The risk extends during trial where jurors and witnesses would have no choice but to be exposed daily to the messages and viewpoints of the protestors when entering and leaving the courthouse or sitting in the courtroom or jury room.

Additionally, the Court concludes that modification to the April 4, 2024 Order is necessary. Despite the 200-foot buffer zone around the courthouse complex during the first trial, on the western side of the courthouse complex where there is a large open space running along High Street between Bullard Street and Ames Street, the collective voices of groups of demonstrators gathering outside the buffer zone could be clearly heard inside the courthouse. See Affidavit of Massachusetts State Police Sergeant Michael W. Hardman at par. 5. Vehicles honking their horns in response to signs and gestures from these demonstrators could also be heard frequently during the first trial. See *id.* at par. 6. Indeed, after trial, a deliberating juror reported that during deliberations, the jurors could hear protestors outside screaming and yelling. See Affidavit of Juror Doe at par. 10.[2] To ensure a fair trial with an impartial jury, extending the

---

[2] The Court also recognizes the list of concerns sent to the Court by the "Karen Read Trial Prepare Together Group"—a group of local business owners and organizations that experienced issues with protestors during the first trial.

AA070

buffer zone is necessary to prevent jurors from outside influence and to prevent interruptions and distractions during trial.

It is, therefore, **ORDERED** that no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street. Individuals are also prohibited from using audio enhancing devices while protesting.

It is further **ORDERED** that no individuals will be permitted to wear any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.

Date:   March 25, 2025

Beverly J. Cannone
Justice of the Superior Court

3

**AA071**



AA072



# Exhibit B

Town of Dedham Police
Community Notification

**AA074**

**Michael d'Entremont**
Chief of Police

**TOWN OF**
**DEDHAM**
**POLICE**

📞 781-751-9300

📍 26 Bryant Street, Dedham, MA 02026

🌐 www.dedham-ma.gov/police

March 31, 2025

## Community Notification - Commonwealth vs. Karen Read Trial

On Tuesday April 1, 2025, the Commonwealth vs. Karen Read trial is scheduled to begin at the Norfolk County Superior Court located at 650 High Street in Dedham.

This case continues to attract a significant amount of attention in the media, on social media and at the Courthouse during case related events.

Through multi-agency collaboration, a plan has been formulated to provide for the safety and security for all in and around the trial venue.

The Justice on this case has issued a **Memorandum of Decision and Order on Commonwealth's Motion for Buffer Zone and Order Prohibiting Signs or Clothing in Favor of Either Party or Law Enforcement**. A copy of this order is attached. Please note that the buffer zone as articulated in the Order has expanded westerly of the Superior Court as compared to during the first trial of this case. Police Officers will be visible in and around the buffer zone to monitor for compliance with the Order. A designated peaceful demonstration area outside of the buffer zone will be reserved in the Keystone parking lot on Eastern Ave, closest to the intersection of Providence Highway and Eastern Ave. We ask anyone who may plan on peacefully protesting to read and comply with the court order. The beginning of the buffer zone on public ways will be marked with signage to inform members of the public.

Norfolk Street will be closed during trial-related activity at the Courthouse between Court Street and Pearl Street. Pearl Street may be closed intermittently throughout the trial. There are no other planned road or sidewalk closures at this time. Roadways, sidewalks and businesses will remain open to members of the public as usual.

We anticipate that there will be an increase in activity in the area during this trial. We urge all to exercise patience when traversing the area. If you need a place to park, please park in legal parking spaces and in compliance with posted restrictions.

**The mission of the Dedham Police Department is to protect and serve the citizens of Dedham through collaboration, preventative programs and the judicious enforcement of the laws of the Commonwealth of Massachusetts and the by-laws of the Town of Dedham.**

AA075

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-cv-10770

JASON GRANT, ALLISON TAGGART, LISA
PETERSON, and SAMANTHA LYONS,

Plaintiffs,

v.

TRIAL COURT OF THE COMMONWEALTH
OF MASSACHUSETTS, BEVERLY J.
CANNONE, in her official capacity as Justice of
the Superior Court, GEOFFREY NOBLE, as
Superintendent of the Massachusetts State Police,
MICHAEL d'ENTREMONT, in his official
capacity as Chief of Police Department of the
Town of Dedham, Massachusetts, and MICHAEL
W. MORRISEY, in his official capacity as the
Norfolk County District Attorney,

Defendants.

**STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

By this action, Plaintiffs seek to have this Court belatedly enjoin the modest expansion of

a buffer-zone order issued by a Massachusetts Superior Court judge for the *Commonwealth v.*

*Karen Read* murder trial.  The state-court trial judge, Beverly J. Cannone, issued the buffer-zone

order on March 25, 2025, following a hearing on the issue in open court.  The new buffer-zone

order modestly expands a previous buffer-zone order that was issued by Judge Cannone before

the first trial, which took place in 2024 and ended in a mistrial.  The first buffer-zone order was

upheld by the Massachusetts Supreme Judicial Court (SJC) against a First Amendment challenge

1

**AA076**

in *Spicuzza v. Commonwealth*, 494 Mass. 1005 (2024) (per curiam). For the reasons set forth

below, in particular that the likelihood of success on the First Amendment claim is non-existent

given that the order is content-neutral nature and does not restrict speech based on its message,

that it is narrowly tailored to restrict noise from infringing on the defendant's right to a fair trial,

and that it leaves open alternatives given the order's limited scope, this Court should deny

Plaintiffs' request for a temporary restraining order or preliminary injunctive relief.

## **BACKGROUND**

In March 2024, during the first state-court trial in *Commonwealth v. Karen Read*, the

Commonwealth moved for an order barring demonstrations within a buffer-zone of 500 feet

around the Dedham courthouse complex and prohibiting certain items from being worn or

displayed inside the courthouse.[1] A group of individuals moved to intervene in the case to

oppose the Commonwealth's request.[2] And the American Civil Liberties Union of

Massachusetts, Inc. ("ACLUM") sought leave to file an amicus curiae memorandum, essentially

opposing the request.[3] Ms. Read took no position on the matter.[4]

Following a hearing, the Superior Court denied the motion to intervene, granted the

ACLUM leave to submit its memorandum (which the court noted it had read), and granted the

request for a buffer zone but only in part, instead ordering a smaller buffer ordered that:

> No individual may demonstrate in any manner, including carrying signs or
> placards, within 200 feet of the courthouse complex during trial of this case,
> unless otherwise ordered by this Court. This complex includes the Norfolk
> Superior courthouse building and the parking area behind the Norfolk County
> Registry of Deeds building. Individuals are also prohibited from using audio
> enhancing devices while protesting . . . [and] . . . no individuals will be permitted
> to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the

---

[1] Commonwealth's Motion for Buffer Zone and Order Prohibiting Signs or Clothing in Favor of Either Party or Law Enforcement, at 2 (Dkt. 1-3).
[2] Id.
[3] Id.
[4] Id.

2

**AA077**

case pending against the defendant or relating to any trial participant, in the courthouse during the trial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.[5]

The individuals who had been denied permission to intervene then filed a petition for extraordinary relief pursuant to Mass. Gen. Laws c. 211, § 3, challenging the trial court's denial of their motion to intervene as well as the buffer zone itself.[6] In addition, an association of individuals who wanted to demonstrate within the buffer zone filed a petition for relief under the same statute.[7] The Commonwealth opposed both petitions, while Ms. Read again took no position.[8]

On April 12, 2024, a single justice of the SJC denied both petitions.[9] Characterizing the Superior Court's decision on the motion to intervene as "an ordinary procedural ruling," he concluded that it did not warrant the exercise of the SJC's extraordinary power of superintendence and denied relief as to that aspect of the first petition.[10] Moving to the merits and noting "that the petitioners ha[d] standing to challenge the buffer zone order pursuant to G. L. c. 211, § 3, where they allege[d] that the buffer zone order infringes their First Amendment rights," the single justice determined that the buffer zone was a content-neutral and reasonable time-place-and-manner restriction that was narrowly tailored to a significant government interest and that left open ample alternative avenues for communication.[11]

---

[5] Id. at 2 (quoting the first buffer-zone order).
[6] Id. Chapter 211, section 3 of the Massachusetts General Laws confers upon the Supreme Judicial Court "a general superintendence power that permits, among other things, review of interlocutory matters in criminal cases only when substantial claims of irremediable error are presented and only in exceptional circumstances, where it becomes necessary to protect substantive rights." *Read v. Norfolk Cnty. Superior Ct.*, No. 25-1257, -- F.4th --, 2025 WL 926289, at *1 (1st Cir. Mar. 27, 2025) (quotations and ellipses omitted).
[7] Dkt. No. 1-3, at 2-3.
[8] Id. at 3.
[9] Id. at 3; Affidavit of Assistant District Attorney Caleb Schillinger ("Schillinger Aff."), Ex. 1, which is filed in support of this Opposition.
[10] Id.
[11] Id.

**AA078**

The petitioners then appealed the single justice's rulings to the full SJC.[12]  Again, the Commonwealth opposed relief, and Ms. Read took no position.[13]  On April 26, 2024, the SJC issued an order affirming the single justice's judgment, and it issued an explanatory opinion on May 2, 2024.[14]  494 Mass. 1005 (2024)(per curiam). The SJC held that the single justice did not commit an error of law or abuse his discretion in deciding that the intervention request did not warrant the exercise of the court's extraordinary superintendence power.[15]  And as to the petitioners' constitutional arguments, the SJC concluded that the buffer zone was content-neutral, not a prior restraint, narrowly tailored to serve a significant government interest, and permitted adequate alternative means of communication.[16]

The SJC having upheld the buffer zone, Ms. Read's trial continued, "spanning eight weeks of evidence, [and] involving seventy-four witnesses and 657 exhibits."[17]  The 200-foot buffer zone adequately prevented any demonstrations on the southern, eastern, and northern sides of the courthouse complex from interfering with the proceedings inside the courthouse.[18]  The western side of the courthouse, however, was different.  On that side, there are larger open spaces that extend beyond 200 feet from the courthouse.[19]  Groups of demonstrators gathered in those areas and engaged in coordinated shouting and chanting, which shouts and chants could be heard inside the courthouse.[20]  In addition, despite the 200-foot buffer zone, individuals were able to position themselves close enough to nearby streets such that they were able to encourage

---

[12] Dkt. No. 1-3, at 3.
[13] Id.
[14] Id.
[15] Id.
[16] Id.
[17] *Read v. Commonwealth*, 495 Mass. 312, 313 (2025)(affirming trial court's denial of defendant's motion to dismiss after court declared a mistrial).
[18] Dkt. No. 1-3, at 5.
[19] Id.
[20] Id. at 6.

**AA079**

passenger and commercial vehicles to honk their horns as a form of demonstration.[21]  The

honking, especially from the airhorns of commercial vehicles, could easily be heard inside the

courthouse.[22]  The Massachusetts State Police issued more than two dozen citations for horn

violations and other motor-vehicle offenses in connection with the trial.[23]

　　At the conclusion of the evidence, the jury deliberated for five days.[24]  They could hear

the protesters yelling and screaming during deliberations.[25]  They sent progressively insistent

notes to the judge about their inability to reach a unanimous verdict.[26]  In their third and final

note, "the jury stated that 'some members firmly believed that the evidence surpasses the burden

of proof establishing the elements of the charges,' while others did not."[27]  "They described their

views as rooted in 'sincere adherence to their individual principles and moral convictions,' and

stated that further deliberation would be 'futile' and would 'force them to compromise these

deeply held beliefs.'"[28]  After receiving the final note, the judge declared a mistrial.[29]  The

Commonwealth then elected to re-try Ms. Read on the charges.

　　In advance of Ms. Read's retrial, on March 17, 2025, the Commonwealth filed a motion

asking the court to impose a buffer zone and prohibit individuals from wearing or exhibiting in

the courthouse any buttons, photographs, clothing, or insignia relating to the case or to any trial

participant.[30]  The Commonwealth proposed that the buffer zone include the same 200-foot area

---

[21] Id.
[22] Id.
[23] Id.
[24] *Read*, 495 Mass. at 313.
[25] Dkt. No. 1-3, at 6.
[26] *Read*, 495 Mass. at 313.
[27] Id. (brackets and ellipsis omitted).
[28] Id. (brackets omitted).
[29] Id.
[30] Dkt. No. 1-3, at 1.

**AA080**

around the courthouse complex that was in place during the first trial, as well as an area encompassed within four streets on the western side of the courthouse.[31]

On March 25, 2025, after a hearing, the court granted the Commonwealth's motion.[32] The court found that a buffer zone was appropriate because, among other reasons, when proceedings in the case are taking place, "individuals line the sidewalks outside the courthouse, loudly chanting and voicing their opinions about witnesses, attorneys, and the strength of the Commonwealth's case."[33]  These individuals, the court found, also "display matters which may be in evidence during the trial or share their viewpoints as to the guilt or innocence of [Ms. Read] on their clothing or signage."[34]  If prospective or sitting jurors were exposed to such protesters or messages, the court concluded that Ms. Read's "right to a fair trial will be jeopardized."[35]  Further, the court determined that a modest expansion of the buffer zone was necessary.  It noted that during the first trial, demonstrators outside the 200-foot buffer on the western side of the courthouse "could be clearly heard inside the courthouse."[36]  The court also acknowledged the Commonwealth's concern about the honking from passing vehicles that could "be heard frequently during the first trial."[37]  Additionally, the court cited the facts that a deliberating juror reported being able to hear protesters "screaming and yelling" during deliberations, and that a "group of local business owners and organizations" had sent to the court a "list of concerns" that arose from "issues" they had experienced during the first trial.[38]

---

[31] Id.
[32] Dkt. No. 1-4, at 4; https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 (last accessed on Apr. 3, 2025).
[33] Dkt. No. 1-4. at 3.
[34] Id.
[35] Id.
[36] Id.
[37] Id.
[38] Id.

**AA081**

The retrial began in the Superior Court on April 1, 2025.  Plaintiffs filed the instant civil action and their motion for a temporary restraining order and preliminary injunction on the same day.[39]

## ARGUMENT

A preliminary injunction is "a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

 The first factor—likelihood of success on the merits—is the "*sine qua non* of a preliminary injunction.  If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (Souter, J.) (citations omitted).  "[T]he movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Because Plaintiffs fail all of these elements for entitlement to a preliminary injunction, the Motion must be denied.[40]

---

[39] Dkt. Nos. 1, 2, 3.

[40] "The standard for issuing a [temporary restraining order] is the same as for a preliminary injunction."  *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (quotation omitted).

**AA082**

I.    **PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.**

A.    <u>**Plaintiffs' First Amendment Claim Fails Because the Buffer Zone is a Content-Neutral Time, Place, and Manner Regulation That Survives the Applicable Level of Scrutiny.**</u>

In a public forum, the regulation of the time, place, and manner of speech is permissible if it is (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leaves open adequate alternatives for communication.  *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 27 (1st Cir. 2002) (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 n.3 (2002)).  For the reasons that follow, Plaintiffs fail to meet their burden to show that any of these elements are not satisfied.  *See Mazurek*, 250 U.S. at 972.

1.    **Content Neutral**

Plaintiffs cannot show that the government adopted "a regulation of speech because of disagreement with the message it conveys."  *See Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).  The buffer-zone order restricts any individual from "demonstrat[ing] in any manner, including carrying signs or placards within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court."  Dkt. 1-4 (Pl. Exhibit C), at 3.  This restriction is not based on any particular message the speech conveys.  *See Coalition to Protest Democratic Nat'l Convention v. City of Boston*, 327 F. Supp. 2d 61, 70 (D. Mass. 2004) (holding restriction against parades in specific zone, which "applie[d] to all parades, regardless of content, let alone viewpoint" was content-neutral).  Regardless of whether a demonstrator wants to convey a message in support of Ms. Read or in support of the Commonwealth, their speech is equally restricted.  This is the very definition of content-neutral.  *See Ward*, 491 U.S. at 791 (regulation is content-neutral if it is "justified without reference to the content of the regulated speech").[41]

---

[41] Additionally, as the Supreme Court observed in *Cox v. State of Louisiana*, 379 U.S. 559, 562 (1965):

**AA083**

A determination that the second buffer-zone order is content-neutral would be consistent with the SJC's decision upholding the first buffer-zone order entered prior to Ms. Read's first trial. Specifically, the SJC held that because any protesters in support of Ms. Read or in support of the Commonwealth would be equally subject to restrictions of the buffer zone, the order was "'justified without reference to the content of the regulated speech.'" *Spicuzza*, 494 Mass. at 1007 (quoting *Ward*, 491 U.S. at 791). Moreover, in response to the argument that the buffer zone was not content-neutral because commercial speech was still allowed, the SJC noted that it is permissible for a regulation to have an incidental effect on some speakers and not others. *See Spicuzza*, 494 Mass. at 1007 (quoting *Ward*, 491 U.S. at 791). On these grounds, the SJC concluded that the first buffer-zone order was content-neutral, just as this Court should conclude with respect to the second buffer-zone order.

In addition, the Supreme Court has said that a law is content-based if "applies to particular speech because of the topic discussed or the idea or message expressed," which "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. City of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

---

There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy. *See Wood v. Georgia*, 370 U.S. 375, 383 (1962). The constitutional safeguards relating to the integrity of the criminal process attend every stage of a criminal proceeding, starting with arrest and culminating with a trial 'in a courtroom presided over by a judge.' *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963). There can be no doubt that they embrace the fundamental conception of a fair trial, and that they exclude influence or domination by either a hostile or friendly mob. There is no room at any stage of judicial proceedings for such intervention; mob law is the very antithesis of due process. *See Frank v. Mangum*, 237 U.S. 309, 347 (1915) (Holmes, J., dissenting). A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence. A narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law.

**AA084**

"Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* The buffer-zone order does not violate any of these principles. As noted, it bars all demonstrations within 200 feet of the courthouse regardless of whether the demonstrator conveys a message in support of Ms. Read, or against her. The order makes no distinction based on the "topic discussed or the idea or message expressed." *Id.* Anyone demonstrating not only regarding the Read trial, but also on any other topic—*i.e.*, without regard to the topic or message—may not do so within the buffer zone. And it does not regulate speech with respect to its "function or purpose." Regardless of the function or purpose of the speech, any form of protesting around the courthouse is subject to the buffer zone. *Contrast id.* at 164 (municipal ordinance was content-based where it subjected different kinds of signs—those "directing the public to church or some other 'qualifying event'"; signs "designed to influence the outcome of an election"; and "ideological signs" that "communicate [certain] message[s] or ideas"—to different form of regulations depending on which category it fell into).

In the event the Court disagrees, however, and concludes that the buffer zone is content based, then the buffer zone also satisfies strict scrutiny, in that it is narrowly tailored to satisfy the compelling governmental interest in protecting Ms. Read's constitutional right to a fair trial by guarding against witness intimidation and, most importantly, protecting the jury from receiving extraneous inputs as they hear the case and, later, deliberate about the evidence to reach a verdict. *See Reed*, 576 U.S. at 171-72 (discussing compelling interest and narrow tailoring requirements of strict scrutiny). In the event that the Court concludes strict scrutiny applies, then the State Defendants request leave to submit additional briefing on why the buffer

**AA085**

zone satisfies strict scrutiny, given the short amount of time they have had to prepare this initial response.

### 2.    Narrow Tailoring

The requirement for narrow tailoring is met if "the means chosen are not substantially broader than necessary to achieve the government's interest." *Coalition to Protest Democratic Nat'l Convention*, 327 F. Supp. at 70 (quoting *Ward*, 491 U.S. at 800). For time, place, and manner regulations, the government's method need not be the least restrictive means of serving the government interest. *Id*. Instead, the "essence of narrow tailoring" is that it "must 'focus on the source of the evils the [government] seeks to eliminate . . . and eliminate them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Id.* (quoting *Ward*, 491 U.S. at 800 n.7).

Here, the trial judge entered the order "[t]o ensure the defendant's right to a fair trial" and an impartial jury. Dkt. 1-4 (Pl. Exhibit C), at 1-2. "No right ranks higher than the right of the accused to a fair trial." *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501, 508 (1984). The "right to a fair criminal trial by an impartial jury whose considerations are based solely on record evidence is a compelling state interest." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999) (citing *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 1075 (1991). Public fora "frequently require regulations to ensure that free speech activities do not unreasonably interfere with their functions." *Int'l Soc. for Krishna Consciousness, Inc. v. City of New York*, 484 F. Supp. 966, 971 (S.D.N.Y. 1979) (quotation omitted). *See also*, *e.g.*, U.S. Supreme Court Building Regulations, Regulations Six and Seven

11

**AA086**

(regulating the use of signs, and barring "demonstration," within the Supreme Court "building and grounds" as defined in 40 U.S.C. § 6101).[42]

It is essential that jurors remain free of extraneous influences that could render them partial in deliberations. *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (Sixth Amendment guarantees the right to trial "by an impartial jury"); *United States v. Wood*, 299 U.S. 123, 133 (1936) (biased jurors prohibited from serving on criminal juries). Here, the State Trooper's affidavit details how the buffer zone was sufficient to prevent disturbances from three of the four sides of the courthouse but not the west side. (Schillinger Aff., Ex. 1 attaching Trooper Affidavit, at 1-2). He explains how he was able to hear the demonstrators within the courthouse from its west side. (Schillinger Aff., Ex. 1 attaching Trooper Affidavit, at 3). Furthermore, due to the layout of the courthouse, the demonstrators' signs caused passing vehicles to honk their horns, which the trooper explains "could be easily heard inside the courthouse" throughout trial. (Schillinger Aff., Ex. 1 attaching Trooper Affidavit, at 3). Perhaps most concerning, an anonymous juror detailed how he "could hear protesters outside screaming and yelling" throughout jury deliberations. (Schillinger Aff., Ex. 2 attaching Juror Affidavit, at 2).

The judge's order is a moderate increase of the prior buffer zone approved by the SJC. It does not extend the buffer zone on three of the four sides of the courthouse. Instead, the order extends only the zone on the western side of the courthouse complex where "there is a large open space" and "the collective voices of groups of demonstrators gathering outside the buffer zone could be clearly heard inside the courthouse." Dkt. 1-4 (Pl. Exhibit C), at 2. Extending the buffer zone in this limited fashion focuses narrowly on the important interest the judge identified here—protecting Ms. Read's right to a fair trial and an impartial jury by preventing noise that

---

[42] Available at https://www.supremecourt.gov/about/buildingregulations.pdf.

AA087

could interfere with court proceedings, including jury deliberations. *See Coalition to Protest Democratic Nat'l Convention*, 327 F. Supp. at 70. This is especially underscored by the fact that the prior arrangements did not prevent demonstrations from infringing not only upon the trial itself but also upon the jury deliberation process. *See, e.g., Mahoney v. Vondergritt*, 938 F.2d 1490, 1491 (1st Cir. 1991) (noting "longstanding rule that courts must protect jurors and their verdicts from unwarranted intrusions" (quotation marks and citation omitted)); *Alegjo Jimenez v. Heyliger*, 792 F. Supp. 910, 914-915 (D.P.R. 1992) (presence of security officer, even if he did not initiate conversation, "may still have affected the deliberations if just through his presence he intimidated jurors from speaking frankly amongst themselves"). It is part of the essential function of a courthouse to provide a trial free from these potential extraneous influences. *See Int'l Soc. for Krishna Consciousness, Inc.*, 484 F. Supp. at 971.

Lastly, this conclusion is consistent with the SJC's decision on the earlier buffer-zone order. The SJC held that given the significant government interests of ensuring (1) a safe path for jurors, witnesses, and other individuals who go to the courthouse and (2) a fair and unbiased jury, the order was narrowly tailored. *Spicuzza*, 494 Mass. at 1008. "The buffer zone does not preclude the petitioners, or anyone else, from engaging in the same forms of protest they have previously done; it simply constrains them from doing so within a limited zone tied to court house property." *Id.* This Court should similarly conclude that the instant buffer-zone order is narrowly tailored.

### 3.    Adequacy of Alternatives

Where plaintiffs have access to numerous speech alternatives, they are unlikely to succeed on the merits. *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007) (noting court has upheld "alternative means of communication despite diminution in the quantity of speech, a

**AA088**

ban on a preferred method of communication, and a reduction in the potential audience"). Here, demonstrators are not prevented from gathering near the courthouse but simply from gathering in the narrow range where the sound of demonstrations could affect the proceedings inside the courthouse. *See Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1225 (10th Cir. 2007) (plaintiffs "were sufficiently able to communicate their message even though they had no close, physical interaction with their intended audience"). As the SJC noted in its decision on the earlier buffer-zone order, the limited nature of the buffer zone leaves open "ample alternative channels for communication of the information." *Spicuzza*, 494 Mass. at 1008 (quotation marks omitted).

In conclusion, the buffer-zone order is content-neutral because it does not restrict speech based on the demonstrators' message. The new order is also narrowly tailored only to preventing noise that might interfere with Ms. Read's right to a fair trial and impartial jury and the public's concomitant interest in a fair trial and impartial jury. Lastly, the order leaves open alternatives, such as the ability of demonstrators to convey their message in any area other than the limited area proscribed by the order. Because the order is content-neutral and narrowly tailored, and because it leaves open alternatives, the Plaintiffs cannot demonstrate that they are likely to succeed on the merits.

B.    **Plaintiffs' Due Process Claim Fails**.

There is also no merit to Plaintiffs' Fourteenth Amendment Due Process Clause claim. Plaintiffs' claim is based on the flawed factual premise that they were not granted an opportunity to be heard by the Superior Court. In fact, the Superior Court held a public hearing on the Commonwealth's buffer-zone Motion. https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 (last accessed on Apr. 3, 2025). Other members of the public submitted concerns to the

14

**AA089**

Superior Court which were considered by the Court. *Id.* Plaintiffs point to no evidence that they tried to raise their concerns with the Superior Court and were denied a hearing. Accordingly, they have no likelihood of success on the merits of their due process claim.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY WILL SUFFER IRREPARBLE HARM.

Plaintiffs' claims of irreparable harm requiring an immediate injunction are undermined by having waited almost two weeks after the Commonwealth first moved for the entry of the buffer zone and a week after the issuance of the state court order on March 25, 2025. "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (vacating preliminary injunction, where 10-week delay by plaintiff in seeking injunction after learning of defendant's alleged wrongdoing undermined claim of irreparable harm). As a result, "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 35 (1st Cir. 2011). Here, Plaintiffs fail to convincingly explain their delay in seeking relief until *after* jury selection has begun. This delay undermines Plaintiffs' claim of irreparable harm. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (plaintiffs' "cries of urgency are sharply undercut by [their] own rather leisurely approach to the question of preliminary injunctive relief").

## III.    THE BALANCE OF THE EQUITIES DO NOT TIP IN PLAINTIFFS' FAVOR.

Here, the balance of the equities favor maintaining the buffer-zone order. First, Plaintiffs' delay in seeking relief cuts against them. Although the Commonwealth moved for entry of the renewed buffer zone on March 17, 2025, and the Superior Court held a public

**AA090**

hearing on the motion before it issued the buffer-zone order on March 25, 2025, Plaintiffs apparently made no attempt to raise their concerns about the buffer zone directly with the Superior Court.[43]  Rather, they waited until April 1, 2025, a week after the Superior Court entered the buffer-zone order and more than two weeks after the Commonwealth moved for the renewed entry of the buffer-zone order, to file their challenge in this Court.  Moreover, jury selection in the case began on April 1, 2025.  The trial is now under way.

Second, as outlined in the Commonwealth's motion papers and as set forth in the Superior Court's order of March 25, 2025, there are substantial fair-trial concerns that tip overwhelmingly in favor of the State Defendants.  Among these equitable concerns are the real-world disruptive impact of noise on the jury emanating from individuals outside the buffer zone as well as vehicle horns and similar noises coming from vehicles on nearby roads whose drivers are expressing support for one side or the other by way of horn-honking and similar noises audible to the jurors inside the courthouse.

## IV.    AN INJUNCTION HERE WOULD HARM THE PUBLIC INTEREST.

In addition to failing to demonstrate a substantial likelihood of success on the merits, a significant risk of irreparable harm, or that the balance of the equities tips in their favor, Plaintiffs also have not met their burden of showing "a fit (or lack of friction) between the injunction and the public interest."  *Nieves-Marquez*, 353 F.3d at 120.  Plaintiffs' failure to carry that burden may be because, contrary to Plaintiffs' argument, the buffer-zone order supports the public's interest in ensuring a fair trial by protecting the jury from extraneous influences.

---

[43] Had Plaintiffs raised their objections with the Superior Court they likely would have been considered by the Court.  During the hearing on the Commonwealth's motion concerning the buffer zone, the Superior Court noted that it had received emails from other interested persons concerning the scope of the buffer zone and that it would read and consider those emails before ruling on the Commonwealth's motion. https://www.youtube.com/watch?v=yIhOMpltXE8 at 1:10:44 through 1:14:39 (last accessed on Apr. 3, 2025).  In fact, the buffer-zone order acknowledges the concerns raised by nonparties.  Dkt. 1-4 (Pl. Exhibit C), at 2 n.2.

**AA091**

Plaintiffs' failure to carry that burden is yet another reason why this Court should deny

Plaintiffs' request for a temporary restraining order or preliminary injunctive relief.

Again, the judge entered the buffer-zone order "[t]o ensure the defendant's right to a fair

trial." Dkt. 1-4 (Exhibit C), at 1-2. The Commonwealth, and by extension the public, also "has

the right to, and an interest in the defendant receiving, a fair trial." *Commonwealth v.*

*Underwood*, 358 Mass. 506, 511 (1978). And part of ensuring a defendant's right to, and the

public's interest in, a fair trial is preventing exposure of the jury to extraneous influence. *See*

*Duncan*, 391 U.S. at 149; *Wood*, 299 U.S. at 133. As described above, the buffer zone ordered

during the first trial did not prevent the sound of demonstrations from the west side of the

courthouse, and the honking of horns in response to those demonstrations, from being heard

inside the courthouse. (Schillinger Aff., Ex. 1 attaching Trooper Affidavit, at 3). Additionally,

an anonymous juror from the first trial attested that he "could hear protesters outside screaming

and yelling" as the jury deliberated. (Schillinger Aff., Ex. 2 attaching Juror Affidavit, 2). Thus,

denial of Plaintiffs' motion and the resulting maintenance of the buffer-zone order would protect

the public interest by preventing the sound of demonstrations from becoming an extraneous

influence on the jury.

Such a conclusion regarding the public's interest in maintenance of the buffer-zone order

would be consistent with the SJC's decision on the earlier buffer-zone order and how that order

protected Ms. Read's and the Commonwealth's right to a fair trial. As held by the SJC with

respect to the earlier buffer-zone order, the buffer zone "will help ensure a fair trial" "by

physically clearing the path for jurors, witnesses, and other individuals to come and go from the

court house complex without obstruction or interference by protestors or demonstrators and any

concomitant intimidation or harassment." *Spicuzza*, 494 Mass. at 1008. The order "helps protect

17

**AA092**

the jurors . . . from extraneous influence that might result from, for example, viewing pictures of putative evidence directly in their path." *Id.*

Thus, for at least those reasons, the buffer-zone order is consonant with the public interest. At the very least, Plaintiffs failed to demonstrate, as they must, that the equitable relief that they seek would serve the public interest. That failure, along with Plaintiffs' other shortcomings described above, should result in this Court denying plaintiffs' motion for a temporary restraining order or preliminary injunction.

## V.    PRINCIPLES OF COMITY CAUTION AGAINST INJUNCTIVE RELIEF HERE.

Here, the preliminary-injunction record shows that the entry of the Superior Court's buffer-zone order occurred only after the judge carefully and cautiously considered the relevant facts. The buffer zone has been modestly expanded on the west side of the courthouse based only on the real-life experience of the first trial and the shortcomings of the first buffer-zone order, all of which were in the factual record before the judge. Additionally, the judge's order is informed by her own experience in the courtroom and courthouse where the trial is now unfolding. The state-court judge is in the better position to assess the facts on the ground. Plaintiffs have available state-court avenues for seeking judicial review of the buffer-zone order. And in fact, other plaintiffs seeking similar relief did so in challenging the first buffer-zone order, bringing a petition before a single justice of the SJC and then the full SJC panel. Here, the doctrine of comity cautions against this Court enjoining the state court order. *See generally Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010) (discussing the comity doctrine). Accordingly, this Court should defer to the Superior Court's analysis of the relevant facts and not disturb the Superior Court's order.

**AA093**

## **CONCLUSION**

For the reasons set forth above, this Court should deny Plaintiffs' Motion for injunctive relief.

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ John R. Hitt

_____

Thomas Bocian, BBO # 678307
John R. Hitt, BBO# 567235
Gabriel Thornton, BBO # 674402
Emily Rothkin, BBO # 711591
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 727-2200
thomas.bocian@mass.gov
Dated:  April 4, 2025                    john.hitt@mass.gov
gabriel.thornton@mass.gov
emily.rothkin@mass.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that I have today, April 4, 2025, served this Opposition by ECF.

_/s/ John R. Hitt_____
Assistant Attorney General
Massachusetts Attorney General's Office

**AA094**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-cv-10770

---

JASON GRANT, ALLISON TAGGART, LISA
PETERSON, and SAMANTHA LYONS,

Plaintiffs,

v.

TRIAL COURT OF THE COMMONWEALTH
OF MASSACHUSETTS, BEVERLY J.
CANNONE, in her official capacity as Justice of
the Superior Court, GEOFFREY NOBLE, as
Superintendent of the Massachusetts State Police,
MICHAEL d'ENTREMONT, in his official
capacity as Chief of Police Department of the
Town of Dedham, Massachusetts, and MICHAEL
W. MORRISEY, in his official capacity as the
Norfolk County District Attorney,

Defendants.

---

**AFFIDAVIT OF ASSISTANT DISTRICT ATTORNEY CALEB J. SCHILLINGER**

I, Caleb J. Schillinger, state the following under oath:

1. I am an Assistant District Attorney in the Norfolk District Attorney's Office.  I am one of
   the prosecutors working on the matter of *Commonwealth v. Karen Read*, Criminal Action
   No. 2282CR00117, pending in the Norfolk County Superior Court (the "*Read* Case").

2. Attached to this affidavit as exhibits are true and accurate copies of the filings in the *Read*
   Case relating to the entry of the buffer-zone order on March 25, 2025.

3. Before the Court issued the buffer-zone order on March 25, 2025, the Court held a
   hearing on March 20, 2025, during which several pending motions were addressed,
   including the Commonwealth's motion to re-establish a buffer zone for the defendant's
   retrial.  That hearing was open to the public and was also broadcast live by the media.

Signed under the penalties of perjury this 4th day of April, 2025.

*[signature]*

**AA095**

EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                               DOCKET NO. 2282-CR-0117

COMMONWEALTH

v.

KAREN READ

---

**COMMONWEALTH'S MOTION FOR BUFFER ZONE AND ORDER PROHIBITING
SIGNS OR CLOTHING IN FAVOR OF EITHER PARTY OR LAW ENFORCEMENT**

---

During the defendant's first trial, the Court established a buffer zone in which

demonstrations were prohibited within 200 feet of the courthouse complex.  The Commonwealth

requests that this buffer zone be re-established for the defendant's upcoming retrial, but with two

important modifications.  First, on the western side of the courthouse facing Court Street, the

extent of the buffer zone was inadequate to prevent such demonstrations from jeopardizing the

integrity and fairness of the proceedings; the demonstrations could be heard inside the

courthouse, including by the jurors during their deliberations.  To prevent this from reoccurring,

the Commonwealth requests that the buffer zone be extended to include the area encompassed

within Bates Court, Bullard Street, Ames Street, and Court Street.  Second, the Commonwealth

requests that the Court's buffer zone order expressly include a mechanism for its enforcement.

Where a person is believed to have violated the buffer zone provision, and has refused requests

to comply, law enforcement personnel should be authorized to use reasonable physical force and

to arrest that person to ensure compliance.

Additionally, the Commonwealth requests that the Court again order that individuals are

not permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the

case or to any trial participant, in the courthouse during the retrial.

**AA097**

## **Background**

On March 26, 2024, the Commonwealth moved for an order barring demonstrations within a buffer zone of 500 feet around the courthouse complex, and prohibiting certain items from being worn or displayed inside the courthouse, during the defendant's first trial.  (Dkt. 254). A group of individuals moved to intervene in the case to oppose the Commonwealth's request. (Dkt. 265).  The American Civil Liberties Union of Massachusetts, Inc. ("ACLUM") sought leave to file an "*amicus curiae* memorandum," essentially in opposition to the request.  (Dkts. 266, 267).  The defendant took no position on the matter.

Following a hearing on April 4, 2024, the Court denied the motion to intervene, granted the ACLUM leave to submit its memorandum (which the Court noted it had read), and ordered that:

> "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court.  This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building.  Individuals are also prohibited from using audio enhancing devices while protesting"

and

> "no individuals will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial.  Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse."

(Dkt. 274) (the "buffer zone order," copy attached as <u>Exhibit A</u>).

The would-be intervenors filed a petition for extraordinary relief pursuant to G.L. c. 211, § 3, in the Supreme Judicial Court for Suffolk County, challenging both the denial of intervention and the buffer zone order (case no. SJ-2024-0122).  Soon thereafter, a second petition under G.L. c. 211, § 3, was filed by an association of individuals who wished to demonstrate in the buffer

AA098

zone during the trial and two members of the association (case no. SJ-2024-0123).  The

Commonwealth opposed the petitions, and the defendant again took no position.

On April 12, 2024, a single justice of the Supreme Judicial Court denied the petitions.

See memorandum of decision and judgment, copy attached as <u>Exhibit B</u>.  The single justice held

that the denial of the motion to intervene was "an ordinary procedural ruling" not requiring the

Court's extraordinary intervention and therefore denied any relief from that ruling.  The single

justice also determined, on the merits, that the buffer zone order passed constitutional muster and

did not violate the petitioners' First Amendment rights.  Specifically, the establishment of the

buffer zone was a content-neutral and reasonable time-place-manner restriction on speech that

was narrowly tailored to serve a significant governmental interest and that left open ample

alternative channels for communication of information.

The petitioners appealed the single justice's judgment to the full Supreme Judicial Court

(case no. SJC-13589).  The Commonwealth filed a response; the defendant further declined to

take a position.  On April 26, 2024, the full Court issued an order affirming the judgment, and on

May 2, 2024, it issued an opinion stating the reasons for that order.  See <u>Spicuzza</u> v.

<u>Commonwealth</u>, 494 Mass. 1005 (2024).  The Court held that the single justice did not commit

an error of law or abuse his discretion in determining that the denial of the motion to intervene

was not a matter warranting the Court's exercise of its extraordinary power of general

superintendence.  See <u>id</u>. at 1007.  As to the petitioners' constitutional arguments, the full Court

similarly concluded that the restriction created by the buffer zone was content neutral and not a

prior restraint on speech, it was narrowly tailored to serve a significant governmental interest,

and it left open ample alternative means of communication.  See <u>id</u>. at 1007-1008.

**AA099**

**<u>Discussion</u>**

The factual circumstances and concerns that necessitated the creation of the buffer zone last time are no less present or compelling today.  This case continues to garner significant public interest and media attention, locally and nationally, and is the subject of commentary on various social media platforms.  The proceedings are still attended by groups of individuals demonstrating in front of the courthouse, displaying references to materials that may or may not be introduced in evidence at retrial, and airing their opinions as to the trial judge, prosecutors, witnesses, and the guilt or innocence of the defendant on their clothing or on signage.  Shown below, for example, are photographs of demonstrators who appeared (despite the inclement weather) at the hearing on February 6, 2025:







**AA100**

In addition, and as the Court found when it issued the buffer zone order, protesters have shouted at witnesses and have confronted family members of the victim. Witness intimidation also remains a prevalent issue in this case, with additional criminal charges having been filed earlier this month. See Commonwealth v. Aidan Kearney, Stoughton Dist. Ct. No. 2555-CR-225. See also Affidavit of Juror Doe (Dkt. 380) (describing efforts by individuals to intimidate, harass, and "dox" jurors following declaration of mistrial). The re-establishment of a buffer zone is therefore necessary to help ensure that both parties receive a fair retrial, free from outside influences. See Spicuzza, 494 Mass. at 1009, citing Commonwealth v. Underwood, 358 Mass. 506, 511 (1970) (noting the Commonwealth too has the right to, and an interest in the defendant receiving, a fair trial, and the buffer zone order also supported that right).

During the first trial, the 200-foot extent of the buffer zone was adequate to prevent any demonstrations occurring on the southern, eastern, and northern sides of the courthouse complex from interfering with the proceedings inside the courthouse. See Affidavit of Massachusetts State Police Sergeant Michael W. Hardman ("Aff."), filed herewith, at ¶ 3. On the western side of the complex, however, it proved to be inadequate. On that side there are larger, open spaces that extend beyond 200 feet from the courthouse—in particular, the paved and grassy areas along High Street between Bullard Street and Ames and Court Streets. These areas are shown in the Google Maps screenshot below, along with a red line superimposed to indicate the extent of the 200-foot buffer zone on that side of the complex:

**AA101**



(Aff., ¶ 4).  Groups of demonstrators gathered in these areas, presumably with the property

owners' permission, and engaged in coordinated shouting and chanting aimed directly at the

courthouse.  (Aff., ¶ 5).  Even when standing just outside the buffer zone, these demonstrators

could be heard inside the courthouse, including during deliberations.  See Aff., ¶ 5; Affidavit of

Juror Doe at ¶ 10 ("During jury deliberations we could hear protesters outside screaming and

yelling.").

     As another consequence of the 200-foot extent of the buffer zone, individuals positioned

in these areas were close enough to Court and Ames Streets to encourage passenger and

commercial vehicles traveling on those streets to honk their horns as a form of demonstration.

(Aff., ¶ 6).  This happened repeatedly, and the honking—especially from the air horns of the

**AA102**

commercial vehicles—could easily be heard inside the courthouse.  (Aff., ¶ 6).[1]  In connection

with the first trial, the Massachusetts State Police issued more than two dozen citations for horn

violations and other motor vehicle offenses.  (Aff., ¶ 6).

To maintain the integrity of the retrial proceedings, and to prevent witnesses and

prospective or seated jurors from being subjected to these demonstrations, the Commonwealth

requests that the buffer zone on the western side of the courthouse complex be extended to

include the area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street.

The extended buffer zone would range from approximately 300 feet between the northern ends

of the complex and Bullard Street to roughly 400 feet between the complex and Bullard Street

along High Street.  (Aff., ¶ 7).  This would bring within the buffer zone those areas where

demonstrations undermined the buffer zone's very purposes, while at the same time ensuring that

demonstrators are not moved any farther away from the courthouse complex than is necessary to

prevent those same issues from recurring.  It is narrowly tailored to address the specific problems

that were encountered from experience at the first trial, and it will still leave open ample

alternative channels of communication and outlets for demonstrations.

The Commonwealth also requests that the order re-establishing a buffer zone expressly

state that a violation of any of the provisions of the order may constitute contempt of court and

that law enforcement officers are authorized to enforce compliance with the order by using

reasonable physical force and arresting any person who officers reasonably believe to be in

violation of the order and who has refused to follow officers' prior verbal requests to comply.

Officers will continue to seek compliance in the first instance through verbal requests and the use

---

[1] This continues to be a demonstration tactic, as shown in the above photograph of the individual
at the February 6 hearing who is holding up a sign that says, "Honk for Justice."  Frequent
honking has occurred at nearly every hearing held in this case over the past several months and
has been clearly audible in the upstairs courtrooms.

**AA103**

of de-escalation techniques to the maximum extent possible. (Aff., ¶ 8). But where an individual refuses to comply, officers need to be able to use reasonable physical force and to make an arrest to ensure compliance with the order and to avoid jeopardizing their own safety and that of the public. (Aff., ¶ 8). The order itself may provide that authorization. See Commonwealth v. Williams, 439 Mass. 678, 686 (2003), citing Commonwealth v. Garner, 423 Mass. 735, 745-746 (1996) (courts may authorize law enforcement personnel to use reasonable force to carry out lawful orders, and courts are not constitutionally required "to prescribe with exactitude the particular degree of force to be used" in carrying out orders).

For these reasons, the Commonwealth respectfully requests that the Court allow this motion and issue an order with the following (or substantially similar) terms:

- The Court hereby establishes a "buffer zone" around the courthouse complex during retrial of this case. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone extends 200 feet from the courthouse complex and further includes the area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street. No individual may demonstrate in any manner, including carrying signs or placards, within the buffer zone, unless otherwise ordered by this Court. Individuals are also prohibited from using audio enhancing devices while demonstrating.

- No individual will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the retrial. Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.

- A violation of any provision of this Order may constitute contempt of court. Court officers may eject or exclude entry to any person believed to have violated the provision against wearing or exhibiting certain clothing or items in the courthouse. Any person believed to have violated the buffer zone provision of this Order, and who has refused a prior verbal request by law enforcement personnel to comply with that provision, may be subject to arrest. Law enforcement personnel may use reasonable physical force where necessary to compel such person's compliance with that provision.

**AA104**

Respectfully submitted
for the Commonwealth,


*/s/ Hank Brennan*
Hank Brennan
Specially Appointed Assistant District Attorney

*/s/ Adam C. Lally*
Adam C. Lally
Assistant District Attorney

*/s/ Laura A. McLaughlin*
Laura A. McLaughlin
Assistant District Attorney

Dated:  March 17, 2025



## Certificate of Service

I hereby certify that a copy of the foregoing was served on counsel for the defendant via email on March 17, 2025.

*/s/ Hank Brennan*
Hank Brennan
Specially Appointed Assistant District Attorney

**AA105**

# EXHIBIT A

$\partial 74$

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT
                                               CRIMINAL ACTION
                                               22-00117

### COMMONWEALTH

### vs.

### KAREN READ

### MEMORANDUM OF DECISION AND ORDER ON COMMONWEALTH'S MOTION FOR BUFFER ZONE SURROUNDING NORFOLK SUPERIOR COURT AND REQUEST FOR ORDER PROHIBITING SIGNS OR CLOTHING IN FAVOR OF EITHER PARTY OR LAW ENFORCEMENT

The Commonwealth seeks an Order from this Court (1) establishing a buffer zone around the Norfolk Superior Courthouse in Dedham during the trial of the defendant, in which demonstrations related to the case would be prohibited, and (2) prohibiting any individual from wearing any clothing or insignia related to the case in the courthouse during trial. While the Court recognizes and appreciates the constitutional right of the people to peacefully protest under the First Amendment to the United States Constitution,[1] the defendant has the right to a fair trial by an impartial jury under the Sixth Amendment to the United States Constitution. See U.S. Const. amend. VI ("the accused shall enjoy the right to a speedy and public trial, by an impartial jury"); *Skilling* v. *United States*, 561 U.S. 358, 377 (2010). "This right, ensuring the defendant 'a fair trial,' has also been characterized as 'a basic requirement of due process.'" *In re Tsarnaev*, 780 F.3d 14, 18 (1st Cir. 2015), quoting *Skilling*, 561 U.S. at 378.

To ensure the defendant's right to a fair trial, the Court may restrict protected speech so long as the restrictions do not "burden substantially more speech than is necessary to further the

---

[1] This court acknowledges the helpful *amicus curiae* memorandum submitted by the American Civil Liberties Union of Massachusetts, Inc.

**AA107**

government's legitimate interests." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 799 (1989). In this case, it is well documented that protestors have shouted at witnesses and confronted family members of the victim. Individuals have also taken to displaying materials which may or may not be introduced into evidence during trial, and airing their opinions as to the guilt or innocence of the defendant on their clothing or on signage. Witness intimidation has also been a prevalent issue in this case. Given these past actions, the Court concludes there is a substantial risk that the defendant's right to a fair trial will be jeopardized if prospective jurors are exposed to the protests and messages displayed on signs or otherwise, particularly before this Court has had an opportunity to instruct the jurors about their obligations with regard to remaining fair and unbiased. The risk extends during trial where jurors and witnesses would have no choice but to be exposed daily to the messages and viewpoints of the protestors when entering and leaving the courthouse or sitting in the courtroom.

The defendant here is entitled to a fair trial with an impartial jury, free from outside influence, focused solely on the evidence presented in the courtroom during trial and the applicable law. To protect this right, this Court must reduce the risk of exposing witnesses or jurors in this case to such outside influences.

## ORDER

It is, hereby, **ORDERED** that no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. Individuals are also prohibited from using audio enhancing devices while protesting.

**AA108**

It is further **ORDERED** that no individuals will be permitted to wear or exhibit any buttons, photographs, clothing, or insignia, relating to the case pending against the defendant or relating to any trial participant, in the courthouse during the trial.  Law enforcement officers who are testifying or are members of the audience are also prohibited from wearing their department issued uniforms or any police emblems in the courthouse.

Date:   April 4, 2024

Beverly J. Cannone
Justice of the Superior Court

3

**AA109**

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                          SUPREME JUDICIAL COURT
                                     FOR SUFFOLK COUNTY
                                     No. SJ-2024-0122
                                     No. SJ-2024-0123

                                     NORFOLK SUPERIOR COURT
                                     No. 2282CR0117

TRACEY ANN SPICUZZA & others[1]

<u>vs</u>.

COMMONWEALTH & another.[2]


FREEDOM TO PROTEST COALITION & others[3]

<u>vs</u>.

COMMONWEALTH & another.[4]


<u>**MEMORANDUM OF DECISION AND JUDGMENT**</u>

I have before me two petitions pursuant to G. L. c. 211,

§ 3, seeking relief from an order of a Superior Court judge

(Cannone, J.) establishing a buffer zone in which demonstrations

are prohibited within 200 feet of the Norfolk County courthouse

---

[1] Lorena Jenkinson, Dana Stewart Leonard, and Paul
Cristoforo.

[2] Karen Read.

[3] Nicholas Rocco and Jon Silveria.

[4] Karen Read.

**AA111**

complex during a particular criminal trial.[5]  As to one of the
petitions, the petitioners also challenge an order denying their
motion to intervene for the limited purpose of opposing the
Commonwealth's motion to establish the buffer zone.  For the
following reasons, the petitions are DENIED.

    <u>Background</u>.  The petitions arise from the prosecution of
Karen Read (defendant), who has been charged with murder and
other offenses.  The case has attracted considerable public
interest, including demonstrations in the vicinity of the
courthouse.  According to the trial judge's findings,
"protestors have shouted at witnesses and confronted family
members of the victim.  Individuals have also taken to
displaying materials which may or may not be introduced into
evidence during trial, and airing their opinions as to the guilt
or innocence of the defendant on their clothing or on signage.
Witness intimidation has also been a prevalent issue in this
case."[6]  To prevent such demonstrations from jeopardizing the
fairness of the trial proceedings, the Commonwealth moved for an
order barring demonstrations within a buffer zone of 500 feet
around the courthouse.  A group of individuals wishing to

---

[5] In the same ruling, the trial judge also prohibited the
wearing or exhibiting of certain items in the courthouse during
the trial.  Neither petition challenges this prohibition.

[6] The petitioners do not challenge these factual findings.

**AA112**

demonstrate outside the courthouse during the trial moved to intervene for the limited purpose of opposing the Commonwealth's motion.  The trial judge denied the motion to intervene.  As to the Commonwealth's motion, the trial judge ordered "that no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. . .Individuals are also prohibited from using audio enhancing devices while protesting" (buffer zone order).  The would-be interveners filed a G. L. c. 211, § 3, petition challenging both the denial of intervention and the buffer zone order.  Shortly thereafter, a second G. L. c. 211, § 3, petition was filed by an association of individuals who wish to demonstrate in the buffer zone during the trial and two members of the association.

Discussion.  "[A] party seeking extraordinary relief [under G. L. c. 211, § 3, must demonstrate both '"error that cannot be remedied under the ordinary review process" and a "substantial claim of violation of [his] substantive rights."'"  Ardanaeh v. Commonwealth, 492 Mass. 1019, 1020 (2023), quoting Care & Protection of Zita, 455 Mass. 272, 277-278 (2009).  See Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 706 (1990).  "A single justice faced with a G. L. c. 211, § 3, petition [must perform] a two-step inquiry," first

3

**AA113**

assessing whether this court can properly become involved in the
matter and second evaluating the merits of the petition.
<u>Commonwealth</u> v. <u>Fontanez</u>, 482 Mass. 22, 24 (2019).

The denial of the motion to intervene does not pass the
first step of the inquiry.  In my judgment, the decision whether
to allow third parties to intervene in a criminal case is an
ordinary procedural ruling that does not "present[] the type of
exceptional matter that requires the court's extraordinary
intervention."  <u>Id</u>. at 25.  Relief from that ruling is therefore
denied.

The buffer zone order, in contrast, does pass the first
step.  The defendant's prosecution has attracted extraordinary
public interest, and the creation of buffer zone around a
courthouse is itself highly unusual.  Moreover, where the buffer
zone order was issued less than two weeks before trial, the
ordinary appellate process is not adequate to remedy the harm,
if any, to the petitioners' claimed First Amendment right to
demonstrate near the courthouse during the trial.[7]  The trial
would be over before any appeal could be heard.  Accordingly, I
turn to the merits of the buffer zone order.

---

[7] On a related point, although I do not disturb the denial
of the motion to intervene, I find that the petitioners have
standing to challenge the buffer zone order pursuant to G. L.
c. 211, § 3, where they allege that the buffer zone order
infringes their First Amendment rights.

4

**AA114**

By creating an area where the petitioners may not demonstrate during the trial, the buffer zone order does impose some restrictions on the petitioners' speech.[8]  However, not every government action that restricts speech violates the First Amendment.  In particular, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989), quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984).  The buffer zone order passes muster under these standards.

---

[8] Contrary to the petitioners' argument, however, the buffer zone order is not a prior restraint on speech.  See Madsen v. Women's Health Center, Inc., 512 U.S. 753, 763 n.2 (1994) (injunction creating buffer zone around abortion clinic did not constitute prior restraint: "petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone").  Similarly, the petitioners' reliance on cases concerning courtroom closure is misplaced.  No one is prevented from entering or remaining in the buffer zone, much less the courtroom; only demonstrations are prohibited in the buffer zone.

**AA115**

First, the buffer zone order is content neutral. The "principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" <u>Madsen</u> v. <u>Women's Health Center, Inc</u>., 512 U.S. 753, 763 (1994), quoting <u>Ward</u>, <u>supra</u>. The buffer zone order prohibits <u>all</u> demonstrations within the buffer zone without respect to their content. Moreover, even if the "petitioners all share the same viewpoint regarding" the defendant's trial, this "does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order." <u>Madsen</u>, <u>supra</u>.

Second, the buffer zone order is narrowly tailored to serve a significant government interest, namely, the integrity and fairness of the defendant's trial.[9]  Demonstrations near the courthouse threaten this interest by exposing witnesses and jurors to intimidation and harassment, undermining their ability

_____

[9] Indeed, if I were to apply strict scrutiny to the buffer zone order, I would find that the government has a compelling interest in preserving the integrity and fairness of the trial. Cf. <u>Lyons</u> v. <u>Secretary of the Commonwealth</u>, 490 Mass. 560, 587 (2022), quoting <u>Burson</u> v. <u>Freeman</u>, 504 U.S. 191, 199 (1992) (upholding buffer zone prohibiting electioneering near polling places: "each State 'indisputably has a compelling interest in preserving the integrity of its election processes'").  Surely, jurors selected to determine the defendant's guilt or innocence, no less than voters, "are entitled to peace while they undertake this most 'weighty civic act.'"  <u>Lyons</u>, <u>supra</u> at 591.

**AA116**

to testify or to serve without fear of reprisal.[10]   In addition,
demonstrations may expose jurors to extraneous material beyond
the evidence presented at trial, improperly influencing their
decision.  As to narrow tailoring, the First Amendment does not
require that a content-neutral time, place, or manner regulation
"be the least restrictive or least intrusive means" of serving
the government's interest.  Ward, supra at 798.  Rather, in the
case of an injunction, the question is "whether the challenged
provisions . . . burden no more speech than necessary to serve a
significant government interest."  Madsen, supra at 765.  In
considering this question, I give deference to the trial judge's
"familiarity with the facts and background of the dispute," id.
at 770, as well as her knowledge of the physical layout of the
courthouse complex and its environs.  The buffer zone order only
minimally burdens the petitioners' speech.  It merely moves
demonstrations 200 feet from the courthouse, a modest distance
that can be traversed in less than a minute.Cf. Lyons v.
Secretary of the Commonwealth, 490 Mass. 560, 589 (2022)
(upholding content-based ban on electioneering within 150 of

_____

[10] And it is not only the witnesses and jurors in the
defendant's case who might face harassment and intimidation if
they must pass a gauntlet of demonstrators on their way into or
out of the courthouse.  Many people might come to the courthouse
for reasons having nothing to do with the defendant's case, such
as attorneys, parties, witnesses, and jurors involved in other
matters, as well as court personnel.

AA117

polling places).  Indeed, recognizing the need to balance the right to demonstrate against the defendant's right to a fair trial, the judge thoughtfully rejected the much broader 500-foot buffer zone proposed by the Commonwealth.  I find that the 200-foot buffer zone burdens no more speech than necessary to protect the integrity and fairness of the defendant's trial.

Third, the buffer zone order leaves the petitioners with ample alternative channels for expressing their views.  They remain entitled to demonstrate outside the buffer zone.  The buffer zone order also contains no restriction whatsoever on other channels of communication, such as private conversations, letters to the editor, and social media, by which they may express their views about the defendant's case.

I conclude that the buffer zone order is content-neutral and does not violate the First Amendment.  The petitions are denied.

/s/Serge Georges, Jr.

_____
Serge Georges, Jr.
Associate Justice

Entered:  April 12, 2024

8

**AA118**

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                               DOCKET NO. 2282-CR-0117

COMMONWEALTH

v.

KAREN READ

---

**AFFIDAVIT OF MASSACHUSETTS STATE POLICE SERGEANT
MICHAEL W. HARDMAN**

---

I, Michael W. Hardman, hereby depose and state as follows:

1.      I am employed with the Massachusetts State Police ("MSP") and hold the rank of

Sergeant.  I respectfully submit this affidavit in connection with the Commonwealth's request to

have the Court re-establish a buffer zone around the Norfolk County Superior courthouse

complex for the defendant's upcoming retrial.

2.      I was a supervisor of the MSP personnel responsible for providing security

outside the courthouse, and implementing and enforcing the buffer zone, during the defendant's

first trial.  In that role, I was physically present at the courthouse for much of the trial, including

jury empanelment and deliberations, and I personally interacted with numerous individuals who

came to the courthouse to demonstrate.  The facts set forth in this affidavit are based on my first-

hand knowledge and experience.

3.      During the first trial, the 200-foot extent of the buffer zone was adequate to

prevent any demonstration-related activity or noise on the southern, eastern, and northern sides

of the courthouse complex from interfering with the proceedings happening inside the

courthouse.  This was due in large measure to the physical nature and footprint of the environs

**AA119**

on those sides of the complex, where there are buildings in close proximity and an absence of large, open spaces.

4.      By comparison, on the western side of the courthouse complex—that is, the side facing Court and Ames Streets—there are larger, open spaces that extend beyond 200 feet from the courthouse.  In particular, there are paved and grassy areas running along High Street between Bullard Street and Court and Ames Streets.  Pasted below is a screenshot from Google Maps, which shows these areas as well as a red line superimposed to indicate the extent of the 200-foot buffer zone on that side of the complex:



**AA120**

5.      At various times throughout the trial, groups of demonstrators gathered in these areas.  I observed these groups shouting and chanting in unison while directly facing the courthouse.  On more than one occasion, I was present inside the courthouse to confer with other law enforcement personnel regarding witness security, and I could clearly hear the demonstrators because of the collective volume of their voices.  I could hear them even though they were positioned just outside the 200-foot buffer zone.

6.      In addition, demonstrators positioned in these areas were close enough to Court and Ames Streets to be seen by vehicles traveling on those streets.  They held up signs and used arm gestures to encourage these passing vehicles to honk their horns right outside the courthouse.  This happened repeatedly during the trial, and the horns could easily be heard inside the courthouse, especially the air horns used by commercial vehicles.  In connection with the first trial, the MSP issued more than two dozen citations for horn violations and other motor vehicle offenses.

7.      If the buffer zone for the retrial were to be extended to include the area encompassed within Bates Court, Bullard Street, Ames Street, and Court Street, it would account for these areas that were problematic throughout the first trial.  Using the distance measurement function in Google Maps, I estimate that this extended buffer zone on the western side of the complex would range from approximately 300 feet between the northern ends of the complex and Bullard Street to roughly 400 feet between the complex and Bullard Street along High Street.

8.      Another significant issue that we encountered with the buffer zone last time was the lack of explicit authority to arrest individuals who violated the Court's order and refused to cooperate with our verbal requests to comply.  Law enforcement personnel are trained in various de-escalation techniques, and we make it a priority to use those techniques to the maximum

**AA121**

extent possible under the circumstances.  I personally employed those techniques several times

with uncooperative demonstrators during the first trial, as did the other MSP personnel under my

supervision, and we will continue to do so for purposes of the retrial.  But where the need to

arrest someone, and the attendant use of reasonable physical force, becomes unavoidable to

ensure compliance with the Court's order and to avoid jeopardizing officer or public safety, it

would greatly assist us to have that authorization expressly set forth in the order itself.


I aver that the foregoing is true and correct to the best of my knowledge, information, and

belief.  Signed under the penalties of perjury this 17th day of March, 2025.


/s/ Michael W. Hardman
Michael W. Hardman
Sergeant, Massachusetts State Police

**AA122**

EXHIBIT 2



COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

NORFOLK, SS                                    DOCKET NO. 2282-CR-00117

COMMONWEALTH OF
MASSACHUSETTS
     Plaintiff

v.

KAREN READ
     Defendant

## <u>AFFIDAVIT OF JUROR DOE</u>

Now comes Juror Doe, a pseudonym, who on oath deposes and says as follows:

1.     I am of legal age and have personal knowledge of the facts set forth herein.

2.     I was a member of the jury that was seated in the recently concluded trial in the above-captioned case.

3.     I just retained counsel to represent me.

4.     I have read the Impoundment Order entered by Superior Court Associate Justice Beverly J. Cannone on July 8, 2024, which found that "good cause exists to impound the list identifying the names of empaneled jurors in the trial of this case."

5.     As I read the Court's Order, it is scheduled to expire on July 18 unless it is extended by the Court.

6.     I submit this Affidavit in support of my request to extend the Impoundment Order entered on July 8.

**AA124**

7.      I am asking that the Impoundment Order be extended indefinitely because I am in fear of my personal safety and the personal safety of my family if the names of the jury are made public.

8.      I have read the Impoundment Order and noted on the very first page that individuals associated with this case have been charged criminally with intimidation.  I am frightened for my personal safety as a result of learning that someone associated with this case has been criminally charged with intimidation.

9.      I also recall testimony from at least one witness who described being harassed by individuals and her family being harassed because of their involvement in this case.   I do not know any of the specifics of any such harassment, but I fear that my family and I will not only be harassed if the names of the jurors are made public, but that our personal safety will be seriously compromised.

10.      During jury deliberations we could hear protesters outside screaming and yelling.

11.      During our jury service, the members of the jury would meet at what was supposed to be a secret location to be transported to and from the courthouse by bus.  After being discharged from jury service on July 1, 2024, we were taken by bus back to what was supposed to have been a secret location where we observed what appeared to be members of the media including photographers.  I was so much in fear on my way home that I pulled over to the side of the road to see if I was being followed.  Thankfully, I was not being followed, but that was (and remains) my mindset.  If juror names are made public, we will be constantly threatened and harassed and there will likely be a physical confrontation at some point.

12.    Since being discharged from jury service on July 1, 2024 I have read multiple news articles about the case and the attention that this case garnered across Massachusetts, New England and the country.

13.    There are clearly people who have very strong opinions about the case and about the jurors who deliberated over many days. I have seen articles, comments to articles and postings about the verdict saying some very nasty and dangerous things.  Some individuals have expressed outrage and anger that the jury did not acquit the defendant.  Some individuals have expressed outrage and anger that the jury did not find the defendant guilty.

14.    Just yesterday, I read an article in *The Boston Globe*, with the headline, "Karen Read case ended in a mistrial.  But the diehards haven't given up."  See, Exhibit 1.   In approximately the 12th paragraph of this article, an administrator of a Karen Read-focused Facebook group was quoted as saying: 'The people who were on the fringe of being interested in it are now engulfed...The anger level was at a nine before and now it's at an 11.5."  The article characterized this increase as "a rising rage".

15.    Later in this July 15 *Boston Globe* article another individual interviewed by the reporter stated "people are insane about this case.  If they don't agree with you, they'll try to dox you."  I understand the term "dox" to mean that individuals will publicize someone's personal information, including someone's residential address, occupation, business address etc. Publicizing my personal information in this context exposes me and my family to unwanted, and likely surprise, encounters with strangers who likely have an axe to grind with any juror.

16.    I have seen social media posts that were very demeaning of and attacking the integrity of the trial judge.  If someone is going to attack a sitting judge, I see no reason why they would not demean and attack, verbally and physically, a juror who sat on this jury.

**AA126**

17.     I understand that there are individuals who are upset that an Impoundment Order
was entered and that they are actively seeking the identity of all of the jurors.

18.     For example, my attorneys have made me aware of a video posted by a blogger /
journalist, whom I understand to be a person who has been charged with witness intimidation
related to this case, speaking about the trial and the jury's inability to reach a unanimous verdict
on all counts after trial. In the video, the blogger initially states that he has identified the jury
foreperson in the case. Not only does the blogger state that he has identified the jury foreperson,
but also where this person lives and what the person does for a living. A link to this video can be
found here:  https://x.com/JulieCar94/status/1808495920511607087

19.     In this same video, the blogger demands to know the identity of the "[expletive]
idiot on this jury" who did not vote in his preferred manner and further that:

> "Whoever did that subverted justice…Like, they helped cover up for a murder, as far as
> I'm concerned, fuck 'em, that's what I think."

https://x.com/JulieCar94/status/1808495920511607087

The blogger states in another video posted to "X,"

> ""Who outed the Chesna juror, remember that? The one woman who hung the Michael
> Chesna trial,[1] in July? The jury lists are public, so I got the jury list and I went down the
> list and I found the juror who hung the jury, and I shamed her, as I should, cause it's
> shameful…." (emphases added).

A link to this post can be found here: https://x.com/Heels_In_TheAir/status/1779344132235997463.

20.     I understand that the above-mentioned blogger has been accused of harassing
witnesses to the case, including by organizing crowds of people to harass them outside their
homes, and I am aware that he has made statements in a blog from 2023 to the effect of,

---

[1] Commonwealth v. Lopes, Norfolk County Superior Court Docket No. 1882CV00309.

**AA127**

"murderers, <u>and those who cover for them</u>, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe." See Exhibit 2.

21.    If, as he has stated, this blogger believes that members of the jury on which I served "helped cover up for a murder," and he further believes that "those who cover for [murderers]" are legitimate targets of harassment, I fully expect that members of the jury will be subjected to efforts to harass and shame them with the very real probability that some physical confrontation will inevitably occur.

22.    My concerns are not limited to a particular blogger or to a particular "side" of this case. I am aware that there are other outspoken bloggers, commentators, and groups of people who wished for a guilty verdict on some or all charges against the defendant. I am aware that there have been physical confrontations between the two sides of supporters.

23.    An example of this is from two recent postings by an individual who appears to be a reporter from New Bedford. In today's post, she stated that she was in court today defending against a harassment charge against her and her pursuit of a counter-harassment charge. See, Exhibit 3.

24.    Yesterday, this reporter posted about "getting protection" from another blogger. See, Exhibit 4. While I do not know the facts concerning these court appearances, it is very evident that individuals on all sides in this case have acted irrationally and aggressively over the past few years, which has caused multiple court appearances by parties seeking protection of the courts from other individuals.

25.    In light of the mistrial – there is no end in sight to this irrational behavior, which clearly continues today. Jurors will undoubtedly be subjected to harassment and likely physical confrontations if their names are made public.

**AA128**

26.     My affidavit and motion should not be interpreted as indicating how I or any other juror voted on this case, or how I or any other juror feel about this case. Every member of the jury, regardless of how they voted, is likely to face backlash from a segment of the large portion of the public who intensely followed this case. I wish to remain anonymous, and I bring this motion on behalf of myself and any other juror who does not wish to be identified, regardless of whether or not we agreed during our deliberations.

27.     It was an honor to serve on the jury. It also was a significant sacrifice of time, which I understood and anticipated when I was selected. What I did not anticipate, however, was the likelihood that I and other members of the jury would become targets of intense public scrutiny and likely harassment campaigns strictly due to the outcome of our private deliberations.

28.     If jury names are made public, I will be subject to nonstop requests for comment about jury deliberations.  I would prefer to not have to respond to these inquiries.  However, what I fear is not only will I be subject to requests for interviews, but that I will be targeted and harassed because of what I did, or did not do on that jury.  I fear that verbal harassment will likely lead to physical confrontation and physical harm.  I am not prepared or equipped to anticipate and prepare for any surprise personal attack.  More importantly, I fear that I will not be able to protect myself and my family.


Signed under the penalties of perjury this 16th day of July 2024


/s/ Juror Doe_____

**AA129**

**CERTIFICATE OF SERVICE**

I hereby certify that this document eFiled on July 17, 2024 will be sent by separate email to all counsel of record and the Office of the Attorney General of the Commonwealth of Massachusetts at the following addresses:

David R. Yannetti, Esq.
44 School Street
Suite 1000A
Boston, MA 02108
law@davidyannetti.com

Alan J. Jackson, Esq.
Elizabeth S. Little, Esq.
Werksman Jackson & Quinn, LLP
888 West Sixth Street, 4th Floor
Los Angeles, CA 90017
ajackson@werksmanjackson.com
elittle@werksmanjackson.com

Martin G. Weinberg, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
owlmgw@att.net

Adam Lally, Esq.
Assistant District Attorney
Norfolk County District Attorney's Office
45 Shawmut Road
Canton, MA 02021
Adam.lally@mass.gov

Andrea Campbell, Esq.
Attorney General
Commonwealth of Massachusetts
One Ashburton Place, 21st Floor
Boston, MA 02108
Andrea.campbell@mass.gov

/s/ Andrew P. DiCenzo

**AA130**

# EXHIBIT 1

AA131

# Karen Read case ended in a mistrial. But the diehards haven't given up.

### The judge in the Karen Read trial declared a mistrial. It triggered a cliffhanger — and in some, an even deeper obsession.

**By Beth Teitell** Globe Staff, Updated July 15, 2024, 6:04 a.m.



Jack Carney, right, of Canton, with other Karen Read supporters continuing their dedication to her, on a sidewalk along Providence Highway in Dedham on July 14. PAT GREENHOUSE/GLOBE STAFF

DEDHAM —The TV cameras have moved on. The man wearing the blonde Judge Beverly Cannone wig is gone. The street is no longer lined with people bedecked in pink holding "Free Karen Read" signs.

It's a weekday afternoon outside the Norfolk Superior Court, and where Read's supporters once reigned, with their righteous outrage and their beach chairs, there is instead a farmer's market. A band plays

**AA132**

Sonny Rollins. A child climbs into a fire truck brought just for that reason. A woman carries an armful of sunflowers.

But the pastoral scene is deceiving. The July 1 end of the trial wasn't the end at all. It was a <u>mistrial</u>, a cliffhanger, an invitation for yet more obsession over a real-life situation that's as sad as it gets, but for many has turned into a binge-worthy true-crime drama. And they get to be part of the story!

Those in the trial's grip are still out protesting, still fighting on Twitter and Facebook, still buying Karen Read merch (the "Jackson Yannetti 2024" baseball caps, named for the defense attorneys, make a nice keepsake).

Indeed, just six miles away from the Dedham courthouse where they got so chummy, the old "Karen Read was framed" gang reconvened last Wednesday. Once strangers, they have become people who hug hello and ask after each other's family members.

ADVERTISING

They have gathered in Canton, protesting in front of the offices of Norfolk District Attorney Michael Morrissey — one of their many nemeses.

**AA133**



(From left) Jack Carney, Cathy Carney, and Gail White hold up signs supporting Karen Read outside DA Morrisseys office in Canton.  KAYLA BARTKOWSKI FOR THE BOSTON

"Morrissey Gotta Go!" reads one sign. "Justice is coming," promises another.

The weather app shows 88 degrees, but the air is thick, and it feels hotter. The group is huddled on a small patch of grass between the road and their enemy's parking lot. Shade is scarce, but crusaders aren't stopped by humidity.

"This is a busy week," says Scott McGuinness as he describes the demanding schedule of a Karen Read diehard. Today he is at a protest, and he went to one on Monday, too, in South Boston, outside of the Massachusetts State Police barracks. He spent Tuesday night at a meeting of the Canton Select Board. And tomorrow, Thursday, he'd be heading to Dedham, to support the blogger known as Turtleboy in court appearances related to his coverage of the case.

McGuinness lives in Shirley, and sometimes the commute to his Karen Read job takes an hour, or more if the traffic's bad. "But I feel like I'm letting people down if I don't go," he says.

It's been two weeks since Judge Cannone declared a mistrial, leaving unanswered, for now (for some), the question of whether Read drunkenly backed her Lexus into her boyfriend and left him to read in

the snow on a lawn in Canton on a January night in 2022, as the Commonwealth alleges, or whether she was framed for his murder by the people inside the house, as her attorneys argued.

If you indulged in a brief coma on mistrial day, such is the ongoing intensity that you could be forgiven for thinking the trial was still in session. And not just because it's still spinning out actual news — leaks about the jurors' thoughts; the motion by Read's lawyers to dismiss two charges; the suspension without pay of state Trooper Michael Proctor, lead investigator in the case; the suspension with pay of Canton Police Detective Kevin Albert, whose brother owned the home where John O'Keefe's body was found.

An administrator of an enormous Karen Read-focused Facebook group says he is spending three or four hours a day on his responsibilities — approving new posts, writing his own, welcoming new members, who are coming in in droves, as Read's fame continues to grow.

"The people who were on the fringe of being interested in it are now engulfed," said the administrator, a middle school teacher, who asked to be identified by his Facebook name, Dooh Greg. "The anger level was at a nine before and now it's at an 11.5" — a rising rage he attributes to the assertion by Read's lawyers that the jury reportedly unanimously agreed to acquit her on two of the three counts.

"I've got a fire lit in me that I didn't know needed to be lit," Paul Cristoforo, a restaurant owner and one of the informal organizers of the resistance. It was early in the week, and already plans were being formulated for weekend protests in spots from Auburn to the South Shore, some at rotaries, others on overpasses.

"I'm just as active as I was during the trial," he said.

People's rage takes different forms. At least one Read supporter who is unhappy with Judge Cannone's handling of Read's trial has taken to Facebook to post a link to the Massachusetts Commission on Judicial Conduct so that others can easily file complaints against her.

Many Read obsessive spend their time on X, reading endless posts that dissect, once again, and possibly forever, what Karen Read did or didn't say after she discovered John O'Keefe's body buried in the snow, and who did or who did not hear her say it, whatever it is.

Then there are the trial highlight reels to binge for those who miss the good old days. One, "A goodbye to our new friends," is a nostalgia-tinged montage of the now-familiar courtroom characters (the court

**AA135**

reporter, the clerk, the cult-favorite ceiling fan) with Sara McLachlan's emotional "I Will Remember You" for a soundtrack.

Jay, its creator, asked that his last name not be used because "people are insane about this case. If they don't agree with you, they'll try to dox you."

He's a former insurance adjuster who became so fascinated with true crime that he cashed in his 401(k) to start a trial-focused YouTube channel. His Read montage was a hit — it got 1.7k likes — but even so, he found dealing with both sides of the case so unpleasant, he said, that he vowed not to cover a second Karen Read retrial.

Could it be? A person with the strength not to tune in for season two?

——————————

Beth Teitell can be reached at beth.teitell@globe.com. Follow her @bethteitell.

**Show 195 comments**

©2024 Boston Globe Media Partners, LLC

# EXHIBIT 2

# Canton Cover-Up Part 76: Chris Albert Confronts "Loser" Woman In "Free Karen Read" Shirt In Waterfall Parking Lot For Taking His Picture

Aidan Kearney    July 17, 2023



**– Framed – Video for Full Background on Canton Cover-Up Story**
**– Donate to the Karen Read Legal Defense Fund**
**– See all parts of the Canton Cover-Up Series**
**– Watch the Live Shows and Videos**

On Saturday a pair of turtle riders wandered over to the Waterfront Bar

& Grille in Canton, which was the last place John O'Keefe was seen alive. They wore the new Free Karen Read shirts that everyone's been raving about.



However, when they stepped foot inside they saw a familiar face.



Chicken Parm Charlie. The last time we saw him he was kicking an award winning journalist out of his pizza shop, and thus denying access to Chris Albert's world famous mediocre chicken parm. He then called police, claiming that he was some sort of victim, while periodically opening the door to call me a "looooosssaah" who was "going to get it."

Clearly this man is on tilt because he knows he can no longer go out in public and live a normal life like he used to. That tends to happen when your family is involved in the murder of a police officer, followed by the subsequent cover up and framing of an innocent woman.



ADS & POPUPS DRIVING YOU MAD?    GET AD-FREE FROM $10 A MONTH

It appears as if Chicken Parm Charlie, who is an elected member of the Board of Selectman, realized he was being photographed. However, instead of quietly accepting that people have the right to take pictures in public, and that he is both an elected official and the brother and father of men who have been accused in open court of murder, Chicken Parm Charlie decided to confront and berate these two women in the parking lot. He accused the woman of giving this award winning

journalist a handjob, which is factually untrue, but it would probably be more satisfying than his pizza. After that she began filming. Watch:

This dude cannot go five second without calling someone a "loooosssahhh," despite having a worse record in court than the New York Jets. Mr. Chicken Parm Charlie, you had to move into a small apartment because you couldn't afford to live in your house, you get by on your family name, and you make mediocre chicken parm that the Little League coaches buy out of pity. I assure you that the loser here is now who you think it is. As Marlo Stanfield once said, "You want it to be one way, but it's the other way."

Chris Albert wants to live in the world he used to live in, where the Alberts owned the town of Canton and nobody crossed them. He's not used to being unliked, despite the fact that he once killed a man and has countless court judgments and liens against him, which really says a lot about the town of Canton. This is a man who is a well known conservative in a town that Joe Biden won by 30 points, who managed to beat a Yale educated liberal attorney, simply because he comes from the cool jock family. He doesn't know how to react to negativity because he's never been in this position before, which is why he hired an attorney to send out more than a dozen demand letters threatening

defamation lawsuits against people who speculated about his family's involvement in a murder on Facebook.

But unfortunately for Chicken Parm Charlie we began reporting on this case, and the Albert family name no longer carries the swagger in town that it did three months ago. As Slim Charle once wisely said, "the thing about the old day, they the OLD days."

There is a Wire quote for everything.

The best part about the Alberts and McCabes is that they think they can talk their way out of everything. Matt McCabe told me when I confronted him previously that it was "proven in court" that his wife never Googled "how long to die in cold." When you're accustomed to

getting away with everything your entire life you don't know how to behave when you're finally held accountable. You're used to people blindly eating up your bullshit, which is why people like Chris think they can talk their way out of anything.

*"You don't know anything about me and my family."*

Here's some things we know about your family:

- Your brother Brian never came outside after being alerted that there was a dead cop on his front lawn
- Your son Colin frequently posts videos of himself threatening to kill people
- Your son was born innocent but became a depraved psychopath who believes that violence solves problems, which is a direct result of your failures as a father to impart morals into him, despite going through the motions and pretending to be practicing Catholics
- Your son had a black eye and cut up knuckles two weeks after John O'Keefe was killed
- You yourself once killed a man and left the scene of the crime
- You are close personal family friends with the Proctor family and have been for well over a decade
- Your family never left Canton because they control everything and can bang any woman they want so long as they graduated from Canton High School between 1989 and 1996

*"Why are you taking pictures of me?"*

Because she's a free person living in a free country and she can take pictures of whatever she wants without having to explain herself to you. But if you really wanna know why, it's because you're so brazen that

you still go to bars like the Waterfall, knowing full well what everyone in town is thinking about you.

*"Because you were being all weird to me."*

Sir, you're yelling at women in a parking lot and accusing them of giving an award winning journalist a handjob. I assure you that it is not them who is being weird. Also, your assumption that two women wouldn't drive a pickup truck reeks of toxic masculinity.

This interaction was the best:

Turtle rider: "You're framing an innocent woman."

Chicken Parm Charlie: "Am I really? Because Karen f***ing ran John over. You have no f***ing clue."

Turtle rider: "That's why Colin has bruises all over his body."

Chicken Parm Charlie: "You have zero clue."

Turtle rider: "The whole state believes that you are guilty."

Chicken Parm Charlie: "You're a f***ing looosah."

Turtle rider: "I'm a loser? You're arguing with a woman in a parking lot."

His response was basically the same response Matt McCabe gave me about his wife's Google search. It defies logic and reason, and ignores all the facts. But if they shout it loud enough then no one will challenge them. Karen Read did not run John over, and I will buy a $500 gift card to D&E Pizza (which I assume will be him writing something on a napkin) if he can explain to me the physics of how that happened,

which align with all witness statements and the autopsy photos.

The best thing she said was that the whole state believes they are guilty. Chris needed to hear that because the Alberts and McCabes have insulated themselves in a bubble of people that is growing smaller by the day, who reassure them that they believe Karen Read killed John O'Keefe. And for a while, so did most people. Outside of Canton no one believes that, and inside of Canton more and more people are seeing the truth. The one place that was their sanctuary of acceptance is no longer that.

Anyway, let's keep this up. I was so proud to see turtle riders unafraid, confronting evil like this in the flesh. The fact that he's still going to places like the Waterfall is because he feels comfortable doing so. But murderers, and those who cover for them, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe.

*Hello Turtle Riders. As you know if you follow Turtleboy we are constantly getting censored and banned by Facebook for what are **clearly not violations of their terms of service**. Twitter has done the same, and trolls mass reported our blog to Google AdSense thousands of times, leading to demonetization. We can get by and survive, but we could really use your help. Please consider donating by hitting the Donation button above if you'd like support free speech and what we do in the face of Silicon Valley censorship. Or just buy our award winning book about the dangers of censorship and rise of Turtleboy:*

# EXHIBIT 3

← **Post**

**Jessica Machado** ✔
@jessmachadoshow

Follow  ···

This morning,  the individual who is accusing me of harassing her at Norfolk Superior Court during the Karen Read trial had an opportunity to be heard in front of a judge but chose not to be. Instead, she claimed that she now needs an attorney, as I counter filed against her this morning.

When the judge asked if she realized that there was no order in place and that she would not get one today if she requested a new date, she said she understood and asked for it to be continued.  We now have a new date of July 26th. There is no order.

I was extremely prepared to not only defend myself against these ridiculous accusations,  but I was equally as prepared to prove that I am the one in need of protection. However,  at this time, I will be hiring an attorney to do the heavy lifting.

Many friends and followers have offered to help fund my legal representation and I will take you all up on that offer. Later today I will post a link to a fundraising option that you can use if you would like to contribute.

This is distracting from my work and as you can imagine,  very stressful. The seemingly habitual exploiting of court ordered protection orders  by women in our court system is a real problem and the only way to stop it is to fight back. I intend to do that.

Last edited 11:30 AM · Jul 16, 2024 · **44.8K** Views

💬 63          ⟲ 37          ♡ 515          🔖 10          ⬆

**Post your reply**

**Rich Vetstein** @richardvetstein · 2h                          ···
The newspaper you work for should really be paying your legal fees, since this is all happening as a result of your employment related activities. Just saying again.

💬 7          ⟲ 4          ♡ 180          �district 4.8K          🔖 ⬆

**Jessica Machado** ✔ @jessmachadoshow · 1h                   ···
We have a meeting at 130 today to discuss.

**AA148**

# EXHIBIT 4

← Post    🔍 Search

**Meredith O** @meredithoneil · Jul 15
Happy Monday! I figured everyone could use a good laugh after this weekend.

TBT to the dark days before @jessmachadoshow got @msgrant_smith banned from court. I didn't take this video, but it was went to me on a Sunday afternoon in May after I'd set up @DoctorTurtleboy's chair
Show more

Watch again

0:00

💬 55        🔁 9        ♡ 205        📊 37K        🔖  ↑

**Jessica Machado** ✓ @jessmachadoshow        ···

This video was entered into evidence and instrumental in me getting protection from Grant.

Have to admit, I hate watching this but it's a good reminder that you have to fight to stop people like Grant from attacking you because if you don't, they will.

12:45 PM · Jul 15, 2024 · **3,915** Views

💬 7        🔁 2        ♡ 174        🔖 1        ↑

Post your reply

**Butt Dial McCabe** @McAlbuht · Jul 15
We (i) love you
💬 1        🔁         ♡ 9        📊 245        🔖  ↑

**Mimi** @j9sween1 · Jul 15
I love that he can't go to courthouse anymore. He treats everyone that way.. good job Jessica1
💬         🔁         ♡ 9        📊 193        🔖  ↑

**Laila Mickelwait** ✓ @LailaMickelwait        Ad ···
*TAKEDOWN* reveals the never-before-told inside story of how P*rnhub was exposed for enabling and profiting from countless videos of child rape and trafficking. But the fight isn't over yet! Victims deserve justice.

Watch & share this video, then learn more at the link below.

---

**Home** 🏠
**Explore** 🔍
**Notifications** 🔔
**Messages** ✉
**Grok**
**Bookmarks** 🔖
**Communities** 👥
**Premium** ✗
**Verified Orgs** ⚡
**Profile** 👤
**More** ⊙

Post

---

**Relevant people**

**Jessica Machado** ✓
@jessmachadoshow        Follow
Correspondent @FallRiverReport and @NewBedfordGuide. Former host of the Jessica Machado Show and SouthCoast Tonight @WBSM. Former columnist at @HowieCarrShow

**Meredith O**        Follow
@meredithoneil

**Grant Smith Ellis**        Follow
@msgrant_smith
Artist formerly known as Grande. Lindsey's simp. Wendy's disabled adult child. Human parody. All source and opinions from my Mom. Protected witness so FAFO.

**What's happening**

**The Jim Rome Show**
Sports · 45 minutes ago

Politics · Trending
**FIRED**
333K posts

News · Trending
**#Maine**

Trending in United States
**Blake Lively**
Trending with Lady Deadpool

Entertainment industry · Trending
**California to Texas**
16.5K posts

Show more

Terms of Service    Privacy Policy    Cookie Policy
Accessibility    Ads info    More ···    © 2024 X Corp.

**Don Keavany**
@DKeavany        ···                    Messages        **AA150**

EXHIBIT 3

**AA151**

Karen Read Trial Prepare Together Group
Issues and Concerns from 2024 Trial

## Issues Organizations and Businesses Had Last Year

- Protestors were on the lawn/property without permission
- On street parking spaces needed for regular business were taken up by protestors and film crews, negatively affecting retail business, camps, Farmers Markets, service businesses.
- Private and tenant reserve parking spots were taken by protestors
- Noise level and yelling of protestors was disturbing to children camp/preschool, music lessons, yoga studio and non-retail businesses
- Businesses and organizations were disrupted by the constant honking from passing cars and the noise from the protests.
- Non-profit organizations did not have enough staff to manage crowds/keeping protestors off property/patrolling property
- Organizations, churches and businesses needed to keep doors locked to keep protestors from coming in and walking around building/business without permission or entering non-retail businesses looking for bathrooms. Locked doors are counter intuitive to business and missions.
- Constant requests to use bathrooms. Some protestors were aggressive when denied use.
- Customers stayed away from businesses causing loss of revenue
- Bus from Southshore had aggressive people
- Protestors confrontational and aggressive in local business
- Staff at business didn't feel comfortable alone, needed supplemental staff increasing burden on business
- Students and families did not feel comfortable attending while protestors in the area
- Staff at businesses were frustrated
- Afraid of optics or staff targeted when asking protestors to leave property
- Protestors drinking alcohol on property
- Even food deliveries to protestors on the sidewalk was disruptive with delivery vehicles entering private driveways to turn around/park
- 3pm Karen Read walk was disruptive and made traffic worse
- Businesses on Pearl St significantly affected. Decline in classes/retail business. Clients and students mentioned that the traffic was simply too much to navigate.
- Even those who managed to attend classes have been disrupted by the constant honking from passing cars and the noise from the protests.
- Protestors with tents, chairs and coolers on sidewalk blocked sidewalk
- Customers felt intimidated walking on sidewalk and under tents
- Protestors tailgated and did not patronize businesses
- Financial impact on Farmers Market during trial was devastating and had summer long affect
- Consistency of officers was helpful. Checking in was helpful.



- Farmers Market had very few customers during the trial, affecting the vendors and small business owners in Dedham Square.
- 

**Requests From Businesses**
- Would it be possible to relocate the protestors further away from Pearl St and businesses close to court, maybe to Dedham Common?
- Could we reserve some spots on the street for local businesses during the trial?
- Would it be possible to provide portable bathrooms for the protestors?
- Could we ask that protestors refrain from holding "Honk" signs?
- Could we ask protestors not to amplify and project the court proceedings on the street which disturbed businesses and organizations.

**AA153**

## CERTIFICATE OF SERVICE

I hereby certify that I have today, April 4, 2025, served the Affidavit of Assistant District Attorney Caleb Shillinger by ECF.

*/s/ John R. Hitt*
Assistant Attorney General
Massachusetts Attorney General's Office

**AA154**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>     Plaintiffs,<br><br> v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>     Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

## <u>NOTICE OF FILING SUPPLEMENTAL EXHIBIT</u>

Plaintiffs hereby file the following supplemental exhibit in support of their Motion for a Temporary Restraining Order and for a Preliminary Injunction or, in the alternative, an Injunction Pending Appeal (ECF No. 2):

1.   The video recorded by Tom Derosier ("Derosier"), filed in *Derosier et al. v. Noble et al.*, Case No. 1:25-cv-10812, in the United States District Court for the District of Massachusetts (ECF No. 1-5), attached hereto as **Exhibit A**. This video was authenticated by Derosier through a verified complaint, attached hereto as **Exhibit B**.

Dated: April 4, 2025.                    Respectfully Submitted,

                                         /s/ Marc J. Randazza
                                         Marc J. Randazza, BBO# 651477
                                         mjr@randazza.com, ecf@randazza.com
                                         Jay M. Wolman, BBO# 666053
                                         jmw@randazza.com
                                         RANDAZZA LEGAL GROUP, PLLC
                                         30 Western Avenue
                                         Gloucester, MA 01930
                                         Tel: (978) 801-1776

                                         Mark. Trammell
                                         (*Pro Hac Vice* Forthcoming)
                                         Center for American Liberty
                                         P.O. Box 200942
                                         Pittsburgh, PA 15251
                                         Tel: (703) 687-6200
                                         MTrammell@libertyCenter.org

                                         *Attorneys for Plaintiffs.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2025, the foregoing document was served on all parties

or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

# <u>Exhibit A</u>

Tom Derosier Video
April 1, 2025

## To be filed conventionally with the Clerk's Office

# **Exhibit B**

Verified Complaint
*Derosier et al. v. Noble et al.*
Case No. 1:25-cv-10812
ECF No. 1

**AA159**

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

TOM DEROSIER and MICHEL BRYANT,

                Plaintiffs,

     v.

GEOFFREY NOBLE, in his official capacity as Superintendent of the Massachusetts State Police; SGT. MICHAEL HARDMAN, in is official and personal capacities; and JOHN DOES 1 & 2 in their official capacities as Massachusetts State Police officers and in their personal capacities,

                Defendants.

</td><td>

Civil Action No. _____

</td></tr>
</table>

## VERIFIED COMPLAINT

TOM DEROSIER and MICHEL BRYANT (collectively, the Plaintiffs) are two journalists who were barred from engaging in journalism on public sidewalks, where news media traditionally gather, by members of the Massachusetts State Police.

Plaintiffs' primary concern is their violation of their Civil Rights under the First Amendment. GEOFFREY NOBLE is sued in his official capacity only as Superintendent of the Massachusetts State Police; Defendants SGT. MICHAEL HARDMAN and JOHN DOES 1 & 2 (Massachusetts State Police officers) are sued in their official and personal capacities. Plaintiffs bring claims under 42 U.S.C. § 1983 for Defendants' violation of Plaintiffs' First Amendment rights, and allege as follows:

## THE PARTIES

1.      Plaintiff Tom Derosier is a natural person who resides in the Commonwealth of Massachusetts.

2.      Plaintiff Michel Bryant is a natural person who resides in the State of Connecticut.

**AA160**
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

3.      Defendant Geoffrey Nobel is the Superintendent of the Massachusetts State Police and, at all relevant times, worked in the Commonwealth of Massachusetts.

4.      Defendant Sgt. Michael Hardman is a Sergeant with the Massachusetts State Police and, at all relevant times, worked in the Commonwealth of Massachusetts.

5.      Defendant John Doe 1 is an officer with the Massachusetts State Police and, at all relevant times, worked in the Commonwealth of Massachusetts.

6.      Defendant John Doe 2 is an officer with the Massachusetts State Police and, at all relevant times, worked in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this civil action per 28 U.S.C. § 1331 as this is a civil action arising under 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution.

8.      This Court has personal jurisdiction over all defendants as they are all citizens or organs of the Commonwealth of Massachusetts, and the defendants committed the acts complained of within the said Commonwealth.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) as all defendants reside in this District and all events giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

**A.      General Background**

10.     On or about January 29, 2022, John O'Keefe, a Boston Police Officer, died.

11.     On or about June 9, 2022, a true bill was returned in the Trial Court of the Commonwealth of Massachusetts, Superior Court Department, Norfolk County, indicting Karen Read and charging her with a) second degree murder of O'Keefe per G.L. c. 265, § 1; b) killing

**AA161**
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

O'Keefe with her motor vehicle while intoxicated per G.L. c. 265, § 13 ½; and c) a hit-and-run death of O'Keefe under. G.L. c. 90, § 24,(2)(a ½)(2).

12.     Judge Beverly Cannone is the presiding judge in the Read prosecution, in the case styled *Commonwealth v. Read,* Case No. 2282CR00017, in the Trial Court of the Commonwealth of Massachusetts, Superior Court Department, Norfolk County (hereinafter "*Read* Case").

13.     A trial in the *Read* Case was held in 2024, which resulted in a mistrial after the jury failed to reach a unanimous decision (hereinafter "first trial").

14.     A second trial in the *Read* Case began on April 1, 2025 (hereinafter "second trial").

15.     Prior to the first trial, the Commonwealth filed a motion to *inter alia* create a "buffer zone" beyond the grounds of the Norfolk Superior Courthouse, to prohibit any individual from demonstrating in any manner about Read, law enforcement, the DA, potential witnesses, and evidence within 500 feet of the court complex during the trial.

16.     Judge Cannone then issued an order granting the Commonwealth's motion, asserting that the Commonwealth's perceived inconveniences overcame everyone else's First Amendment rights, without regard for any differentiation between members of the public, and expressly ordered that "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court.  This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building.  Individuals are also prohibited from using audio enhancing devices while protesting."  *See* **Exhibit A**.

17.     Speech that does not qualify as a "demonstrat[ion]" was not restricted.  Thus, a nearby café could advertise breakfast using a bullhorn and parade its menu on picket signs and

**AA162**
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

placards; Celtics and Bruins fans could similarly honor their teams by hooting/hollering and carrying placards. And in fact, commercial speech was permitted within the zone.

18.     In advance of the second trial, the Commonwealth again moved for a buffer zone, but with a larger area (again, encompassing private property and traditional public fora, including public sidewalks and other areas). The Commonwealth also sought specific instructions to request police to use force to quash any dissent or protest. *See* **Exhibit B.**

19.     Without an opportunity for affected persons to intervene or be heard, Judge Cannone issued an Order on March 25, 2025, granting the Commonwealth's motion, asserting that the basis for the first motion warranted a *larger* buffer zone for the second trial, and expressly ordered that "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case, unless otherwise ordered by this Court. This complex includes the Norfolk Superior courthouse building and the parking area behind the Norfolk County Registry of Deeds building. The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street. Individuals are also prohibited from using audio enhancing devices while protesting." *See* **Exhibit C** (hereinafter "Second Prior Restraint Order").

20.     Massachusetts State Police officers took action to enforce the buffer zone order during the first trial, and the Massachusetts State Police, under the control and direction of Defendant Noble, are acting to enforce the Second Prior Restraint Order.

**B.     Unidentified State Police Officers Interfere with Bryant's Newsgathering**

21.     Plaintiff Michel Bryant is a Host and Producer with Justice Served TV.

22.     Bryant is an Executive Producer for *I Survived a Crime*, a production with Law and Crime Productions and The Legal Edge Network, LLC, airing on A&E Network and NETFLIX.

AA163
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

23.     Bryant is an Executive Producer for CULT JUSTICE, airing on the Hulu Network.

24.     On April 1, 2025, Bryant was walking on the sidewalk near the Dedham Courthouse, inside the "buffer zone," but he was not protesting, he was news gathering.

25.     While doing so, he recorded a video through his phone titled "Arrest Threats by Mass Staties in #KarenRead Case."

26.     A true and correct copy of the video appears at **Exhibit D**.

27.     While he was newsgathering, he interviewed a Mr. John Delgado, ("Delgado").

28.     Delgado was not protesting; he was, however, wearing a blue sticker that says, "Real Justice for John O'Keefe FKR."

29.     While newsgathering in the "buffer zone," two unidentified Massachusetts State Police officers, Defendants John Does 1 & 2, approached Bryant and told him that he could not remain in the area, despite the fact that he was only newsgathering.

30.     Doe 1 told Delgado, "That's gotta go" in reference to Delgado's sticker.

31.     Doe 1 then violently ripped Delgado's sticker off his jacket.

32.     Doe 1 then threatened Delgado "I don't want to see you walking by here again."

33.     The aforesaid police encounter with Delgado appears as part of **Exhibit D**.

34.     The said video streamed live from Bryant's phone to YouTube on or about 9:33 am EDT on April 1, 2025.

35.     Bryant later uploaded this video of the interaction to his YouTube Channel, JSTV – Justice Served TV, on April 2, 2025, as part of his reporting, at  https://www.youtube.com/watch?v=rI4M9y-6Xec.

AA164
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

36.     The video was part of the longer broadcast "Karen Read Trial: Jury Selection Begins! Michel LIVE at the Courthouse | Linda Breaks It All Down" at https://www.youtube.com/live/gnRtGAD4LSM.

37.     Bryant's YouTube channel has approximately 9,780 subscribers.

## C.     Sgt. Hardman Threatens Derosier and Interferes with his Newsgathering

38.     Tom Derosier is the owner of media company, CPU Guys.

39.     Derosier is weekday live host of "Seeking Justice with Tom and Mike."

40.     On April 1, 2025, Derosier was present at outside the Dedham Superior Courthouse covering the Karen Read trial.

41.     At that time, Derosier was newsgathering and broadcasting as part of his show to the "Seeking Justice with Tom and Mike" YouTube channel, on a broadcast entitled "Jury Selection 4/1/25" at https://www.youtube.com/watch?v=PH2OoGMBxEQ .

42.     Derosier's YouTube channel has approximately 6,700 subscribers.

43.     Derosier carried no picket signs and otherwise bore no indicia of being a protestor.

44.     While Derosier was walking on the sidewalk, Sergeant Michael Hardman, a Massachusetts State Police officer (badge number 3121), verbally assaulted Derosier.

45.     First, Defendant Hardman asserted "*You don't have media credentials, you've got to go behind the buffer zone, ok, or you're going to be subject to arrest.  Go follow them, you're being told right now*."

46.     Derosier thereupon protested Hardman's unlawful order, asking "I'm not media?"

47.     Hardman responded and threatened, "No, you're not. Go back. Go back there. You're being subject to being arrested."

48.     Hardman asked if he could follow another individual into the public courthouse.

RANDAZZA | LEGAL GROUP

AA165
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

49.     Hardman ordered again, "No, you can't."

50.     At all relevant times, Hardman knew that Derosier was recording video and newsgathering, even acknowledging such during their interaction.

51.     Derosier recorded video of the incident. *See* **Exhibit E**.

**CAUSE OF ACTION**
***Count I***
**Violation of the First Amendment to the United States Constitution**
**Declaratory Judgment & Injunctive Relief**
**(42 U.S.C. 1983 – First Amendment)**
**(Against All Defendants)**

52.     Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

53.     The Second Prior Restraint Order is facially unconstitutional.  It is a content-based regulation of protected speech in a public forum that cannot withstand strict scrutiny.  While the Supreme Court has upheld a statute relating to picketing or parading near courthouses, it has not approved of a 200-foot buffer with an additional larger, ill-defined area.   *Contrast Cox v. Louisiana*, 379 U.S. 559 (1965).  It is overinclusive—it includes speech in private businesses and homes and in traditional public fora.  And, it is underinclusive, as it does not regulate other forms of speech directed at potential jurors (the ostensible "fair trial" reason given).

54.     The Second Prior Restraint Order purports to address noise and to minimize prospective jurors' exposure to viewpoints about the Read case, but it is targeted solely to speech in the ambit of the Read case when Judge Cannone and the Superior Court routinely conduct jury trials without such restrictions.

55.     Judge Cannone could have taken measures to reduce jurors' exposure to noise and public speech without imposing content-based restrictions.

**AA166**
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

56.     Whatever interest Judge Cannone intended to advance, the Order contains no standards channeling officers' discretion toward that interest.  Instead, the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755, and its 200-foot sweep is far broader than necessary to accommodate any legitimate government interest.

57.     On its face, the Order "restricts access to traditional public fora" and authorizes officers to regulate a sweeping volume of First Amendment activity, including Plaintiffs' otherwise lawful newsgathering. *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

58.     Criminalizing peaceful, nonobstructive newsgathering advances no legitimate interest.  The state has no power to restrict reporting that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them." *Alvarez*, 679 F.3d at 606; *accord Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (newsgathering in public "that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation").

59.     The Order is not narrowly tailored.  Its scope is untethered to whether a journalist's conduct "risk[s] substantial harm or if dispersal is otherwise necessary," *Bell v. Keating*, 697 F.3d 445, 459 (7th Cir. 2012), and the 200-foot bubble is far broader than necessary to protect any legitimate interest, *see Glik*, 655 F.3d at 80, 84 (individual "roughly ten feet away" is at "a comfortable remove" (citation omitted)).

60.     The Order fails to leave open "alternative observation opportunities," *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017), when 200 feet is too great a distance for Plaintiffs to visually observe or capture audio of newsworthy events.

AA167
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

61.     Even if the Order were construed as a content-neutral time, place, or manner restriction or a law that also targets conduct, it would remain overbroad.

62.     The Order sweeps in an enormous breadth of protected speech and newsgathering that poses no risk of obstruction.  *See Bell*, 697 F.3d at 456–57 (even where the "triggering conduct cannot be an act constituting protected expression," a statute "still implicate[s] protected expression" where, "once triggered, it may be applied to disperse people engaged in peaceful speech or expressive conduct").

63.     The Second Prior Restraint Order is unconstitutionally vague.  The Massachusetts State Police cannot ascertain what is and is not prohibited, such that they are prohibiting newsgathering activities by members of the public, including Plaintiffs.

64.     The Order "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement."  *City of Chicago*, 527 U.S. at 56.  In both respects, the statute is unconstitutionally vague.

65.     Because the Order allows officers to order an individual to withdraw for any reason (or for no reason), the Order provides no "warning about the behavior that [can] prompt[] a lawful dispersal order."  *Bell*, 697 F.3d at 462.

66.     The Order likewise fails to provide fair notice and an opportunity to comply because reporters cannot workably determine whether they are within the 200-foot bubble when gathering news at a crowded public event and the buffer zone is ill-described.

67.     The Order is independently void for vagueness because the law "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

AA168
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

68.     The Order contains no standards of any kind to guide law enforcement officers in deciding who should be ordered to withdraw.

69.     In preventing newsgathering activities, the Second Prior Restraint Order is an unconstitutional prior restraint on speech.

70.     The Second Prior Restraint Order is unconstitutional both facially and as applied. Defendants have been targeting people, like Plaintiffs, notwithstanding their First Amendment rights to gather news.

71.     Plaintiffs desire to continue to engage in lawful newsgathering activities on the sidewalks near and/or abutting the Dedham Superior Courthouse.

72.     Plaintiffs have been injured, or reasonably fear imminent injury, by these constitutional violations, and Plaintiffs are entitled to relief.

73.     Therefore, Plaintiffs are entitled to a declaration that the Second Prior Restraint Order is unconstitutional and they are entitled to an injunction against all Defendants prohibiting enforcement of the Second Prior Restraint Order.

### _Count II_
**Violation of the First Amendment to the United States Constitution: Retaliation**
**(42 U.S.C. 1983 – First Amendment)**
**(Bryant vs. Does 1 & 2)**

74.     Plaintiff Michel Bryant hereby repeats and realleges each and every allegation in paragraphs 1-37 as if set forth fully herein.

75.     The Doe Defendants' conduct of threatening Bryant on account of his April 1, 2025, constitutionally protected newsgathering activities is unconstitutional and violates his First Amendment right to freedom of speech and expression, and freedom of the press.

**AA169**
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

76.     The Doe Defendants' conduct of prohibiting Bryant from engaging, on April 1, 2025, in constitutionally protected newsgathering activities is unconstitutional and violates his First Amendment right to freedom of speech and expression, and freedom of the press.

77.     It is clearly established that there is a First Amendment right to engage in lawful newsgathering activities, which activities are not prohibited in the buffer zone.

78.     The Doe Defendants' restriction on Bryant's speech is content-based and is in violation of the Free Speech and Free Press Clauses of the First Amendment.

79.     Bryant desires to continue to engage in lawful newsgathering activities on the sidewalks near and/or abutting the Dedham Superior Courthouse.

80.     Even a momentary deprivation of First Amendment rights is an irreparable injury.

81.     The violation of Bryant's First Amendment rights has caused him damage, including mental and emotional injury.

82.     Bryant has been injured, or reasonably fears imminent injury, by these constitutional violations, and Bryant is entitled to relief, including, but not limited to, compensatory damages and injunctive and declaratory relief.

### *Count III*
**Violation of the First Amendment to the United States Constitution: Retaliation**
**(42 U.S.C. 1983 – First Amendment)**
**(Derosier vs. Hardman)**

83.     Plaintiff Tom Derosier hereby repeats and realleges each and every allegation in paragraphs 1-20 & 38-52 as if set forth fully herein.

84.     Hardman's conduct of threatening Derosier on account of his April 1, 2025, constitutionally protected newsgathering activities is unconstitutional and violates his First Amendment right to freedom of speech and expression, and freedom of the press.

Verified Complaint

AA170

Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

85.     Hardman's conduct of prohibiting Derosier from engaging, on April 1, 2025, in constitutionally protected newsgathering activities is unconstitutional and violates his First Amendment right to freedom of speech and expression, and freedom of the press.

86.     It is clearly established that there is a First Amendment right to engage in lawful newsgathering activities, which activities are not prohibited by the buffer zone.

87.     Hardman's restriction on Derosier's speech is content-based and is in violation of the Free Speech and Free Press Clauses of the First Amendment.

88.     Derosier desires to continue to engage in lawful newsgathering activities on the sidewalks near and/or abutting the Dedham Superior Courthouse.

89.     Even a momentary deprivation of First Amendment rights is an irreparable injury.

90.     The violation of Derosier's First Amendment rights has caused him damage, including mental and emotional injury.

91.     Derosier has been injured, or reasonably fear imminent injury, by these constitutional violations, and Derosier is entitled to relief, including, but not limited to, compensatory damages and injunctive and declaratory relief.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury on each claim asserted or hereafter asserted in the Complaint, and on each defense asserted or hereafter asserted by the Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks this Court:

A.      A declaration that the Second Prior Restraint Order is unconstitutional under the First Amendment.

AA171
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

B.       A declaration that enforcing the Second Prior Restraint Order is unconstitutional under the First Amendment.

C.       A preliminary and permanent injunction enjoining each Defendant from interfering with Plaintiff's right to lawfully engage in constitutionally protected expression and activity, including (but especially) newsgathering activities, within Dedham, Massachusetts.

D.       To award Plaintiffs damages for the violation of their constitutional rights.

E.       To award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and any other applicable law; and,

F.       To award such other relief as this Honorable Court may deem just and proper.

Dated: April 3, 2025.                    Respectfully Submitted,

                                         /s/ Marc J. Randazza
                                         Marc J. Randazza, BBO# 651477
                                         mjr@randazza.com, ecf@randazza.com
                                         Jay M. Wolman, BBO# 666053
                                         jmw@randazza.com
                                         RANDAZZA LEGAL GROUP, PLLC
                                         30 Western Avenue
                                         Gloucester, MA 01930
                                         Tel: (978) 801-1776

                                         Mark. Trammell
                                         (*Pro Hac Vice* Forthcoming)
                                         Center for American Liberty
                                         P.O. Box 200942
                                         Pittsburgh, PA 15251
                                         Tel: (703) 687-6200
                                         MTrammell@libertyCenter.org

                                         *Attorneys for Plaintiffs.*

AA172
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

## <u>VERIFICATION OF COMPLAINT</u>

I, Tom Derosier, am a Plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Dated: 04 / 03 / 2025 _____

By: _____
Tom Derosier

- 14 -
Verified Complaint

**AA173**

Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

## VERIFICATION OF COMPLAINT

I, Michel Bryant, am a Plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Dated: 04 / 03 / 2025

By: _Michel Bryant_
Michel Bryant

AA174
Doc ID: 2eda23dff27af8326a96acf41414ba6d2ee09c02

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 4/4/2025 at 3:28 PM EDT and filed on 4/4/2025

| | |
|---|---|
| **Case Name:** | Grant et al v. Trial Court of the Commonwealth of Massachusetts et al |
| **Case Number:** | 1:25-cv-10770-MJJ |
| **Filer:** | |
| **Document Number:** | 28(No document attached) |

**Docket Text:**
**Electronic Clerk's Notes for proceedings held before Judge Myong J. Joun: Hearing held on 4/4/2025 re [2] MOTION for Temporary Restraining Order *and for a Preliminary Injunction or, in the Alternative, an Injunction Pending Appeal* filed by Lisa Peterson, Jason Grant, Samantha Lyons, Allison Taggart. Court heard arguments and took the motion under advisement; supplemental briefing to filed by 4/10/2025. (Court Reporter: Jamie Halpin at jkhhalpin@gmail.com)(Attorneys present: Austin, Goldberg, Hitt, and Randazza) (JL)**

**1:25-cv-10770-MJJ Notice has been electronically mailed to:**

John R. Hitt     john.hitt@mass.gov

Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman     jmw@randazza.com, ecf@randazza.com

Janelle M. Austin     jaustin@k-plaw.com

Gabriel T. Thornton     gabriel.thornton@mass.gov, appealsefilings@mass.gov

Lauren F. Goldberg     lgoldberg@k-plaw.com

Thomas E. Bocian     thomas.bocian@state.ma.us, AppealsEFilings@state.ma.us

Emily N. Rothkin     emily.rothkin@mass.gov, AppealsEFilings@mass.gov

**1:25-cv-10770-MJJ Notice will not be electronically mailed to:**

**AA175**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 4/7/2025 at 11:32 AM EDT and filed on 4/7/2025

| | |
|---|---|
| **Case Name:** | Grant et al v. Trial Court of the Commonwealth of Massachusetts et al |
| **Case Number:** | 1:25-cv-10770-MJJ |
| **Filer:** | |
| **Document Number:** | 31 |

**Docket Text:**
**Transcript of Motion Hearing held on April 4, 2025, before Judge Myoung J. Joun. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jamie Halpin at jkhhalpin@gmail.com. Redaction Request due 4/28/2025. Redacted Transcript Deadline set for 5/8/2025. Release of Transcript Restriction set for 7/7/2025. (DRK)**

**1:25-cv-10770-MJJ Notice has been electronically mailed to:**

John R. Hitt     john.hitt@mass.gov

Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman     jmw@randazza.com, ecf@randazza.com

Janelle M. Austin     jaustin@k-plaw.com

Gabriel T. Thornton     gabriel.thornton@mass.gov, appealsefilings@mass.gov

Lauren F. Goldberg     lgoldberg@k-plaw.com

Thomas E. Bocian     thomas.bocian@state.ma.us, AppealsEFilings@state.ma.us

Emily N. Rothkin     emily.rothkin@mass.gov, AppealsEFilings@mass.gov

**1:25-cv-10770-MJJ Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/7/2025] [FileNumber=11299361-0
] [187c6b32b30fd6d189a62825070ffe2e8e30b87d79985fdbdf30c986bd166d2d15b
df9ac643fe905b8e3c4bd8d3ab1bd127234f04925b5f439f97c3ad84a36ef]]

**AA176**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>Plaintiffs,<br><br>v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

## SUPPLEMENTAL BRIEF

At the hearing on April 4, 2025, the Court invited supplemental briefing on the motion for a temporary restraining order/preliminary injunction (ECF No. 2), as to the level of constitutional scrutiny to be utilized to analyze Judge Cannone's buffer zone order and "anything else" the parties wished to add, "as long as it's not duplicate." (Transcript, ECF No. 31 at 26:20-27:21). As set forth in the prior arguments and below, the requested injunctive relief should be granted.

## 1.0    Anti-Injunction, Abstention, and Comity Concerns are Misplaced

The Court understandably seemed trepidatious about turf issues when it comes to what an injunction might look like. Specifically, the Court raised questions regarding the Anti-Injunction Act, *Younger* abstention, and *Rooker-Feldman* abstention. (ECF No. 31 at 8:14-23). None of these doctrines stand in the way, and there is case law directly on point that specifically approves of what the Plaintiffs are asking for. *See Mitchum v. Foster*, 407 U.S. 225 (1972).

The Anti-Injunction Act prohibits federal courts from granting injunctions "to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.  However, as the court will recall, the defense was candid with the court – since this is a Section 1983 action, the Anti-Injunction Act does not apply. (ECF No. 31 at 16:5-10). The defense was likely familiar with *Mitchum* which held that Section 1983 expressly authorizes federal courts to issue injunctions in state proceedings, because the purpose of Section 1983 is to "interpose the federal courts between the States and the people" and to enforce the Fourteenth Amendment against state action, "whether that action be executive, legislative, or judicial."  407 U.S. at 240.  The *Mitchum* court recognized that the legislative history of Section 1983 demonstrates congressional distrust of state courts, which were often "in league with those who were bent upon abrogation of federally protected rights" *Id*. at 240-241. The federal district court in *Mitchum* lawfully enjoined a Florida restraining order that violated Mr. Mitchum's First and Fourteenth Amendment rights.  This is exactly what this Court should do here.  It should issue an order that the order creating the Prior Restraint Zone or Buffer Zone was issued unconstitutionally in violation of the Fourteenth Amendment and it functions as a violation of the First Amendment, thus it is federally enjoined.

As the First Circuit recognized, even if there were no *Mitchum*, the Anti-Injunction Act does not apply if the party requesting injunctive relief from the federal court was neither a party, nor in privity with a party, to the state court proceeding sought to be enjoined. *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252, 264 (1st Cir. 1993) (citing *County of Imperial v. Munoz*, 449 U.S. 54, 59-60 (1980); *Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 378, (1939); *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 440, (1934); *Garcia v. Bauza-Salas*, 862 F.2d 905, 909 (1st Cir. 1988)).  This is referred to as the "strangers to the state court proceedings" exception to

the Anti-Injunction Act.  The *Casa Marie* case dealt with a precise question that this Court asked

during oral argument about whether the Plaintiffs needed to first seek state court remedies.

> "The 'strangers' exclusion presumably embraces federal plaintiffs who deliberately
> bypass an available opportunity to intercede in pending state court proceedings,
> since 'the law does not impose upon any person absolutely entitled to a hearing the
> burden of voluntary intervention in a suit to which he is a stranger.'"

988 F.2d at 264.

The case that *Casa Marie* relied on for this proposition was *Chase Nat'l Bank*, 291 U.S. at

441.  In that case, the Supreme Court noted that even if under state practice it would have been

*possible* for the party seeking to intervene, there was no need to.  *Chase* was even more extreme

than here, as the plaintiff in that case sought an injunction against a state court *judgment,* not just

against an improper order.  Since the judgment affected a nonparty's rights, the Supreme Court

recognized the precise arguments Plaintiffs make in this case: They were strangers to the

proceedings before Judge Cannone, thus the prior restraint she issued on the public sidewalks

should not affect their legal rights.  *Id.*

Defense counsel continued to act with professionalism and candor by conceding that

*Rooker-Feldman* does not apply, either.  (ECF No. 31 at 16:11.)  They were correct, as that doctrine

is "confined to cases…brought by state-court losers complaining of injuries caused by state-court

judgments rendered before the district court proceedings commenced and inviting district court

review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544

U.S. 280, 284 (2005).  "*Rooker-Feldman* does not bar actions by a nonparty to the earlier state

suit."  *Lance v. Dennis*, 546 U.S. 459, 464 (2006), citing *Johnson v. De Grandy*, 512 U.S. 997,

1005-1006 (1994).  Plaintiffs are not parties to the Karen Read trial. This doctrine is inapplicable.

As to the *Younger* abstention doctrine, it, too, does not apply, notwithstanding the defense's

honest mistake in saying that it "kind of does[.]"  (ECF No. 31 at 16:12.)  In *Younger v. Harris*,

401 U.S. 37 (1971), the defendant was prosecuted under a state law he believed violated his First Amendment rights and sought a federal injunction against his criminal case. The Supreme Court found that since Mr. Younger could raise his constitutional defenses in his case in state court, the federal court should abstain from intervention. *Id*. at 53-54. *Younger* clearly does not apply here, since not only are Plaintiffs not seeking to enjoin the ongoing prosecution, but merely the unlawful declaration of a Prior Restraint Zone, and they are strangers to the criminal proceeding. *Younger* abstention only applies "when litigation between the same parties and raising the same issues is . . . pending in a state court." *Trainor v. Hernandez*, 431 U.S. 434, 440 (1977); *see also Sullivan v. City of Pittsburgh*, 811 F.2d 171, 177-78 (3d Cir. 1987) (federal plaintiffs not parties to ongoing zoning proceeding, and thus found not sufficiently "related" to parties therein), cert. denied, 484 U.S. 849 (1987); *Family Div. Trial Lawyers v. Moultrie*, 725 F.2d 695, 702-03 (D.C. Cir. 1984) (lawyers' federal claims cognizable in federal court where lawyers were not parties to state proceedings). While *Younger* abstention might apply to "closely related" parties, it does not apply where there is merely an "alignment of interests among similar but distinct parties[.]" *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 42-43 (1st Cir. 2012). And, here, there is not even a party in the state case with whom Plaintiffs are aligned—Ms. Read expressly took no position on the buffer zone. Thus, in no way, does *Younger* abstention "kind of" apply.

No other principle of comity interferes to preclude this Court from acting. In their opposition brief, the defense cited only to *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010). (ECF No. 10 at 18). However, *Levin* was about state tax administration and appears cabined to such cases, rendering it inapt. In *Am. Trucking Ass'ns v. Alviti*, 944 F.3d 45, 57 (1st Cir. 2019), the First Circuit stated, that the "comity principle…can be traced to Justice Field's opinion in *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 109-10 (1870)." That is, *Dows* merely provides for

Plaintiffs' Supplemental Brief re: Motion for TRO and Preliminary Injunction
Civil Action No. 1:25-cv-10770-MJJ

**AA180**

comity when a challenge is made under Section 1983 to "any state tax system[.]"  *Excellence Mgmt. Audits & Realty Corp. v. United States*, 812 F. Supp. 2d 126, 132 (D.P.R. 2011).  Unlike in a tax case, plaintiffs cannot sue to recover any improperly collected tax—their First Amendment injuries are irreparable and injunctive relief is necessary and proper.

General, vague, reference to comity is otherwise unwarranted.  The Government claims that the state court "carefully and cautiously considered the relevant facts." (ECF No. 21 at 18).  This is demonstrably not the case.  In *Mitchum*, the Supreme Court recognized the congressional intent in passing Section 1983 and ensuring that federal courts could bypass state courts who were often "in league with those who were bent upon abrogation of federally protected rights." 407 U.S. at 240-241.  The *Mitchum* court was not specific about what "in league" means, but this clearly does not require a conspiracy – merely aligned governmental interests.  Judge Cannone prohibited the Plaintiffs from continuing to criticize her in her self-declared zone of power – power she does not have.  And she has enlisted co-defendants in law enforcement to crack down on protesters, which the State Police thus far have done with great alacrity and aggression.  Cannone's proceeding only "considered" cherry-picked facts, such as the affidavit of an anonymous alleged juror, who did not merely come forward out of a sense of civic duty – but was the hand-picked jury foreman in the first Karen Read trial, and who other jurors have claimed was blinded by pro-prosecution bias from the day he was chosen.[1]

Judge Cannone also considered "facts" that have nothing to do with the stated reason for the Prior Restraint.  For example, while she made it clear that she would *never* let protesters

---

[1] In an interview by another juror, that juror said that the only awareness jurors had of the crowds outside was when Karen Read was entering or leaving the courthouse, but it was "not distracting" during deliberations.  Turtleboy Live, "Karen Read Trial Juror: *Exclusive* Live Interview" YouTube, 15 Feb. 2025, https://www.youtube.com/live/8pDwEJTIH4E, at 2:08:45.

intervene to be heard in her courtroom, she considered an email from the "Karen Read Trial Prepare Together Group" (whatever that is) which simply is a bullet point list of hearsay complaints from neighbors about the inconvenience of the presence of protesters. ECF No. 22 pp 58-60. Not one complaint had anything to do with the trial, but just people who prefer to have no protesters on the streets. The fact that this list of irrelevant grievances was considered at all shows that there was neither "care" nor "caution" put into the decision to suspend the First Amendment. Judge Cannone seemingly did not want people, like Plaintiffs, holding up signs that criticize her during the highly publicized trial, and it looks like she used a pretext to shut down that criticism.

The law enforcement defendants seem to have varying degrees of enthusiasm about using the Prior Restraint Zone Order as a reason to shut down dissent, with the Massachusetts State Police, and especially Sgt. Hardman both using it to eject protesters and journalists as well as a pretextual reason by at least one officer to physically assault individuals inside the zone. *See Derosier, et al. v. Noble, et al.*, Case No. 1:25-cv-10812-DJC (D. Mass.) and *Delgado v. Noble, et al.*, Case No. 1:25-cv-10818-RGS (D. Mass.). Comity is, therefore, neither warranted or appropriate. This Court has the power to, and should, issue an injunction that the "Buffer Zone" order is unlawful, was issued in violation of the 14th Amendment, and is therefore enjoined. The Court similarly has the power to issue an injunction that the "Buffer Zone" violates the First Amendment, and is therefore enjoined. And without a doubt, this Court has the power to enjoin law enforcement from enforcing the Buffer Zone Order anywhere outside the Norfolk County Courthouse, even if the Court decides to leave the Order intact, which it should not.

## 2.0    State Court Remedies

At oral argument, the Court was interested in whether state court remedies had been exhausted, and the government argued that there were such remedies. (ECF No. 31 at 21:2-20 &

Plaintiffs' Supplemental Brief re: Motion for TRO and Preliminary Injunction
Civil Action No. 1:25-cv-10770-MJJ

**AA182**

25:21-24). However, the government is confused. There is no adequate state court remedy, and this issue is closely intertwined with the lack of any abstention impediments. *Chase Nat'l Bank*, 291 U.S. at 441, as discussed above, is controlling.

All the defense pointed to was a hearing before Judge Cannone on the Commonwealth's motion for the buffer zone, citing to a *Court TV* YouTube video. That video is not properly before the court, but evidentiary issues aside, it fails to support the defense. In the video, the Commonwealth argued its motion and Ms. Read declined to take a position. The public was not invited to argue the motion nor to present any evidence, cross examine witnesses, nor to be heard at all. Plaintiffs were certainly not invited to be heard. Judge Cannone marked a letter full of hearsay statements purporting to be from local business owners as an exhibit, but she did not receive it in evidence nor allow them to intervene.[2]    Thus, there was no opportunity to be heard.

Even if under Massachusetts practice it would have been *possible* for the Plaintiffs to intervene, *which they are prohibited from doing*, there is no reason for them to have done so before coming to this Court. The Plaintiffs were strangers to the proceedings before Judge Cannone, and thus had neither the right to intervene, nor to seek extraordinary relief before the SJC. To the extent they had even an ephemeral opportunity to, there was no need to. "'*the law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger*.*" Chase Nat'l Bank*, 291 U.S. at 441.

As the Government notes in its brief, in the first Karen Read trial, the *Spicuzza* parties attempted to intervene in the state court. (ECF No. 21 at 2). However, Judge Canonne refused to permit intervention. *Id*. She refused to even *consider* the points raised by protesters. For the Defense to suggest that this option was open to the plaintiffs *now* seems odd. This option was

---

[2] ECF No. 1-4 at 3 n.2

Plaintiffs' Supplemental Brief re: Motion for TRO and Preliminary Injunction
Civil Action No. 1:25-cv-10770-MJJ

**AA183**

clearly closed to them.  As the Commonwealth successfully argued to the SJC, "[i]ntervention is 'a concept foreign to criminal procedure.'" *Spicuzza v. Commonwealth*, SJC-13589 (Red Brief at 29-30 quoting *The Republican Company v. Appeals Court*, 442 Mass. 218, 227 n.14 (2004)). Where there is no right to intervene in a criminal case, the only option open is to seek "extraordinary relief" under Mass. Gen. Laws c. 211 § 3.  As the Defense wrote in its brief, even *that* avenue was not entirely open.  "Characterizing the Superior Court's decision on the motion to intervene as an 'ordinary procedural ruling,' he concluded that it did not warrant the exercise of the SJC's extraordinary power of superintendence." (ECF No. 21 at 3).

Then, when the merits were finally addressed in *Spicuzza*, the SJC **explicitly refused to consider the issue of whether public sidewalks were at issue in the case**.  494 Mass. 1005, 1008 (2024).  In doing so they left the entire question about public sidewalks open for this Court to consider, and did not occupy one solitary piece of sidewalk pavement in *Spicuzza*.  This current case before the Court is entirely and explicitly all about public sidewalks – giving it no intersection at all with *Spicuzza*. *Spicuzza* is not even persuasive.

Accordingly, a motion to intervene in the trial court was not an option open to the Plaintiffs, as discussed at oral argument.  A petition for "extraordinary relief" was *an option*, but it was a very murky and unreliable option – the SJC had no compulsion to even *hear* the petition, it is merely a "discretionary power of review[.]"  *McGuinness v. Commonwealth*, 420 Mass. 495, 497, (1995). If it did choose to hear the petition, it would have had no timeline to issue its decision – and it very well could have sat on the docket until the Karen Read trial was over, thus mooting the issue.  And even if it heard it, it was under no compulsion to hear *both* questions in this case – as it simply refused to address the due process issue raised in the *Spicuzza* case.

Plaintiffs had no *right* to address this matter through state courts.  The Plaintiffs are not parties to *Commonwealth v. Karen Read*, so intervention and appellate review were foreclosed. There was no requirement to seek relief in the state courts first, and state court remedies are otherwise inadequate.  Under *Chase Nat'l Bank*, state court remedies are not relevant here.

## 3.0    Strict Scrutiny Applies

The Court requested specifically that the parties address the level of scrutiny it should apply to the speech restrictions – and it is clear that strict scrutiny applies.  However, the Court should recall that this is only an *in the alternative* analysis.  The Order, even if completely respectful of the First Amendment, was arrived at and imposed in violation of the Fourteenth Amendment's due process requirements, and thus would be invalid even if drafted with precision and perfection and enforced just as cleanly.  Unfortunately for open and robust debate, it was not so crafted and has not so been enforced.

The first step for the Court is to determine whether this is a traditional public forum or not, but it hardly seems worth briefing given the answer is so obvious.  Sidewalks, including sidewalks around courthouses, are traditional public forums.  From "time out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 817 (1985); *United States v. Grace*, 461 U.S. 171, 177 (1983), quoting *Perry Education Assn. v. Perry Local Educator's Assn.*, 460 U.S. 37, 45 (1983). Public streets and sidewalks, "are presumptively traditional public forums, and the Supreme Court has repeatedly reaffirmed their status as places for expressive activity." *Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus*, 634 F.3d 3, 11 (1st Cir. 2011).  In *United States v. Grace*, 461 U.S. 171, 179-80 (1983), the Supreme Court held that the "sidewalks forming the perimeter of the Supreme Court

grounds" are traditional public forums, places where expressive activity is lightly regulated, because they are "indistinguishable from any other sidewalks in Washington, D.C." In other words, Congress tried to protect the Supreme Court from protests, and the Supreme Court itself struck down Congress' attempts to do so. If the Supreme Court can tolerate protests, the Norfolk Superior Court can do so as well.

Having resolved that we are in a traditional public forum, the Court should move on to assess the appropriate level of scrutiny to apply. First, we measure the government's power, and that power to regulate speech is at its absolute weakest level in traditional public forums like sidewalks. The government "must respect the open character of these for[a]." *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011); *Grace*, 461 U.S. at 177 (in a traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited").

The government's already weak power here is even more eroded by the fact that the illegally imposed restrictions are indeed content-based. Content-based restrictions on expressive activities in such fora must pass strict scrutiny — *i.e.,* "the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The Government argues that the Order is content neutral, but they confuse viewpoint neutrality with content neutrality. The order itself does regulate content – *demonstrations*. Speech that is of a commercial nature? Allowed. Speech that shows a brand preference, like Under Armour, or shows off your employer? Allowed:[3]

---

[3]    Image via 12 News, WPRI Reporter Hannah Cotter, available at https://www.instagram.com/hannahecotter/reel/DH6fQA1RQ4R/ (posted April 1, 2025).



The only content that is restricted is a "demonstration."  That is a content-based restriction. Further, to whatever extent the Order itself might have a slight faux veneer of neutrality, it was imposed for the purpose of stifling Anti-Government speech, and law enforcement so far has only interpreted this Order (and the prior Order too) to encompass Anti-Government speech. When, as here, a prior restraint impinges upon the right of the public to speak, and forbids pure speech, not speech connected to any conduct, "the presumption of unconstitutionality is virtually insurmountable." *In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986).

However, the Court might not need to resolve the dispute over whether it discriminates on the basis of viewpoint *or* content, because it is a near-total ban on expression here that would fail under any standard because it is not at all tailored, much less narrowly tailored.  If the government is to be believed in its position that the restriction is not content-based, because it just simply bans *everything,* then the government jumps from the frying pan into the fire. The ban is then properly

Plaintiffs' Supplemental Brief re: Motion for TRO and Preliminary Injunction
Civil Action No. 1:25-cv-10770-MJJ

described as a categorical prohibition on all expressive activity, which "would likely not pass constitutional muster even under the relaxed standard applicable to a nonpublic forum." *United States v. Nassif*, 97 F.4th 968, 980 (D.C. Cir. 2024); *see also Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002).

If the government's position is credited, the ban is so draconian that it bans all noncommercial expressive activity, which makes it wildly overinclusive. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121-23 (1991) (law that is "significantly overinclusive" is not narrowly tailored). The ban prohibits one from engaging in pamphleteering regarding jury nullification in general, not targeting any particular case, despite this being protected speech. *See Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) (finding such pamphleteering protected). As in a recent case involving Congress, the restriction prevents even a single person from standing with a black and white placard that might say "Do Justice." *See Mahoney v. United States Capitol Police Bd.*, 734 F. Supp. 3d 114, 130 (D.D.C. 2024). And just as in *Mahoney*, "it beggars belief" that a complete lockdown on all expressive activity is necessary to address the concerns that seem to be raised – namely nothing more than noise. *See Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75, (1987) (ban on "all First Amendment activities" not narrowly tailored as "no conceivable governmental interest would justify such an absolute prohibition on speech") (cleaned up).

The Order suffers from the opposite problem as well, as it is underinclusive. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint"). The only real complaint that anyone seems to have in the record or at oral argument was that there is a claim that jurors could hear people yelling outside the courthouse. If

"noise" is really the justification, then why wasn't there simply a "quiet zone." After all, someone could walk down the street with a barking dog, creating a far greater source of jarring noise, but nobody would claim that this violated the Buffer Zone.  There is no restriction on motorcycles driving by with loud exhaust pipes, nor is anyone prohibited from driving past the courthouse in a 1969 Camaro with *Free Bird* playing on an 8-track at maximum volume.  In fact, it would seem that since only "demonstrations" are prohibited, it would be entirely lawful for a chorus of people to line up near the courthouse for the sole purpose of singing *Free Bird* a capella.

It is unsurprising that the Prior Restraint Zone does not address other sources of noise or disturbance – because the purpose of it is to stifle dissent and to lash out at critics of Judge Cannone, not to stop the proceedings from being disturbed by noise.

What gives this Court its greatest latitude to strike down the Prior Restraint Zone, or at least enjoin its enforcement, is that there are far less restrictive alternatives available to address the claimed concern – noise.  In fact, the only case that the Order actually relies on is *Ward v. Rock Against Racism*, 491 U.S. 781, 784, 799 (1989), which upheld a regulation on "the volume of amplified music at the bandshell [amphiteater and stage] so the performances are satisfactory to the audience without intruding upon those who use the [nearby grassy area called] Sheep Meadow or live on Central Park West and in its vicinity." The number of options Judge Cannone had, other than a complete suspension of the First Amendment, seems to confirm that Judge Cannone decided to sacrifice speech by burdening substantially more of it than necessary in pursuit of a stated important goal. Why suppress placards and other quiet forms of protest if the interest is in suppressing noise? Therefore, even if the intent was not to stop people from holding placards criticizing her, and it was an actually noble goal, the analytical laziness of the order spoils it.  *See McCullen v. Coakley*, 573 U.S. 464, 486 (2014) ("The government may attempt to suppress speech

**AA189**

not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency' *"); see also Lederman*, 291 F.3d at 45 ("Perhaps the most troubling aspects of the … virtually per se ban on expressive activity … is the ready availability of 'substantially less restrictive alternatives'").

If the true goal of the restrictions is to limit noise, then after a proper hearing and with proper authority, let us see a zone of silence around the courthouse.  But one has to ask, "why now?"  Why not make it permanent, for every trial?  Judge Cannone or her counsel can answer that question.  But if the problem here is truly a concern about tainting the jurors, the jurors can certainly be protected from noise while protesters stand quietly with signs outside the building.

The Court should strike down the entire Prior Restraint Zone order.  Existing disorderly conduct statutes and noise ordinances are sufficient to deal with any problems that Judge Cannone has identified or imagined.

## 4.0    Collapsing the Hearing Into a Trial on the Merits

The issues in this case are ones of pure constitutional law that do not require any discovery or factual development. In cases such as this, it is appropriate to collapse the hearing on a motion for a preliminary injunction into a trial on the merits. Fed. R. Civ. P. 65(a)(2) provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Such consolidation is appropriate where (1) "the record is complete and ripe for review" and (2) there is "no reason for delay," especially where "the evidence reasonably admits of only one outcome." *Bays' Legal Fund v. Browner*, 828 F. Supp. 102, 105 n.3 (D. Mass. 1993). The unconstitutionality of the Buffer Zone

is so readily apparent that there is no reason the Court cannot determine with finality all issues as part of the hearing on the instant Motion.

Dated: April 10, 2025.                                    Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark. Trammell
(*Pro Hac Vice*)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

**AA192**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-cv-10770-MJJ

JASON GRANT, ALLISON TAGGART, LISA
PETERSON, and SAMANTHA LYONS,

Plaintiffs,

v.

TRIAL COURT OF THE COMMONWEALTH
OF MASSACHUSETTS, BEVERLY J.
CANNONE, in her official capacity as Justice of
the Superior Court, GEOFFREY NOBLE, as
Superintendent of the Massachusetts State Police,
MICHAEL d'ENTREMONT, in his official
capacity as Chief of Police Department of the
Town of Dedham, Massachusetts, and MICHAEL
W. MORRISSEY, in his official capacity as the
Norfolk County District Attorney,

Defendants.

## STATE DEFENDANTS' SUPPLEMENTAL
## PRELIMINARY INJUNCTION OPPOSITION

### INTRODUCTION

Pursuant to the Court's request at the April 4 hearing, the State Defendants submit this

supplemental opposition to address several points including, but not limited to, why the buffer-

zone order serves the compelling state interest of protecting Ms. Read's right to a fair trial and is

narrowly tailored to achieve that compelling state interest.

1

**AA193**

## **ARGUMENT**

I.    **ENSURING MS. READ'S RIGHT TO A FAIR TRIAL AND AN IMPARTIAL JURY IS A COMPELLING STATE INTEREST THAT SUPPORTS THE NARROWLY-TAILORED, MODEST EXPANSION OF THE BUFFER ZONE.**

As argued in the State Defendants' principal opposition at 10, and assuming without conceding that strict scrutiny applies, the narrowly-tailored buffer-zone order furthers a compelling state interest as required by *Reed v. City of Gilbert, Ariz.*, 576 U.S. 155, 171-172 (2015). The Superior Court established the buffer zone "to ensure the defendant's right to a fair trial." Dkt. 1-4, at 2. The right to a fair trial has long been recognized as a compelling state interest. "Courts have agreed that protecting the right to a fair criminal trial by an impartial jury whose considerations are based solely on record evidence is a compelling state interest." *In re Morrissey,* 168 F.3d 134, 140 (4th Cir. 1999) (citing, among other cases, *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1075 (1991), and *Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966)). *Contrast with McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 189 (D. Mass. 2015) (ordinance did not survive strict scrutiny because "promotion of tourism and business has never been found to be a compelling government interest for the purposes of the First Amendment"). Additionally, another judge in this District (Casper, J.), faced with a similar issue relating to the Ms. Read's case, noted that "[t]he Supreme Court has recognized the government's interest in 'protecting its judicial system from the pressures which picketing near a courthouse might create.'" *O'Neil v. Canton Police Dep't*, No. 23-cv-12685-DJC, 2023 WL 7462523, at *4 (D. Mass. 2023) (quoting *Cox v. Louisiana*, 379 U.S 559, 562 (1965)).[1]

---

[1] This is also consistent with the prior state court decisions assessing the former buffer-zone order. When considering the constitutionality of the previous buffer-zone order, the Single

**AA194**

Here, the Superior Court's order, as set forth in the memorandum of decision, Dkt. 1-4, at 2-3, is carefully and narrowly tailored to modestly expand the buffer zone on the west side of the courthouse based on the real-world experience of noise and activity outside the courtroom impacting the sanctity of the deliberations and proceedings inside the courthouse during the first trial.  The judge expressly concluded that "[t]o ensure a fair trial with an impartial jury, extending the buffer zone is necessary to prevent jurors from outside influence and to prevent interruptions and distractions during trial." Dkt. 1-4, at 2-3.  Here, the Superior Court narrowly tailored its modest extension of the buffer-zone order to prevent noise that might interfere with a jury maintaining their impartiality.  Shouting heard inside the courtroom and in the jury room, as well as honking from passing vehicles, reportedly disrupted the jury's deliberations in the first trial. *See Picard v. Magliano*, 42 F.4th 89, 104 (2d Cir. 2022) ("The State would clearly have a compelling interest, for example, in prohibiting protests outside a courthouse featuring amplified calls for the jurors to reach a particular verdict in an ongoing trial in that courthouse that are audible inside the courtroom.").  Faced with the unique circumstances presented by the Read case and the experience of what occurred during the first trial, it is hard to envision how the judge could have more narrowly tailored the order to be "the least restrictive means among available, effective alternatives." *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 666 (2004).  In fact, the judge tried other available alternatives, rejected a broader 500-foot buffer zone that the Commonwealth had requested, and based on the real-world experience of the first trial, determined, in essence, that there were no "effective alternatives" to a modest expansion of the buffer zone to ensure the sanctity of the trial. *Id.*  Here, there is a "close fit between the ends

---

Justice of the Supreme Judicial Court stated that "if I were to apply strict scrutiny to the buffer zone order, I would find that the government has a compelling interest in preserving the integrity and fairness of the trial."  Dkt. 22, at 22, n.9.

**AA195**

[i.e., protecting Mr. Read's right to a fair trial] and the means" [i.e., the modestly expanded buffer-zone order] that ensures that Plaintiffs' First Amendment rights have not been "too readily 'scarific[ed] [] for efficiency.'" *McCullen v. Coakley*, 537 U.S. 464, 486 (2014) (quoting *Riley v. National Federation of Blind N.C., Inc.*, 487 U.S. 781, 795 (1988)).

Furthermore, in addition to the reasoning set forth by the judge in the March 25, 2025, memorandum of decision and order as discussed above, the judge also incorporated the reasons that compelled the judge to enter the buffer-zone order in the first trial. Dkt. 1-4, at 1 (stating that "[f]or the reasons that compelled the Court to establish a buffer zone for the first trial, it is necessary to establish a buffer zone for the second trial to ensure the defendant's right to a fair trial"). Those reasons included, among other things: (1) "Individuals . . . displaying materials which may or may not be introduced into evidence during trial"; (2) "[D]isplaying materials . . . airing their opinions as to the guilt or innocence of the defendant on their clothing or signage"; and (3) "Witness intimidation." Dkt. 1-2, at 2. Again, in light of these additional reasons, it is hard to envision how the judge could have crafted a more narrowly-tailored order.

Additionally, there is no merit to Plaintiffs' argument, which it should be noted is supported by no citations to caselaw, that the judge "could simply instruct the jurors to ignore the demonstrations." Dkt. 3, at 9. For example, such an instruction would not effectively address the problem posed by demonstration-related noise preventing jurors from hearing witness testimony or jury instructions in the courtroom. Likewise, Plaintiffs' argument that curative instructions to the jury could solve the problem, Dkt. 3, at 9-10, also fails to address the real-world problem of jurors not being able to hear witness testimony and jury instructions inside the courtroom.

**AA196**

Additionally, cases cited by Plaintiffs such as *United States v. Grace*, 461 U.S. 171 (1983), are distinguishable from this case. *Grace* dealt with protected speech on public sidewalks bounding the United States Supreme Court plaza. However, unlike in *Grace*, 461 U.S. at 182, there *is* evidence in the record here that demonstrations did interfere with the orderly function of the first Superior Court trial, and in particular, the basic functioning of Ms. Read's first trial.

In sum, for at least the reasons set forth above, the buffer-zone order is narrowly tailored.

## II.    ONLY ONE SENTENCE OF THE BUFFER-ZONE ORDER HAS NOT ALREADY BEEN REVIEWED AND UPHELD AS CONSTITUTIONAL BY THE MASSACHUSETTS SUPREME JUDICIAL COURT.

The first buffer-zone order was upheld by the Massachusetts Supreme Judicial Court in *Spicuzza v. Commonwealth*, 494 Mass. 1005 (2024) (per curiam). Except for one sentence, the current buffer-zone order is identical to the one that the SJC upheld. Thus, under the doctrine of comity, this Court should decline to enjoin those portions of the order that the SJC has already reviewed and upheld in connection with Ms. Read's first trial.

The only portion of the buffer-zone order that is new here is the addition of one sentence in the first paragraph of the order: "The buffer zone shall further be extended to include the area bounded by Bates Court, Bullard Street, Ames Street, and Court Street." Dkt. 1-4, at 4. As discussed at the April 4 hearing, these are the streets on the west side of the Dedham courthouse that are referenced in the portion of the Superior Court's decision that explains the judge's reasoning for modestly expanding the buffer zone. In the interest of comity, this Court should not disturb this modest expansion, while there are available state-court remedies for Plaintiffs to challenge the buffer zone. After all, the Single Justice who ruled on the challenge to the buffer zone in Ms. Read's first trial unambiguously stated that "the petitioners [there] ha[d] standing to

**AA197**

challenge the buffer zone order pursuant to G. L. c. 211, § 3, where they allege[d] that the buffer zone order infringe[d] their First Amendment rights." Dkt. 22, at 20, n.7. And, on appeal from the Single Justice's order, the full SJC did not signal that the Single Justice's ruling in that regard was wrong. *Spicuzza*, 494 Mass. at 1007. Thus, Plaintiffs here cannot show the lack of at least a potential, if not actual, avenue to give the state courts the first opportunity to review the constitutional questions presented here.

The Supreme Court has cautioned that "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex mix of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987). Recognizing that "complex mix of considerations," courts have concluded that, even where the formal requirements of an abstention doctrine are not met, relief may be inappropriate when a plaintiff bypasses available state-court remedies to challenge a state court's injunction or order in federal court. *See, e.g., Gottfried v. Med. Plan. Servs., Inc.*, 142 F.3d 326, 332-333 (6th Cir. 1998) ("we hold that a federal court should abstain when a nonparty to a state court injunction brings a First Amendment challenge to the injunction in federal court before requesting relief from the state court"; "[e]ven when there are no jurisdictional bars to such extraordinary relief, a federal court should initially abstain and give due respect to the state court's ability to determine the scope of its injunctions within the constitutional framework."); *Hoover v. Wagner*, 47 F.3d 845, 851 (7th Cir. 1995) (Posner, C.J.) ("Taking as true the facts pleaded by the plaintiffs, we hold that it would be an abuse of discretion, in light of the principles of equity and comity that underlie *Younger,* [401 U.S. 37 (1971),] to grant the relief sought by the plaintiffs. Should the plaintiffs ever be arrested or otherwise impeded or punished for the exercise of their right of free speech,

**AA198**

they will have an abundance of state and federal remedies to which to appeal."). These principles apply with equal force here and weigh in favor of declining to grant the requested preliminary relief.

## III. PLAINTIFFS HAVE WAIVED THEIR CHALLENGE TO THOSE PORTIONS OF THE BUFFER-ZONE ORDER THAT CONCERN THE IMPACT OF NOISE ON THE JURY.

During the April 4 hearing, Plaintiffs' counsel waived Plaintiffs' challenge to the portions of the buffer-zone order relating to noise. Dkt. 31, at 26 ("[W]e are waiving any argument that noise is something that we're seeking you to allow us to engage in"). Thus, Plaintiffs' challenge, at most, is now limited to only that portion of the order that would impact Plaintiffs' ability to "stand on public sidewalks [] holding signs." *Id.*, at 25.

## IV. DURING THE FIRST TRIAL, DEMONSTRATORS' "QUIET" HOLDING OF SIGNS AND GESTURES TO OTHERS, INCLUDING DRIVERS OF VEHICLES, DIRECTLY CAUSED NOISE—MOST NOTABLY HORN-HONKING—THAT COULD BE HEARD IN THE COURTROOM AND THE JURY ROOM AND SERVED AS A BASIS FOR THE MODEST EXPANSION OF THE BUFFER-ZONE ORDER.

Plaintiffs fail to grapple with the problem of noise being created in response to Plaintiffs' signs or their physical gestures while they quietly protest. The Superior Court expressly concluded that the modest expansion of the first buffer zone was necessitated by the problem posed by "[v]ehicles honking their horns *in response to signs and gestures from [] demonstrators* [that] could [] be heard frequently during the first trial." Dkt. 1-4, at 3 (emphasis added).[2] Because jurors would be aware that this unusual and incessant honking is a result of strong

---

[2] In its initial buffer-zone order for the first trial, Dkt. 1-2, at 3, and then again in its buffer-zone order for the retrial, Dkt. 1-4, at 3, the Superior Court was also appropriately mindful that even signs held by protesters could affect Ms. Read's right to a fair trial if they were viewed by jurors or witnesses entering or approaching the courthouse, or by such individuals from within the courthouse. Such signs could introduce extraneous influences just like noise. Any argument by Plaintiffs minimizing that risk is unjustified.

outside opinions about the murder trial on which they are sitting, it could affect their ability to be impartial or cause unnecessary disruptions to, or interference with, the ongoing proceedings. *See* Dkt. 22, at 29 (affidavit of anonymous juror from first trial); Dkt. 22, at 31 ("I am frightened for my personal safety as a result of learning that someone associated with this case has been criminally charged with intimidation."); Dkt. 22, at 32 ("If someone is going to attack a sitting judge, I see no reason why they would not demean and attack, verbally and physically, a juror who sat on this jury."), Dkt. 22, at 33-34 (describing actions of journalist who "harass[ed] witnesses to the case, including by organizing crowds of people to harass them outside their homes" and made public statements "to the effect of, murderers, *and those who cover for them*, do not deserve to live a comfortable life while Karen Read suffers and fights for justice for John O'Keefe" (emphasis in affidavit)). Plaintiffs do not even suggest an effective alternative to the modest expansion of the buffer zone to address the problem posed by horn-honking caused by quiet demonstration that interrupted and disturbed the first trial and would likely do so again during the current trial absent the court's modest expansion of the buffer zone. *Ashcroft*, 542 U.S. at 666. Again, the Superior Court chose the narrowest path to protect Ms. Read's right to a fair trial. *McCullen*, 537 U.S. at 486.

**AA200**

## **CONCLUSION**

For the additional reasons set forth above, this Court should deny Plaintiffs' Motion for

injunctive relief.

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ John R. Hitt
_____

Thomas Bocian, BBO # 678307
John R. Hitt, BBO# 567235
Gabriel Thornton, BBO # 674402
Emily Rothkin, BBO # 711591
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 727-2200
thomas.bocian@mass.gov
Dated:  April 10, 2025                  john.hitt@mass.gov
gabriel.thornton@mass.gov
emily.rothkin@mass.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that I have today, April 10, 2025, served this State Defendants'
Supplemental Preliminary Injunction Opposition by ECF.

_/s/ John R. Hitt_____
Assistant Attorney General
Massachusetts Attorney General's Office

**AA201**

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>Plaintiffs,<br><br>v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>Defendants. | Civil Action No.<br>1:25-cv-10770-MJJ<br><br><br>**NOTICE OF SUPPLEMENTAL EXHIBIT AND REQUEST FOR JUDICIAL NOTICE** |

In further support of their motion for a temporary restraining order/preliminary injunction, Plaintiffs submit the below image as a further exhibit:



Such image depicts protestor Jose Briceno outside the Moakley Courthouse on March 4, 2015, on the first day of the trial in *United States v. Tsarnaev,* Case No. 1:13-cr-10200-GAO (D. Mass.). *See* **Exhibit A**.[1]

Further, Plaintiffs request this Honorable Court take notice of Judge O'Toole's Order of Dec. 30, 2014, in the *Tsarnaev* case (docketed at ECF No. 1062 therein), denying the Motion to Protect Defendant from Prejudicial Effects of "Supporters'" Demonstrations at Courthouse (ECF No. 791 therein), in which the defendant sought the Court direct the U.S. Marshals Service to "take all reasonable measures to ensure that no public demonstrations in the vicinity of the Joseph R. Moakley United States Courthouse regarding the merits of this case are permitted to affect the fairness of the proceedings" with specific attention to alleged "insulting and inflammatory messages" by demonstrators. Judge O'Toole, in considering the motion (Transcript at 80:3-81:10, ECF No. 988-1 therein), specifically cited to *McCullen v. Coakley*, 573 U.S. 464 (2014), noting that *McCullen* invalidated a 35-foot buffer zone, and denied the buffer zone requested, even though it was argued to be content-neutral, against demonstrators of all flavors, in furtherance of the right to a fair trial.

Dated: April 11, 2025.                    Respectfully Submitted,

                                          /s/ Marc J. Randazza
                                          Marc J. Randazza, BBO# 651477
                                          mjr@randazza.com, ecf@randazza.com
                                          Jay M. Wolman, BBO# 666053
                                          jmw@randazza.com

---

[1] *Defense Admits Tsarnaev Carried Out Boston Marathon Bombing,* Fayetteville Observer (Mar. 4, 2015), available at https://www.fayobserver.com/story/news/nation-world/2015/03/04/defense-admits-tsarnaev-carried-out/22237157007/

RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark. Trammell
(*Pro Hac Vice*)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 11, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

# EXHIBIT A

*Defense admits Tsarnaev carried out Boston Marathon bombing*

FAYETTEVILLE OBSERVER (Mar. 4, 2015)

4/11/25, 1:24 PM
Case 1:25-cv-10770-MJJ    Document 37-1    Filed 04/11/25    Page 2 of 9
Defense admits Tsarnaev carried out Boston Marathon bombing



# The Fayetteville Observer

Advertisement - scroll for more content



NATION-WORLD

# Defense admits Tsarnaev carried out Boston Marathon bombing

The Associated Press

Published 11:01 p.m. ET March 3, 2015 | Updated 9:28 a.m. ET March 4, 2015




Advertisement



A federal police officer stands near protestor Jose Briceno, right, outside federal court Wednesday, March 4, 2015, in Boston on the first day of Boston Marathon Bombing suspect Dzhokhar Tsarnaev's federal death penalty trial. Tsarnaev is charged with conspiring with his brother to place two bombs near the marathon finish line in April 2013, killing three and injuring 260 people. *The Fayetteville Observer*

BOSTON - The question, for all practical purposes, is no longer whether Dzhokhar Tsarnaev took part in the Boston Marathon bombing. It's whether he deserves to die for it.

In a startling opening statement at the nation's biggest terrorism trial in nearly 20 years, Tsarnaev's own lawyer told a jury that the 21-year-old former college student committed the crime.

"It WAS him," said defense attorney Judy Clarke, one of the nation's foremost death-penalty specialists.

But in a strategy aimed at saving Tsarnaev from a death sentence, she argued that he had fallen under the influence of his now-dead older brother, Tamerlan.

Advertisement

"The evidence will not establish and we will not argue that Tamerlan put a gun to Dzhokhar's head or that he forced him to join in the plan," Clarke said, "but you will hear evidence about the kind of influence that this older brother had."

Federal prosecutors used their opening statements - along with chilling video and testimony from witnesses - to paint Tsarnaev as a cold-blooded killer and sketch a grisly picture of torn limbs, screams and the smell of sulfur and burned hair in the streets.

Advertisement

### More Stories



**911 records reveal new details in the Green Beret murder investigation**
NEWS



**Wife arrested in Cumberland County killing of ex-Green Beret husband**
NEWS



**People in West Hartford are Loving Martha Stewart's Meal Kit**
Marley Spoon | Sponsored Links

*We're always working to improve your experience. Let us know what you think.*

Advertisement

**AA207**

Tsarnaev planted a bomb designed to "tear people apart and create a bloody spectacle," then hung out with his college buddies as if he didn't have a care in the world, federal prosecutor William Weinreb said.

"He believed that he was a soldier in a holy war against Americans," Weinreb said. "He also believed that by winning that victory, he had taken a step toward reaching paradise. That was his motive for committing these crimes."

Advertisement

Three people were killed and more than 260 hurt when two shrapnel-packed pressure-cooker bombs exploded near the finish line on April 15, 2013. Tsarnaev, then 19, is accused of carrying out the attacks with 26-year-old Tamerlan, who was killed in a shootout and getaway attempt days later.

A shaggy-haired, goateed Tsarnaev slouched in his seat and showed no reaction as Weinreb spoke, not even when the prosecutor described how Tsarnaev ran over his brother with a stolen Mercedes and dragged the body 50 feet during the getaway.

Advertisement

**AA208**

About two dozen victims, including Heather Abbott, who lost a leg in the attack, took up one entire side the courtroom, listening somberly to accounts of the carnage. Several hung their heads and appeared to fight back tears.

Prosecutors contend the brothers - ethnic Chechens who arrived from Russia more than a decade ago - were driven by anger over U.S. wars in Muslim lands.

Because of a wealth of evidence against the younger brother - including a video of him leaving a backpack at the scene, and incriminating graffiti scrawled on the boat where he was captured - legal experts have said there is little chance of escaping conviction during the guilt-or-innocence phase of the trial.

Instead, they said, Tsarnaev's lawyers will concentrate on saving his life by arguing that the radicalized Tamerlan was the driving force in the plot.

Clarke, in an opening statement that took less than 20 minutes, called the bombings "senseless, horribly misguided acts." But she asked the jurors to "hold your hearts and minds open" until the penalty phase, when the panel will decide whether Tsarnaev should be executed or get life in prison.

Advertisement

She held up two enlarged photos - one showing the two brothers years before the bombings, the other showing them carrying the backpacks containing the explosives - and asked the jury to contemplate: "What took Dzhokhar Tsarnaev from this ... to this?"

In an apparent attempt to show that the attack was calculated for maximum carnage, prosecutors called as the trial's first witness Thomas

**AA209**

4/11/25, 1:24 PM
Case 1:25-cv-10770-MJJ Document 37-1 Filed 04/11/25 Page 6 of 9
Defense admits Tsarnaev carried out Boston Marathon bombing

Grilk, executive director of the Boston Athletic Association, which oversees the 118-year-old marathon.

Grilk said that up to a half-million spectators turn out for the race each year, with people lining the streets in cities and towns along the 26.2-mile course and huge crowds near the finish line in Boston.

Sean O'Hara, manager of a sporting goods store near where the bomb blew up, choked back tears as he described smelling burned hair and seeing wounded people streaming into the shop.

"I heard a voice of someone saying, 'Stay with me, stay with me,'" O'Hara said, his voice cracking.

Advertisement

The jury watched video from the store's surveillance cameras showing O'Hara and other employees ripping clothing from the racks for use as tourniquets and rushing outside to help the victims.

The prosecutor also described how 8-year-old Martin Richard stood on a metal barrier with other children so he could get a good view of the runners.

"The bomb tore large chunks of flesh out of Martin Richard," and the boy bled to death on the sidewalk as his mother looked on helplessly, Weinreb told the jury, with the youngster's parents in the courtroom.

Right up until the moment the jury filed into the courtroom, Tsarnaev's lawyers fought to have the trial moved out of Massachusetts, arguing that the emotional impact of the bombings ran too deep and too many people had personal connections to the case. But U.S. District Judge George O'Toole Jr. and a federal appeals court rejected the requests.

**AA210**

4/11/25, 1:24 PM
Case 1:25-cv-10770-MJJ Document 37-1 Filed 04/11/25 Page 7 of 9
Defense admits Tsarnaev carried out Boston Marathon bombing

The panel of 10 women and eight men was chosen Tuesday after two long months of jury selection, interrupted repeatedly by snowstorms and the requests to move the trial, which is expected to last three to four months.

Advertisement

The case is the most closely watched terrorism trial in the U.S. since the Oklahoma City bombing case in the mid-1990s.

Clarke has saved a string of high-profile clients from the death penalty, including Atlanta Olympics bomber Eric Rudolph; Unabomber Ted Kaczynski; and Jared Loughner, who killed six people and gravely wounded then-Rep. Gabrielle Giffords in a 2011 shooting in Tucson, Arizona.



**Amazon Is Losing Money as Connecticut Shoppers Are Canceling Prime for This Clever Hack**
This simple trick can save tons of money on Amazon, but most Prime …

**Neurologists Amazed: These Barefoot Shoes Help Seniors Lose Weight and Live a Life with Less Pain**
Barefoot Shoes are the Ultimate Weight Loss Tool for 2025.

**Amazon Is Losing Money as Connecticut Shoppers Are Canceling Prime for This Clever Hack**
This simple trick can save tons of money on Amazon, but most Prime …

**AA211**

4/11/25, 1:24 PM
Case 1:25-cv-10770-MJJ Document 37-1 Filed 04/11/25 Page 8 of 9
Defense admits Tsarnaev carried out Boston Marathon bombing

### Connecticut Power Companies Are Begging Homeowners Not To Do This

If you pay more than $99/month for power, you probably qualify for this …

Energy Bill Saver | Ad

### Seniors Born 1941-1979 Receive 7 Benefits This Month If They Ask

SeniorDealToday | Ad

### Hollywood Actress Leaves Weight Loss Trick, Gets Fired!

Make this 25-second trick at Home every morning!

Your Healt… | Ad      Learn More



### These Shoes Changed My Life [Ridiculously Comfortable]

Wolf & Shepherd | Ad      Learn More



### Stop Moisturizing Crepe Skin! Tighten Skin With This DIY Trick Instead

Miami MD | Ad



### Sore Knees After 60 Comes Down To 1 Thing (Stop Doing This)

Arthrozene | Ad      Learn More



### Connecticut: New Rule For Cars Driven Less Than 50 Miles A Day

Financebuzz | Ad      Learn More

## Deal of the Day



### How Does Heidi Klum Shave? Save 10% On The Supermodel's Shave Kit

USA TODAY NETWORK



### Don't Wait! G/Fore Just Dropped A Limited-Edition Golf Shoe

USA TODAY NETWORK

Recommendations are independently chosen by our editors. Purchases you make through our links may earn us a commission.

**AA212**

Advertisement

© 2025 www.fayobserver.com. All rights reserved.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS, <br><br> Plaintiffs, <br><br> v. <br><br> TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney, <br><br> Defendants. | Civil Action No. 1:25-cv-10770-MJJ |

## PLAINTIFFS' EMERGENCY MOTION FOR CLARIFICATION

On April 11, 2025, the Court issued a Memorandum and Order (ECF No. 28) regarding Plaintiffs' motion for a temporary restraining order and for a preliminary injunction (ECF No. 2). However, the Order is unclear. On Page 2, the Court says "I DENY Plaintiffs' Motion." That may mean it is denied in its entirety. On the other hand, the Conclusion only uses the term "Temporary Restraining Order" as does the caption.

What happens next turns on knowing precisely what the Court did. If the Court denied the motion in its entirety, Plaintiffs will, naturally, take an immediate appeal. If not, then Plaintiffs need the matter set immediately for a hearing on their requested preliminary injunction.

Pursuant to Local Rule 7.1(a)(2), undersigned counsel hereby certify that they attempted in good faith to confer with Defendants to narrow the issues in this motion prior to filing, but were unable to do so.

WHEREFORE Plaintiffs respectfully request this Honorable Court clarify whether it denied the motion (ECF No. 2) in whole or, alternately, set it for hearing on preliminary injunction forthwith.

Dated: April 11, 2025.                    Respectfully Submitted,

                                          /s/ Marc J. Randazza
                                          Marc J. Randazza, BBO# 651477
                                          mjr@randazza.com, ecf@randazza.com
                                          Jay M. Wolman, BBO# 666053
                                          jmw@randazza.com
                                          RANDAZZA LEGAL GROUP, PLLC
                                          30 Western Avenue
                                          Gloucester, MA 01930
                                          Tel: (978) 801-1776

                                          *Attorneys for Plaintiffs.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

                                          /s/ Marc J. Randazza
                                          Marc J. Randazza

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 4/11/2025 at 7:33 PM EDT and filed on 4/11/2025

| | |
|---|---|
| **Case Name:** | Grant et al v. Trial Court of the Commonwealth of Massachusetts et al |
| **Case Number:** | 1:25-cv-10770-MJJ |
| **Filer:** | |
| **Document Number:** | 40(No document attached) |

**Docket Text:**
**Judge Myong J. Joun: ELECTRONIC ORDER entered Plaintiffs Emergency Motion for Clarification, Doc. No. [39], is GRANTED. Assuming that time is of the essence for the Plaintiffs and also assuming that the parties do not anticipate further briefing, the Court clarifies that its Order denying Plaintiffs' motion for temporary restraining order, Doc. No. 38, also denies Plaintiffs' motion for preliminary injunction since the standard for issuing either is the same. See, Orkin v. Albert, 557 F. Supp. 3d 252, 256 (D. Mass. 2021). (JL)**

**1:25-cv-10770-MJJ Notice has been electronically mailed to:**

John R. Hitt     john.hitt@mass.gov

Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman     jmw@randazza.com, ecf@randazza.com

Janelle M. Austin     jaustin@k-plaw.com

Gabriel T. Thornton     gabriel.thornton@mass.gov, appealsefilings@mass.gov

Lauren F. Goldberg     lgoldberg@k-plaw.com

Thomas E. Bocian     thomas.bocian@state.ma.us, AppealsEFilings@state.ma.us

Emily N. Rothkin     emily.rothkin@mass.gov, AppealsEFilings@mass.gov

**1:25-cv-10770-MJJ Notice will not be electronically mailed to:**

**AA216**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>         Plaintiffs,<br><br>    v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney,<br><br>         Defendants. | Civil Action No. 1:25-cv-10770-MJJ<br><br><br><br>**PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL** |

NOW COME Plaintiffs Jason Grant, Allison Taggart, Lisa Peterson, and Samantha Lyons, and, pursuant to Fed. R. Civ. P. 62(d) & Fed. R. App. P. 8(a)(1) hereby move this Honorable Court, on an emergency basis, for an injunction of Judge Cannone's Order of March 25, 2025, establishing a "buffer zone" in connection with the Karen Read trial, and the enforcement thereof, pending the appeal of the Orders of April 11, 2025 (ECF Nos. 38 & 40) denying Plaintiffs' request for preliminary injunction as to the same.

This Motion is brought on an emergency basis, because every day of the First Amendment being unlawfully suppressed in Dedham, Massachusetts is irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable harm"). Hearing a motion in the ordinary course would be futile and delay the ability of the Plaintiffs to seek an injunction pending appeal from the First Circuit.

In support hereof, Plaintiff refers to the accompanying memorandum, incorporated by reference herein.  Pursuant to Local Rule 7.1(a)(2), undersigned counsel hereby certify that they attempted in good faith to confer with Defendants to narrow the issues in this motion prior to filing, but were unable to do so.

WHEREFORE Plaintiffs respectfully request this Honorable Court enjoin the state court order and the enforcement thereof pending appeal.

Dated: April 17, 2025.                              Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Mark. Trammell
(*Pro Hac Vice*)
Center for American Liberty
P.O. Box 200942
Pittsburgh, PA 15251
Tel: (703) 687-6200
MTrammell@libertyCenter.org

*Attorneys for Plaintiffs.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

Motion For Injunction Pending Appeal
Civil Action No. 1:25-cv-10770-MJJ

**AA219**

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS, <br><br> Plaintiffs, <br><br> v. <br><br> TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police; MICHAEL d'ENTREMONT, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISSEY, in his official capacity as the Norfolk County District Attorney, <br><br> Defendants. | Civil Action No. 1:25-cv-10770-MJJ <br><br><br> **MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL** |

Plaintiffs move this Court for an injunction pending appeal pursuant to Fed. R. Civ. P. 62(d) & Fed. R. App. P. 8(a)(1).[1]  This Motion is brought on an emergency basis, because every day of the First Amendment being unlawfully suppressed in Dedham, Massachusetts is irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable harm").  Hearing a motion in the ordinary course would be futile and delay the ability of the Plaintiffs to seek an injunction pending appeal from the First Circuit.

Given the factual exigency—jury selection has concluded and opening remarks begin April 21—and the fact that the Court's analysis of the Buffer Zone Order was incomplete and reversible,

---

[1] Plaintiffs originally sought such in the alternative when they filed their motion for temporary restraining order and for preliminary injunction (ECF No. 2), but the Court did not adjudicate that part of the request.

an injunction pending appeal will be requested from the First Circuit unless this Honorable Court decides to grant it now, as it should.

## 1.0    Legal Standard

An injunction pending appeal is proper if the movant makes "a strong showing that they are likely to succeed on the merits, that they will be irreparably injured absent emergency relief, that the balance of the equities favors them, and that an injunction is in the public interest." *Together Emples v. Mass Gen. Brigham Inc*., 19 F.4th 1, 7 (1st Cir. 2021). The test is nearly identical to the standard test for a preliminary injunction. *See Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008). Just as Plaintiffs believe the Court should have granted the preliminary injunction, an injunction pending appeal is warranted.

## 2.0    Analysis

Plaintiffs respectfully differ with the Court regarding the sufficiency of its First Amendment analysis,[2] however that is not the glaringly clear issue that makes it nearly certain that the Order will be reversed on appeal:  That is found in the Court's Fourteenth Amendment Due Process analysis which ignored a key issue. That issue, "where does Judge Cannone derive the power to impact the First Amendment outside her courthouse?," was clearly raised by Plaintiffs in their briefing. *See* ECF No. 3 at 15. The government simply ignored it, waiving opposition.  *See, e.g., Muniz v. Rovira,* 373 F.3d 1, 4 (1st Cir. 2004)*,* quoting *Nat'l Ass'n of Soc. Workers v. Harwood,* 69 F.3d 622, 627 (1st Cir. 1995) (holding that it is "transparently clear that the raise-or-waive rule can neither be ignored nor brushed aside as 'a pettifogging technicality or a trap for the indolent'").

---

[2] Plaintiffs will also challenge the First Amendment analysis on appeal, focusing primarily on the lack of narrow tailoring.  However, they do not waive any of their First Amendment arguments and incorporate their motion for preliminary injunction by reference.

A judge can certainly control her own courtroom.  She can almost certainly balance the requirements of the Sixth Amendment and the First Amendment in the hallways of the courthouse and on the courthouse steps.  However, few analyses of First Amendment violations start with "what authority did the censor have at all?"  Due process requires a court to have general or specific jurisdiction over a defendant to avoid "offend[ing] traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (citations omitted).  Similarly, jurisdiction typically does not attach until service of a writ or other process.  *Chisholm v. Gilmer*, 299 U.S. 99, 102-103 (1936).  In fact, there is no reported case in which a judge simply decided that she was the ruler by fiat over any territory, both public and private, and any person outside her courthouse, irrespective of jurisdiction.[3]  Does this Court have jurisdiction over nonparties posting signs in the windows of the Envoy Hotel, or over protesters on Sleeper Street or on Seaport Boulevard?  If this Court has that power over those places, it is asked to reveal the authority for this power that has escaped being enumerated or defined since the foundation of the Republic.  The obvious answer, of course, is: it does not, nor does Judge Cannone.

The Court will recall that the "Compelling Governmental Interest" justifying the imposition of the Buffer Zone was to protect Karen Read's Sixth Amendment right to a fair trial. This claim lacks credibility. Ms. Read did not seek the imposition of a prior restraint (or even a purported content-neutral regulation of speech); the Commonwealth, which is trying to imprison her, did.  *See,* ECF No. 1-3, Commonwealth's Motion for Buffer Zone and Order Prohibiting Signs or Clothing in Favor of Either Party or Law Enforcement.  Nevertheless, let us take this claim at face value.  No matter how compelling of a governmental interest may exist, that does not

---

[3] To suggest otherwise would mean that Judge Cannone's order is a general warrant that leaves "to the discretion of the executing officials the decision as to which persons should be arrested[,]" an affront to the Fourth Amendment. *Steagald v. United States*, 451 U.S. 204, 220 (1981).

mysteriously nor spontaneously create new powers where none exist.  Perhaps if a government authority *with the authority* over the public sidewalks created a regulation that promoted this interest, it could be held to meet the relevant level of scrutiny.  The Town of Dedham, for example, can lawfully require parade permits for the use of its streets.  But the Fourteenth Amendment at least requires that the government official, no matter which branch of government she inhabits, have the power to do what Judge Cannone did.  There is no such power here, and the First Circuit will not likely skip over this key question.

The Court also erred in its Due Process analysis that the Fourteenth Amendment right to notice and an opportunity to be heard had been satisfied where Judge Cannone considered an unsolicited email from unnamed individuals, complaining about everything *except* the right to a fair trial.  *See* ECF No. 1-4, Memorandum of Decision and Order on Commonwealth's Motion for Buffer Zone and Order Prohibiting Signs or Clothing in Favor of Either Party or Law Enforcement, at 2 n. 2; ECF No. 22, Affidavit of Assistant D.A. Caleb J. Schillinger, at 58-59; ECF No. 38, Memorandum and Order on Plaintiffs' Motion for Temporary Restraining Order, at 9-10.  This is despite the fact that Judge Cannone had previously determined that protestors had neither the right intervene nor be heard, a position backed up by the Commonwealth.  But neither Judge Cannone nor this Court have answered the very first question – from where did Judge Cannone derive the power she is exercising?  She has no more power over the sidewalks beyond the courthouse than she has over Bunker Hill, the Berkshires, or the Alps.  Therefore, right there due process slams to a grinding halt.  However, even glossing over that question, the Fourteenth Amendment weeps at any notion that due process is satisfied by an unsigned, unsworn email of grievances.  If so, then all any immigrant caught up in the recent dragnet needs for due process is an email from an anti-immigrant organization calling for their expulsion.  Presto!  Instant Due Process!

The right to procedural Due Process is a serious thing, and required serious analysis. This right is protected by the Fourteenth Amendment, which reads, in relevant part: "No state shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." The Massachusetts Constitution also protects procedural due process. *Duarte v. Commissioner of Revenue*, 451 Mass. 399, 412 n.20 (2008) (quoting *Pinnick v. Cleary*, 360 Mass. 1, 14 n.8 (1971)) (holding that "Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of its Declaration of Rights, are the provisions in our Constitution comparable to the due process clause of the Federal Constitution").

In both the U.S. and Massachusetts Constitutions, the "fundamental requirement of due process is notice and the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 412 (quotation marks and citation omitted). "[T]he specific dictates of due process generally require[] consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Aime v. Commonwealth*, 414 Mass. 667, 675 (1993) ("the individual interest at stake must be balanced against the nature of the governmental interest and the risk of an erroneous deprivation of liberty or property under the procedures which the State seeks to use").

In this case, Judge Cannone did not provide notice to any of the Plaintiffs regarding her intent to hold a hearing on (a) whether she had the power to decree *anything* over non-parties, (b) whether she had the power to impose a Buffer Zone, (c) where she allegedly obtained that power,

and (d) the interests of the protesters.  Judge Cannone might have taken the additional step of inviting participation. After all, the protesters were already standing outside holding signs criticizing her.  However, she did not do that.  She had previously slammed the courthouse door to anyone who wanted to intervene. Instead, she took the word of the Commonwealth, with no adversarial proceeding at all, and used the hearsay pretext of her hand-selected jury foreman's claims that there was "noise," warranting a wholesale disregard of the First and Fourteenth Amendments.  Obeying the Constitution might be inconvenient for courts, but that is why it exists.

Judge Cannone, to quash protests that criticize her, decreed that she should not be forced to bear the indignity of people protesting her where she can see or hear them.  She does not have that power, and her attempt to create it for herself is offensive to the U.S. and Massachusetts Constitutions. This Court cannot allow her to usher in a new era of First Amendment jurisprudence – where a judge can simply engage in land use regulation, without authority, *i.e.* without due process.  If a judge is permitted to isolate herself from any public criticism, why shouldn't every citizen have the right to declare "I have the right to prohibit any criticism of my actions that I find unwarranted or unpleasant?"

Strangely enough, that is what this Court held was sufficient to satisfy due process – some business owners near the courthouse complaining that they didn't like the protesters. Plaintiffs, the ones affected by the order, were the ones entitled to be heard by a court with jurisdiction over them.  This Court erred. Plaintiffs, therefore, request that it grant the instant Motion for injunctive relief pending appeal while they take this issue to the U.S. Court of Appeals for the First Circuit.

Dated: April 17, 2025.                    Respectfully Submitted,

                                          /s/ Marc J. Randazza
                                          Marc J. Randazza, BBO# 651477
                                          mjr@randazza.com, ecf@randazza.com
                                          Jay M. Wolman, BBO# 666053
                                          jmw@randazza.com
                                          Randazza Legal Group, PLLC
                                          30 Western Avenue
                                          Gloucester, MA 01930
                                          Tel: (978) 801-1776

                                          Mark. Trammell
                                          (*Pro Hac Vice*)
                                          Center for American Liberty
                                          P.O. Box 200942
                                          Pittsburgh, PA 15251
                                          Tel: (703) 687-6200
                                          MTrammell@libertyCenter.org

                                          *Attorneys for Plaintiffs.*

RANDAZZA | LEGAL GROUP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2025 the foregoing document was served on all parties or

their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 4/17/2025 at 2:20 PM EDT and filed on 4/17/2025

| | |
|---|---|
| **Case Name:** | Grant et al v. Trial Court of the Commonwealth of Massachusetts et al |
| **Case Number:** | 1:25-cv-10770-MJJ |
| **Filer:** | |
| **Document Number:** | 46(No document attached) |

**Docket Text:**

**Judge Myong J. Joun: ELECTRONIC ORDER entered**

**For the same reasons stated in my Memorandum and Order, Doc. No. [38], Plaintiffs Emergency Motion for Injunctive Relief Pending Appeal is DENIED. (SP)**

**1:25-cv-10770-MJJ Notice has been electronically mailed to:**

John R. Hitt     john.hitt@mass.gov

Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman     jmw@randazza.com, ecf@randazza.com

Janelle M. Austin     jaustin@k-plaw.com

Gabriel T. Thornton     gabriel.thornton@mass.gov, appealsefilings@mass.gov

Lauren F. Goldberg     lgoldberg@k-plaw.com

Thomas E. Bocian     thomas.bocian@state.ma.us, AppealsEFilings@state.ma.us

Emily N. Rothkin     emily.rothkin@mass.gov, AppealsEFilings@mass.gov

Emily Margaret Swanson     emily.swanson@mass.gov

**1:25-cv-10770-MJJ Notice will not be electronically mailed to:**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

JASON GRANT, ET AL,

                    Plaintiffs,          Civil Action
                                         No. 25-CV-10770-MJJ
V.
                                         April 4, 2025
TRIAL COURT OF THE COMMONWEALTH OF
MASSACHUSETTS, ET AL,

                    Defendants.
_____




BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA  02210
jkhhalpin@gmail.com

1    APPEARANCES:

2

3

4    FOR THE PLAINTIFFS:

5    Marc J. Randazza
     Randazza Legal Group, PLLC
6    4974 S. Rainbow Blvd.
     Suite 100
7    Las Vegas, NV 89118
     702-420-2001
8    Email: Mjr@randazza.com

9

10   FOR THE DEFENDANTS:

11   John R. Hitt
     Massachusetts Attorney General's Office
12   One Ashburton Place
     Boston, MA 02108
13   617-963-2084
     Email: John.hitt@mass.gov
14

15   Janelle M. Austin
     KP Law, P.C.
16   101 Arch Street
     Boston, MA 02110
17   617-556-0007
     Fax: 617-654-1735
18   Email: Jaustin@k-plaw.com

19

20   Lauren F. Goldberg
     KP Law
     101 Arch Street
21   Ste 12th Floor
     Boston, MA 02110
22   617-556-0007
     Email: Lgoldberg@k-plaw.com
23

24

25

**AA230**

1                    **P-R-O-C-E-E-D-I-N-G-S**

2          THE CLERK:  All rise.

3          (The Honorable Court Entered)

4          THE CLERK:  Honorable Myong J. Joun is presiding.

5    This is *Civil Action 25-10770, Jason Grant, et al. v. Trial*

6    *Court of the Commonwealth of Massachusetts, et al.*  Counsel,

7    please identify yourselves for the record.

8          MR. RANDAZZA:  I'm Marc Randazza.  I am here for the

9    plaintiffs.  I have my paralegal, Cassie Flavin, with me, and

10   prospective lawyer Ali Gregoire who is taking the LSAT on

11   Saturday, hopefully taking over my job one day.

12         THE COURT:  Good afternoon.

13         MR. HITT:  Good afternoon, your Honor.  Assistant

14   Attorney General John Hitt for the state defendants.

15         THE COURT:  Good afternoon.

16         MS. AUSTIN:  Good afternoon, your Honor.  Attorney

17   Janelle Austin from KP Law representing the Town of Dedham

18   Police Chief as town Counsel.

19         MS. GOLDBERG:  Good afternoon, your Honor.  Lauren

20   Goldberg also from KP Law also representing the Town of Dedham

21   Police Chief.

22         THE COURT:  All right.  Good afternoon, everyone.

23   Welcome.  So I have read all of the filings, the opposition.  I

24   have seen the videos.  So, Mr. Randazza, why don't you, this is

25   your motion, I will let you start, and then I will hear from

1   Mr. Hitt.  Go ahead.

2          MR. RANDAZZA:  Thank you for seeing us, your Honor.

3   Thank you for seeing us on such short notice.

4          This Dedham courthouse was the site of one of the most

5   famous trials in history, the trial of Sacco and Vanzetti.

6   That trial went on with no buffer zone around it.  We can think

7   about a whole lot of famous trials that have taken place, the

8   OJ trial, the Weitzel trial, Johnny Depp v. Amber Heard,

9   Michael Jackson, Harvey Weinstein, Ghislaine Maxwell, this very

10  courthouse where Mr. Tsarnaev was prosecuted, and even the

11  prosecution of Donald Trump.  None of those courts needed a

12  buffer zone.  The First Amendment remained intact outside, but

13  here we have a case where we cannot tolerate protests or

14  demonstration outside and we can't even be creative when we

15  think about narrow tailoring if there even indeed is even a

16  problem or authority to do something about it.

17          So before we even get to the First Amendment issue, I

18  want to talk about due process.  Due process seems to be in

19  short supply these days.  We have immigrants rendition to

20  El Salvador without a hearing, students getting picked up on

21  the street without due process, and if we don't respect it

22  here, I can't see why we would respect it anywhere.  Whatever

23  rights we're concerned with, the one fixed star in our

24  constellation of our rights is due process.  This is violated

25  twice over here.

**AA232**

1          First, the prior restraint here was imposed on my

2   clients with no opportunity for them to be heard.  This order

3   deprives them of a right to stand on public sidewalks as they

4   have since November expressing themselves quietly and

5   peacefully just holding placards.

6          The government argues that there was an opportunity to

7   be heard but this is not true.  During the first trial when

8   Judge Cannone imposed a similar but smaller and narrower prior

9   restraint order, she refused to allow any intervention, and to

10  the extent that the appeals courts allowed any argument, that

11  was discretionary.  They are here at the only avenue they have

12  to have themselves heard as a matter of right.  Judge Cannone

13  made it clear that she had no interest in hearing contrary

14  views.

15         Second, even if there had been due process in the

16  hearing, we need to think about what authority Judge Cannone

17  has to essentially decree what conduct is going to take place

18  outside of her courthouse.  Chief Judge John Roberts cannot bar

19  protests on the sidewalk outside the Supreme Court.  So I don't

20  see how Judge Cannone can then extend her power beyond the

21  courthouse, beyond the curtilage of the courthouse, and if we

22  say 200, 400, how far can she go?  200 miles?  Her authority

23  ends there, and there is a reason for that.  If there was some

24  other action, some legal, some legislative action to create

25  this zone, well, perhaps then you have due process and the

1    democratic process, but all you have here is a decree.

2            So should my clients wish to protest on the public

3    sidewalks outside, here even the majestic power of a federal

4    court could not bar them from doing so.

5            Now, inside the building, that's another story, but

6    let's also remember that even inside the building First

7    Amendment rights exist, otherwise we would not have Mr. Cohen's

8    vulgar jacket in *Cohen v. California*.

9            THE COURT:  So, Mr. Randazza, are we talking about,

10   are you suggesting that a judge has absolutely no power to

11   protect jurors and witnesses?  As from the papers, it seems

12   Judge Cannone had some concerns, and so are you suggesting that

13   a judge has no power or are we just simply talking about

14   boundaries?

15           MR. RANDAZZA:  Oh, no, I would not say the judge has

16   no power, but we expect our judges to be creative.  We expect

17   our judges to think through the process.  You can certainly

18   fashion ways to address the concerns and that's when we get to

19   narrow tailoring.  There are certain ways to do so.  I am not

20   saying she can't do anything.  I am just saying she can't come

21   outside the courthouse and say that property is now under my

22   jurisdiction and that property and this private property and

23   these public sidewalks extending out to wherever this seemingly

24   -- I really don't know why they came up with this kind of a

25   limitation.  There is no decision here that shows that.

**AA234**

1    So let's just pretend for a moment that what she can

2    do does extend outside the courthouse.  Well, then we have to

3    think about the First Amendment, and it's true that there was a

4    different zone with different litigants prior and my friends in

5    the government here seem very delighted with that prior

6    *Spicuzza* decision.  However, with all respect to that decision,

7    first off, I think it was dead wrong on the First Amendment,

8    but they also, in asking for comity, my friends seemed to have

9    forgotten a very important part of the *Spicuzza* decision where

10   the court specifically found at Page 1008 that the issue of

11   sidewalks is not before us.  I was very confused by that when

12   the decision came out.  It seemed also almost that the court

13   had blinded itself to obvious facts, but in doing so, it really

14   left your Honor with a completely blank slate.  They can say

15   whatever they like about protesting in the middle of the

16   street, but I am talking about the traditional public forum of

17   a sidewalk.

18       THE COURT:  Can I just interject just a little bit

19   here.  When you talk about the blank slate, why is it here?

20   Why didn't you, for example, like in the *Spicuzza* case, well

21   number one, in the first instance, seek relief in the Superior

22   Court, maybe a motion to intervene, maybe a motion to

23   reconsider?  Why didn't you do a 211,3 to the SJC?

24       MR. RANDAZZA:  The trial court in Dedham, we did --

25   well, not we.  Different litigants, I represented them,

1    attempted to do that before Judge Cannone who not only refused

2    to allow intervention but quite angrily refused to allow

3    intervention.

4        THE COURT:  You mean last year or this year?

5        MR. RANDAZZA:  Last year, your Honor, so we had

6    already been thrown back at that.

7        Now, seeking intervention with the state appellate

8    court, that's never a matter of right, that's a discretionary

9    review, and we're in kind of a rush.  So to go there and then

10   perhaps not even get review, we want to come here where I think

11   the First Amendment is probably far more respected in this

12   building, and this is really, as a federal judge, you are the

13   authority on the United States Constitution.

14       THE COURT:  Well, I am going to push back on that just

15   a little bit.  The parties haven't really briefed it, but there

16   might be some issues, I think there is only one line in the

17   defendants' brief about comity, but no one has mentioned the

18   Anti-Injunction Act, for example, or some of the doctrines that

19   might apply, the Younger doctrine, the Rooker-Feldman doctrine.

20   I haven't thought through the issues, but it seems to me that I

21   am getting in between what's happening in the state court and

22   you're asking me to order the state court judge to undue what

23   she has done.  I am not sure that I have that power.

24       MR. RANDAZZA:  Well, your Honor, I am also asking you

25   to order the enforcement authorities to not follow the

1    unconstitutional portions of that order, and that would not --
2    I can see the potential issues.
3         THE COURT:  But that's not properly before me.  What
4    you brought here in the complaint was really an attack on the
5    buffer zone order that was issued by the state court judge.
6         MR. RANDAZZA:  Well, we did specifically plead against
7    all possible enforcement authorities including the Mass State
8    Police seeking an injunction against them.
9         THE COURT:  And I thought that the Commonwealth had
10   initially asked for that to be part of her order but they
11   withdrew that at the hearing and so the order as written does
12   not include a provision of enforcement.
13        MR. RANDAZZA:  Well, they initially did ask, yes.  In
14   their request, what they asked for was, I mean somewhat
15   surprising, they were asking for a specific authority to engage
16   in actually violence in order to do something about it.  The
17   fact that that is not in there doesn't mean that if there is an
18   unconstitutional order here -- I mean, a judge can issue -- a
19   state judge can issue an unconstitutional order, but say that
20   the judge, just for the sake of absurd argument, ordered that
21   anybody who protests be locked in a cage for the next six
22   months.  Well, who would do that, the State Police?  We could
23   enjoin the State Police from doing that.
24        So to whatever extent you may feel that your powers
25   and Judge Cannone's powers bump off of each other, you can

1    certainly speak to outside the courthouse to how this is going

2    to be enforced, and I think that you can tailor what the police

3    can do under the constitution and under this order.  So you can

4    point out the problems within it and say you're not going to

5    enforce that.

6          What if they said we're going to rendition everybody

7    to Guantanamo Bay who protests?  Well, you can certainly enjoin

8    that, and here, perhaps not such an absurd example, we have

9    police who have not only taken this order to heart, but we have

10   two other companion cases that we have filed, Desrosier and

11   Bryant, who are two, and this is not necessarily before you,

12   some of the declarations are in there, but Mr. Desrosier and

13   Bryant are journalists who the police are now interpreting this

14   order as prohibiting even news gathering on the sidewalk, and

15   then Mr. Delgado, who is in the courtroom today, was actually

16   physically assaulted by a Mass State Trooper who went up to him

17   because he had a sticker on his jacket that said "Justice for

18   John O'Keefe."  He said, that's got to go and he tore it off of

19   him.

20         So the way that this order is being enforced by the

21   authorities is about as broadly as you could interpret any of

22   the words therein, and I think that the problem we have is,

23   again, this order is overbroad and so objectionable that it

24   must be subjected to strict scrutiny and its enforcement.  The

25   judge can issue whatever order she wants but let her enforce

1    it, and you do have the authority, I think, over everybody who

2    is probably before you today, they have an opportunity to be

3    heard as to why they should be able to act in a manner that

4    violates my client's First Amendment rights.

5          So the government claims that these restrictions that

6    they're enforcing are not content neutral.  At Page 10 of their

7    brief, they cite *Reed v. City of Gilbert*, but I don't think

8    they really get it because *Reed* says that if we define

9    regulated speech by its function or purpose, that's a

10   content-based restriction.  I think what the government is

11   mixing up here is viewpoint discrimination versus content-based

12   restrictions, and it is true that on its face the order has

13   been -- it is viewpoint neutral but it is not content neutral.

14   It prohibits demonstrations.  It doesn't prohibit commercial

15   speech.  It doesn't seem to prohibit other kinds of speech.  It

16   only restricts demonstrations.

17         Now, *Gilbert* is both controlling and on point, but we

18   have to apply the exact standard of strict scrutiny, and if we

19   do, this zone fails, if it should exist at all.

20         Let's look at how it's tailored.  This is not tailored

21   one bit, instead of thinking about what is the problem.  So

22   what we have is the record is a discussion where if we credit

23   the evidence, which I do not, but let's credit it anyway, that

24   jurors could be heard yelling outside but there is no

25   discussion of what they heard.  There is no discussion of how

1    it might have affected them.  There is no discussion of in what

2    way that impacts Ms. Read's Sixth Amendment rights, and it is

3    interesting that we have the Commonwealth concerned about

4    Ms. Read's Sixth Amendment rights but Ms. Read is not

5    concerned, but let's just credit that and say that noise inside

6    the courthouse is causing a problem for this trial and we need

7    to do something about it, and the judge has the authority to

8    extend her tentacles outside of the courthouse, down the

9    street, around the corner, over to the public library which is

10   inside this zone.  Well, why not say quiet protest is allowed?

11   Why not say no sound amplification, no noise over a certain

12   decibel level?  If that were the case, we probably wouldn't be

13   wasting anybody's time here.  Instead of using a scalpel, they

14   used a sledge-hammer.

15        The government has to, under strict scrutiny which

16   applies here, target the exact wrong it wishes to cure, and

17   here they have not done that, and we can see the effects by

18   seeing how its mission creep after existing for only a couple

19   of days has gone from people who might be using noisemakers,

20   which, again, my clients have been out there every two weeks

21   since November quietly holding signs during other trials over

22   which this same judge was presiding, and there has been

23   absolutely not even the slightest attempt to say that they

24   caused a problem.  They were on the public sidewalks doing

25   exactly what Americans have every right to do.

**AA240**

1          Now, if one of them had been questioned for disorderly

2    conduct, had interfered in one of the other trials that had

3    taken place since November, we might have a different factual

4    scenario here, but what we have here is these people in

5    particular have been peacefully protesting with absolutely no

6    negative impact on the Sixth Amendment rights of anybody inside

7    that courthouse.

8          THE COURT:  I thought there was some allegations in

9    the record of jurors being intimidated or harassed.  There is

10   nothing of that sort?

11         MR. RANDAZZA:  There is an affidavit from an anonymous

12   juror that they felt intimidated, but again, it was only

13   talking about that they could hear shouting and that they had

14   seen online criticism.  Well, the judge isn't trying to ban

15   online criticism now, is she?  Maybe, I don't know, but so far

16   they have had in no way at all -- they couldn't be talking

17   about my clients because my clients have started doing this in

18   November so that wasn't even when the prior trial took place.

19   So to whatever extent this one juror, John Doe, claims that

20   they felt some intimidation, well, we can still remedy that,

21   can't we?  The jurors can come in through a back door.  I mean,

22   this happens all the time where jurors are brought in.  I have

23   seen trial after trial where they put panels on a bus and bring

24   them in.  There are many different ways to do this rather than

25   just draw a somewhat confusing diagram around a radius around a

1    courthouse and say the First Amendment is dead inside this

2    zone.  This is why I think the lack of narrow tailoring is

3    fatal to this, and it certainly goes well beyond what is

4    necessary.

5         I mean, if we even think about the right to healthcare

6    in *McCullen v. Coakley*, when people want to come and protest

7    outside of an abortion clinic, 35 feet was enough for that, but

8    here because somebody says they heard protests in a prior

9    trial, not my clients, not my clients' style of protest.  We

10   hear cars honking.  Are these really intrusions upon the Sixth

11   Amendment that are so intrusive and so destructive that we're

12   going to wipe away the entire First Amendment outside, and if

13   we fall back to the Fourteenth Amendment issue, I don't even

14   know where she gets the right to go outside the courthouse at

15   all.  She can control how the jurors come in.  She can control

16   the territory of the courthouse for sure.  I even say she can

17   control the parking lot, and there is a huge parking lot there

18   that they can come in.  She can ban people from that.  I don't

19   know what she can do inside the courthouse, but we're not

20   concerned about that.  We're not challenging anything that's

21   happening inside the courthouse, only on the public sidewalks

22   which are the most traditional public forum that we have in

23   America.

24        And if you have any further questions for me, your

25   Honor, I'd be happy to answer them.  If not, I'd like to turn

1    the podium over to my friends.

2         THE COURT:  Thank you.

3         MR. HITT:  Good afternoon, your Honor.  I would just

4    like to start first just with a housekeeping matter on the

5    affidavit we submitted today which is Document 22.  It may be a

6    little unclear to figure out which exhibits are attached to the

7    affidavits so I just wanted to take a moment to indicate that

8    there are three exhibits attached to the affidavit.

9         The first exhibit starts on what's Page 3 of the

10   60-page document so that would be 22 -- Document 22, Page 3,

11   and that's the Commonwealth's motion package relating to the

12   buffer zone application in the state court criminal case.

13        The second, inside that Exhibit 1 at Page 25 of 60,

14   again, Document 22, is the Trooper affidavit which sets forth a

15   factual basis relating to the noise that was concerned for the

16   judge when she issued the modestly expanded buffer zone order.

17        At Page 29 of 60 is Exhibit 2 and that is the juror

18   affidavit.  So again, Document 22 at Page 29 is where that

19   anonymous juror's affidavit is attached.

20        And then lastly, Exhibit 3 starts at Page 57 of 60 and

21   that is the e-mail list of concerns that were noted by the

22   judge in her second buffer zone decision concerning issues

23   raised by businesses and whatnot around the courthouse.

24        I guess our opposition lays forth in kind of quick

25   detail in the 36 hours that we had why we think on the First

1    Amendment issue that the buffer zone order here that's been

2    modestly expanded satisfies the First Amendment context.

3          There are a couple of questions you just asked, your

4    Honor, that I'd like to address.

5          You asked about The Anti-Injunction Act applied and

6    whether Rooker-Feldman applies or Younger abstention.  I think

7    the answer to those questions are no, The Anti-Injunction Act

8    doesn't apply.  I think here plaintiffs have probably brought a

9    Section 1983 action raising their First Amendment issue.  I

10   think that is permitted under the Supreme Court's case law.

11         Rooker-Feldman I also don't think applies here.

12         However, the Younger doctrine kind of does, though the

13   Supreme Court's case law is a little muddled in this area and

14   that's why we've made our additional point about just general

15   comity principles and noted the fact that there are available

16   avenues for relief in state court that the plaintiffs could

17   avail themselves of including another petition to a single

18   justice to review the modifications to the buffer zone order.

19         Again, here, it's a little curious that plaintiffs

20   have not chosen to go that route since they already have a

21   decision in the Supreme Judicial Court addressing the

22   parameters of the buffer zone order and that court would really

23   be in the best position to address their concerns.

24         Additionally, on that point, the factual basis for the

25   state court's buffer zone order, you have both the affidavit of

**AA244**

1    the trooper.  You have the affidavit of the John Doe juror.

2    You also have the personal experience of the judge and the

3    court has, you know, she sat through the first criminal trial.

4    She sat in that courthouse.  She knows that courthouse.  She

5    knows the very pragmatic problems that exist in that courthouse

6    in terms of controlling the sound, and as the Commonwealth

7    originally sought a buffer zone that was -- they requested 500

8    feet and she actually entered a 200-foot buffer zone which

9    remained in place through the first trial, and based on the

10   experience in the first trial, the judge realized and agreed

11   with the Commonwealth that there was this area on the west side

12   of the courthouse that's in the expanded buffer zone where a

13   lot of noise was making its way into the courthouse and

14   impacting the jury; and, of course, the criminal defendant's

15   Sixth Amendment right is compelling here.  Even if this Court

16   were to apply a strict scrutiny standard of review under the

17   First Amendment protecting the defendant's Sixth Amendment

18   right to a fair trial and a jury not contaminated by outside

19   influences is a compelling state interest.

20          So if we were to look to the, unfortunately the name

21   is Reed, but the *Reed v. Gilbert* Arizona case, the standard

22   there would be satisfied by this particular expansion by this

23   buffer zone order.

24          THE COURT:  The fact that the defendant, Karen Read,

25   that she hasn't taken a position on this, how should I consider

1    that?

2         MR. HITT:  She has not, your Honor, and I think the

3    way it works under Sixth Amendment law and Article 11 of the

4    Massachusetts Declaration of Rights, if the defendant raises

5    the issue that somehow the jury has been tainted by outside

6    information, the burden then shifts to the Commonwealth to meet

7    its burden on that particular issue.

8         So the fact that she hasn't taken a position here I

9    think has no bearing on your analysis.  It's still -- the

10   Commonwealth has the obligation of ensuring that there is a

11   fair trial under both the Sixth Amendment and Article 11 of the

12   Massachusetts Declaration of Rights, though Article 11 is not a

13   issue in this particular case.

14        Now, on this point, in terms of what facts are before

15   the Court right now, plaintiffs' counsel had mentioned two

16   newly filed cases.  I would just like to be clear that those

17   two newly filed cases are not before the Court right now.  They

18   do not provide any sort of factual basis for the issue that's

19   currently before the Court which is just whether or not the

20   modestly modified buffer zone order violates either the First

21   Amendment or The Due Process Clause.

22        In terms of The Due Process Clause point that

23   plaintiffs --

24        THE COURT:  Before you go on, I just --

25        MR. HITT:  Yes, I'm sorry.

1            THE COURT:  No, sorry for interrupting.  I just want
2     to be clear in my own mind that the only difference between the
3     current buffer zone order and the previous buffer zone order
4     was that slight expansion of the zone on the western side of
5     the courthouse.
6            MR. HITT:  Exactly, your Honor.
7            THE COURT:  Otherwise it's identical?
8            MR. HITT:  It's the same as the previous order.  It's
9     just a slight extension to the west, and if one has ever been
10    at the Dedham courthouse, there are just to the west side of
11    the courthouse, there is a busy road and there is an open space
12    where there is sometimes a farmer's market and a couple of
13    streets and that's where the noise was coming from during the
14    first trial.  So she simply extended the buffer zone out to
15    cover those streets to try and minimize as much as possible the
16    impact of any noise or other extraneous influences on the jury.
17           THE COURT:  So there is not a direct connection
18    between that area and the jury deliberation room, but from the
19    pieces that I can gather, that's the connection that Judge
20    Cannone made?
21           MR. HITT:  Yes, your Honor, and when you read the --
22    before she enters her orders on the expanded buffer zone, she
23    sets forth her reasoning in several pages of this introduction,
24    and in those several pages, she does discuss the factual bases
25    for modestly expanding the buffer zone, and again, they are

1    written specifically as factual findings, but she's clearly

2    looking to the affidavit of the State Trooper which discusses

3    the noise issue and the impact on the jury, the juror's

4    affidavit and also the judge's own experience as the trial

5    judge and having heard the noise herself, and that

6    particular -- not that it's in the record here other than in

7    photos and in descriptions by people, but that courthouse is an

8    older courthouse.  The plaintiffs mentioned the Sacco and

9    Vanzetti trial.  You know, it's one of the older courthouses in

10   the Commonwealth.  It has old windows.  I don't believe they're

11   double paned.  Noise gets into that courthouse and you can see

12   how noise can be an issue in the configuration of that

13   courthouse, unlike this courthouse which is very sound-tight

14   and soundproof in its inner rooms or the Boston Municipal Court

15   which is often quieter than probably the Dedham Superior

16   courthouse.

17          So let me just -- I want to check and see if we had --

18   oh, you had asked a question about whether there were

19   allegations of a juror being harassed, and yes, in the

20   affidavit, the affidavit of the anonymous juror does talk about

21   the impact of noise on the juror's deliberations.

22          So with that, your Honor, I don't want to take up a

23   lot of your time.  I think our First Amendment analysis is set

24   forth in our memorandum.  I do know that if the Court wants to

25   hear more on the strict scrutiny point or any other point, we

1    would just ask to have an opportunity to provide supplemental

2    briefing on those particular issues, and I guess I would just

3    leave you with the comment that, again, plaintiffs had adequate

4    state court remedies available to raise their concerns about

5    the scope of the buffer zone.  In fact, here, it's a little bit

6    lost in the factual record but there is reference in our

7    opposition, I think it's a Court T.V. YouTube video which is

8    the day of the motion hearings which included the buffer zone

9    hearing, and in that YouTube video at I think it's 1 hour and

10   10 minutes and 44 seconds, there begins the actual

11   Commonwealth's argument on the buffer zone motion, the judge's

12   questions.  It goes on for about four or five minutes and the

13   judge asked some questions.  The judge also acknowledges the

14   submissions of non-parties in the case so that's where she

15   acknowledges that she's received e-mails that morning which

16   reference these concerns of various businesses and whatnot

17   which are attached as Exhibit 3 to our affidavit from the

18   Assistant District Attorney, and again, this just goes to

19   stress that there are available remedies for the plaintiffs to

20   raise these issues before the state court.

21           Unless you have any other questions, I will rest on

22   our memorandum.

23           THE COURT:  So just one question and it's really a

24   factual question, are we just talking about the noise level or

25   there is no allegation that any jurors or witnesses were

1  harassed or intimidated on their way in or out of the

2  courthouse?

3      MR. HITT:  The noise issue and just the jury being

4  impacted by extraneous elements outside of the courtroom are

5  what motivated the judge's buffer zone order, both the first

6  order and the expanded order, but she does -- the Commonwealth,

7  when you read its motion, it does spend a lot of time talking

8  about noise and noise is a primary focus of the judge's concern

9  but she does also express concern about the broader impact of

10 extraneous demonstrations on the jurors, either in favor of the

11 criminal defendant or, you know, against the criminal

12 defendant.

13      THE COURT:  Thank you.

14      MR. HITT:  Okay, you're welcome.

15      THE COURT:  Attorney Goldberg.

16      MS. AUSTIN:  Good afternoon, your Honor, just very

17 briefly.  Attorney Janelle Austin on behalf of the Dedham

18 Chief.  We defer to the state with respect to the trial court's

19 order in this case.  We would submit, however, that Dedham,

20 given the significant public safety concerns and concerns in

21 the community, we'll certainly comply with whatever buffer zone

22 order is in effect or deemed appropriate by the courts.

23 Specifically, your Honor, given the unique geography in that

24 Dedham Courthouse Complex area located in the heart of the Town

25 of Dedham, the town does have public safety concerns relative

 1    to the fact that the buffer zone obviously is a matter that

 2    would have concurrent jurisdiction.

 3          We would submit, your Honor, that given the crowd

 4    control measures that were placed as submitted to the trial

 5    court for Judge Cannone's review as part of her order, that the

 6    buffer zone is a mechanism in place to deal with some of those

 7    public safety considerations.  So I just wanted to make that

 8    clear.  Thank you, your Honor.

 9          THE COURT:  Thank you.  I'm sorry that I called you

10    Attorney Goldberg.

11          MS. AUSTIN:  Oh, that's okay.

12          MR. RANDAZZA:  Your Honor, my clients recognize the --

13    you seem to notice, it's all about noise.  My clients aren't

14    making any noise.  If we want to have a quiet protest zone, I

15    do not anticipate challenging that.  My clients would most

16    likely or I will -- my clients would probably waive, and they

17    are nodding at me, any argument that they should be able to be

18    loud while protesting.  So I think that that takes care of the

19    problem.

20          And to talk about the alternative avenues to seek

21    redress here, again, Judge Cannone would not have heard us.

22    She didn't hear us the first time.  I don't know why she'd hear

23    us the second time, but we're not required to go to state

24    court.  That's why we have federal courts.  If this was some

25    kind of a necessary exhaustion of administrative remedies

1    issue, that might be another story, but that doesn't exist

2    here.  This is a very clear 1983 action under federal law.

3    This is where you come for it, but I had an interesting idea or

4    an interesting thought that there are alternative avenues

5    existing other than shutting down all protest, all

6    demonstration.  There are existing disorderly conduct laws.  So

7    I am not sure why the municipality couldn't deal with that, and

8    also if there were -- perhaps if the Town of Dedham was

9    concerned and wanted to pass an ordinance, there might be

10   different arguments as far as the Fourteenth Amendment issues,

11   but that's not what we have here.  We have a shortcut, and we

12   don't do shortcuts when it comes to the First Amendment.

13          The only other rebuttal I would really like to bring

14   up here is my friend did point out that those other two cases

15   are not actually before the court.  Yes and no.  The facts of

16   them are at Document 9-1 in this case.  We have a declaration

17   by Mr. Bryant which also discusses what happened to

18   Mr. Delgado.  So while those complaints are not before you, the

19   facts of those cases are before you, and I also think that

20   here, you know, we may be here next week on TROs in those

21   cases, but I think a narrow tailoring, a shutting down of this

22   unconstitutional prior restraint, perhaps narrowing it to loud

23   protest would probably, although I am not asking you to

24   prejudge those TROs that we're going to be seeking, we would

25   probably be mooting them today.  It's not very often that a

1   lawyer arguing a 1983 case is seeking mootness in his own

2   cases, but I would be delighted to see those injunctive relief

3   requests as something that I don't have to do this weekend.

4       All we really want is the First Amendment to exist

5   outside the Dedham Courthouse, and we are perfectly happy to

6   assuage the government's concerns, all the branches of the

7   government represented here on the defendants' side, with a

8   stipulation that we will not be loud, and if the order just

9   says noises that can be heard inside the courthouse, I still

10  can come up with some theoretical reasons why that's a First

11  Amendment reason, but I am not going to dance on the head of

12  that pin.  I just want people to be able to stand on the public

13  sidewalks, holding signs, expressing themselves whether it's

14  pro Commonwealth, pro Karen Read or expressing some religious

15  viewpoint.  Thank you.

16      THE COURT:  So just one question.  I know you brought

17  this case, the claims, under 1983, but the essence of your

18  claim is the assertion that the state court judge's order is

19  unconstitutional.

20      MR. RANDAZZA:  Yes.

21      THE COURT:  The normal remedy for that is to appeal

22  those unconstitutional orders in the state courts, and I know I

23  sort of touched upon this when you were first at the podium,

24  but why is that not an adequate remedy?

25      MR. RANDAZZA:  We are not a party to that case.  We

**AA253**

1    have no right to appeal.  So we're on the outside looking in,

2    your Honor.  This is the only place we can be on the inside.

3    So we don't have that option, and if your Honor does not wish

4    to strike down the order, I think we can still get to the

5    remedy we want here through an injunction that simply says to

6    all of the enforcement authorities, you will not enforce this

7    in an unconstitutional manner.  Judge Cannone can issue all the

8    unconstitutional rulings she wants during this trial.

9    Outsiders may have no right to appeal that, but if it wants to

10   be enforced outside, I believe that's where your power and your

11   jurisdiction comes into play.

12          Again, like I was saying before in my absurd examples,

13   if Judge Cannone issues something on any of us outside of the

14   courthouse, non-parties to the case, I don't have an appeal,

15   but if she wants them enforced, I think that these authorities

16   who would seek to enforce the unconstitutional sections of it

17   should be enjoined from enforcing the unconstitutional parts of

18   it, and again, we are waiving any argument that noise is

19   something that we're seeking you to allow us to engage in.

20          THE COURT:  Thank you.  So I think I am going to take

21   up on Attorney's Hitt's offer for supplemental briefing.

22   Certainly, the parties are free to add anything to what is

23   already filed, but I am also interested in the level of

24   scrutiny that I should apply in this case.

25          MR. RANDAZZA:  Thank you.

1          MR. HITT:  Certainly, your Honor.  Do you have a

2    deadline you would like something by?

3          THE COURT:  How much time do you need?

4          MR. HITT:  Monday, would that be possible?

5          THE COURT:  I am not going to force people to work on

6    the weekend or anything.

7          MR. HITT:  Thank you.  If we could have Thursday of

8    next week just so we have time to vet it with our clients

9    within our office?

10          THE COURT:  Sure.

11          MR. HITT:  Thank you very much, your Honor.

12          THE COURT:  I will take it under advisement.  Thank

13    you.

14          MR. RANDAZZA:  And do you want more from us, your

15    Honor?

16          THE COURT:  Again, I am going to leave it up to you.

17          MR. RANDAZZA:  Just on the level of scrutiny?

18          THE COURT:  Yes, and anything else you think you want

19    to add since we have a little bit of time and I am asking for

20    supplemental briefing, I am not going to stop you from adding

21    anything as long as it's not duplicate.

22          MR. RANDAZZA:  All right.  Thank you.

23

24                    **(A-D-J-O-U-R-N-E-D)**

25

1

2                          - - - - - - - - - - -

3                              CERTIFICATION

4          I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10    /s/Jamie K. Halpin_____    April 7, 2025_____
      Jamie K. Halpin, CRR, RMR, RPR          Date
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25